## IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 1121 PIER VILLAGE, INC, <br> PENN TREATY HOMES, LLC, <br> 2626 FRANKFORD LLC <br> 285 KINGSLAND LLC, <br> 231 E 123 LLC, <br> 193 HANCOCK, LLC <br><br> Debtors | **Chapter 11** <br> **Lead Case No. 21-11466 (ELF)** <br><br> **(Joint Administration Requested)** |
| 1121 PIER VILLAGE, INC, <br> PENN TREATY HOMES, LLC, <br> 2626 FRANKFORD LLC <br> 285 KINGSLAND LLC, <br> 231 E 123 LLC, <br> 193 HANCOCK, LLC <br><br> Plaintiffs <br><br> Vs. <br><br> SHARESTATES INTERCAP LINE, <br> LLC, SHARESTATES INVESTMENTS <br> LLC, ATLANTIS NATIONAL <br> SERVICES, INC., <br> RAYMOND DAVOODI, RADNI <br> DAVOODI, ALLEN SHAYANFEKR <br><br> Defendants | **CHAPTER 11** <br><br><br> **Adversary No. 21-A-00044 (ELF)** |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF PREANSWER MOTION TO DISMISS

Defendants, Sharestates Intercap Line, LLC ("Sharestates Intercap"), Sharestates Investments, LLC ("Sharestates Investments"), Raymond Davoodi, Radni Davoodi and Allen Shayanfekr submit this memorandum of law in support of their PreAnswer Motion to Dismiss (the "Motion") the Plaintiffs' Complaint.

### INTRODUCTION

On May 23, 2021, 1121 Pier Village Inc. ("1121 Pier Village"), Penn Treaty Homes, LLC

("Penn Treaty"), 2626 Frankford, LLC ("2626 Frankford"), 285 Kingsland, LLC ("285

Kingsland"), 231 E 123 LLC ("231 E 123"), and 193 Hancock, LLC ("193 Hancock" and, together

with 1121 Pier Village, Penn Treaty, 2626 Frankford, 285 Kingsland and 231 E 123, collectively,

the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  The Debtors assert in their petitions that they are single asset real

estate entities, as that term is defined in Section 101(51B).  The sole assets each of the Debtors are

parcels of real estate encumbered by one or more mortgages, including mortgages in favor of

Sharestates Intercap or Sharestates Investments (collectively, the "Sharestates Entities").    As

evidenced by the Debtors' schedules and the claims registers in these chapter 11 cases, the

Sharestates Entities were each pre-petition lenders to the Debtors, and advanced loans to the

Debtors over a period of many years, secured by mortgages against the Debtors' assets.

On May 27, 2021, the Debtors filed their Adversary Complaint Seeking Recovery of

Transfers Pursuant to 11 U.S.C. §§ 544, 547, 548 and 550, to Subordinate the Claims of Defendants

Pursuant to Section 510 or for Recharacterization, and to Recover Civil Damages Under State Law

and the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) [ECF No. 1]

(the "Complaint") against the Sharestates Entities, Raymond Davoodi, Radni Davoodi, Allen

Shayanfekr and Atlantis National Services, Inc. ("Atlantis" and, with the other defendants,

collectively, the "Defendants").  Pursuant to the Complaint, the Debtors have assembled a litany

of contradictory and far-fetched claims arising under both the Bankruptcy Code and non-

bankruptcy law, and under theories of contract and tort, which, if successful, would nullify and

avoid the millions of dollars-worth of loans made by the Sharestates Entities to the Debtors over

several years.  Specifically, pursuant to the Complaint, the Debtors assert the following fourteen

claims against Defendants:

(i)     a claim to avoid all mortgages granted in favor of Defendants by 1121 Pier Village pursuant to Section 544 of the Bankruptcy Code (Count I),

(ii)    a claim to avoid all loans, a mortgage modification, a forbearance agreement and a release in favor of one or more of the Defendants as a fraudulent transfer pursuant to Section 548 of the Bankruptcy Code (Count II),

(iii)   a claim to avoid all loans, a mortgage modification, a forbearance agreement and a release in favor of one or more of the Defendants under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S. § 5104(a)(2) *et seq.* ("PUFTA") and the Debtor's "strong arm" powers arising under Section 544 of the Bankruptcy Code (Count III),

(iv)    a claim to avoid all mortgages, a mortgage modification, a forbearance agreement and a release in favor of one or more of the Defendants as a preference under Section 547 of the Bankruptcy Code (Count IV),

(v)     a claim to recover all transfers avoided under the foregoing counts of the Complaint pursuant to Section 550 of the Bankruptcy Code (Count V),

(vi)    a count to equitably subordinate "any claim made by [the Sharestates Entities] or on behalf of the Loans or Mortgages" (Count VI),

(vii)   a claim for lender liability against the Sharestates Entities arising from an alleged breach of contract and/or breach of fiduciary duty (Count VII),

(viii)  a claim for lender liability against the Sharestates Entities arising from an alleged breach of a duty of good faith and fair dealing (Count VIII);

(ix)    a claim against the Sharestates Entities for fraud in the inducement (Count IX),

(x)     a claim against "all Defendants" under the Racketeer Influenced and Corrupt

Organizations Act ("RICO") pursuant to 18 U.S.C. § 1962(c) (Count X),

(xi)     a claim against all Defendants for common law fraud (Count XI),

(xii)    a claim against all Defendants for civil conspiracy (Count XII),

(xiii)   a claim against all Defendants for aiding and abetting (Count XIII), and

(xiv)    a claim against the Sharestates Entities for recharacterization pursuant to section
         105(a) of the Bankruptcy Code (Count XIV).

The Complaint is a 56-page testament to the Debtors' desperate attempts to blame third-parties for their own business choices and financial failures. A critical view of the allegations of the Complaint reveals it to be little more than conclusory statements combined with a regurgitation of the elements of various causes of action the Defendants seek to pursue, with shockingly few well-pled factual allegations. And even taking those few well-pled factual allegations as true, there are fundamental deficiencies in each of the Defendants' claims that necessitate dismissal. To wit:

1. Debtors fail to adequately identify any transfer of value in support of their fraudulent transfer and preference claims that were made during the applicable avoidance periods.

2. Debtors fail to allege facts to support their contention that the Sharestates Entities were "insiders" of the Debtors when the Modification and Forbearance Agreements were executed with the aid of competent counsel, which means no transfers of value were made to the Sharestates Entities during any preference period.

3. Debtors seek to assert claims that pre-date the negotiation and execution of the Modification and Forbearance Agreement which both contain general releases barring those claims. See Exhibit "B" at §5; Exhibit "C" at ¶11. They cannot.

4. The Debtors seek to assert claims that pre-date the Modification and Forbearance

Agreement, notwithstanding the fact that they expressly acknowledged as part of those transactions, with the aid of competent counsel – the same counsel that filed these bankruptcy cases and the Complaint on behalf of these Debtors – they had "no existing defenses, claims, counterclaims, or rights of recoupment or set-off against [the Sharestates Entities] or any affiliated lenders, holding companies or subsidiaries in connection with the negotiation, preparation, execution, performance, or any other matters relating to this Agreement or the Loan Documents." See Compl. at Ex. "C" ¶ 9.

5. Debtors' civil conspiracy claims against the Davoodis and Shayanfekr must be dismissed as a matter of law because these agents, employees, officers and directors cannot conspire with Sharestates and Intercap.

6. The Debtors' civil RICO and fraud claims must be dismissed because the Debtors did not plead those claims with particularity, as required by Fed. R. Civ. P. 9(b).

7. The Debtors' claim for breach of the covenant of good faith and fair dealing must be dismissed because Pennsylvania law doesn't permit an independent cause of action for those claims.

In light of these deficiencies, and the others set forth below, the Debtors have failed to state any claim upon which relief can be granted. For these reasons, and the reasons set forth below, the Complaint must be dismissed in its entirety.

## STATEMENT OF FACTS

It is difficult, if not impossible, to gain an understanding of the relationship between the Debtors and the Defendants from the allegations set forth in the Complaint. While the Complaint manages to convey that one or more of the Sharestates Entities loaned funds to one or more of the Debtors, there are no allegations that set forth the dates those loans were made, the amounts of

those loans, the specific borrowers or guarantors under those loans, or the particular lender that

advanced the loans.  Although the Complaint suggests that the Sharestates Entities loaned "in total,

over $70,000,000 to the Debtors…" and references "over seventy (70) Mortgages on the Projects,"

no loan documents are attached to the Complaint apart from: (i) a Confirmation, Modification and

Ratification to Loan Documents dated August 20, 2020, between Sharestates  Investments (but not

Sharestates Intercap), 1121 Pier Village, and two guarantors of the 1121 Pier Village loans, Saul

Mazor and Alex Halimi (the "Modification"), and (ii) a Forbearance Agreement dated August 20,

2020,  between  the  Sharestates  Entities,  Penn  Treaty,  Saul  Mazor  and  Alex  Halimi  (the

"Forbearance Agreement").  Compl. ¶ 49 (acknowledging loans, in total, over $70,000,000); *Id*. ¶

96 (acknowledging over seventy Mortgages on the projects).

Apart from those two loan documents, there is no description of the loans or mortgages at

issue in the Complaint, or the properties they encumber.  There are no copies of the loan documents

referenced in the Forbearance Agreement or the Modification, and, thus, no way to determine if

the Sharestates Entities acted in accordance with the terms of those loans or if they breached those

contracts, as alleged by the Debtors.   There are, similarly, no allegations that describe the loans

or obligations of those Debtors who were *not signatories* to the Modification or the Forbearance

Agreement – namely, 2626 Frankford, 285 Kingsland, 231 E 123, or 193 Hancock – and how they

are entitled to any relief with respect to the claims made on behalf of all Debtors.  Importantly,

because there are no allegations about when the loans were extended, or mortgages were granted,

it is impossible to gather from the allegations of the Complaint whether claims have been made

within any applicable statute of limitations, or alleged voidable transfers occurred with the time

periods set forth in the Bankruptcy Code and under PUFTA.  While the Complaint certainly seeks

to attribute the Debtors' financial failures to the Sharestates Entities, it in unsuccessful in doing so

in a way that states a valid claim upon which relief can be granted.

In reality, the Sharestates Entities advanced multiple loans to the Debtors and their affiliates over a period of years, beginning as early as 2015. Compl. ¶ 24. The Penn Treaty loans were originally advanced by Sharestates Investments to Penn Treaty as early as November 8, 2017. Forbearance Agreement at 1. The 1121 Pier Village loans were originally advanced by Sharestates Investments to 1121 Pier Village on January 27, 2020. Modification at 1. By August 20, 2020, Penn Treaty had defaulted on its loan obligations to the Sharestates Entities. Forbearance Agreement at 11. The Penn Treaty loans were cross-defaulted with the loans made by the Sharestates Entities to the other Debtors, resulting in defaults under those loans. Compl. ¶ 160. By the time of the Modification and the Forbearance Agreement, the Debtors' operations had ceased, their finances were "destroyed," and their ability to continue as a going concern was so impaired…that the Debtors could not restart operations." *Id.* ¶ 159. The Modification and Forbearance Agreement appear to have been a last-ditch effort to salvage the Debtors' "Project" – and both Penn Treaty and 1121 Pier Village were represented by counsel in those endeavors.[1] Those efforts were ultimately unsuccessful. Still, the failure of the Debtors' businesses is not the fault of the Defendants, and – even if taken as true – the well-pled factual allegations of the Complaint fail to state any valid claim upon which relief can be granted.

### STANDARD OF REVIEW

A motion to dismiss for failure to state a claim is governed by Fed. R. Civ. P. 12(b)(6), made applicable hereto by Bankruptcy Rule 7012(b). When deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all true allegations in the complaint, as well as all reasonable inferences that can be drawn from them. *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d

---

[1] 1121 Pier Village and Penn Treaty were represented by the same law firm who commenced the present action.

Cir. 2018). The Court must further construe the facts in a light more favorable to the non-movant. *Id.* (citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 289, 262, n. 27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts, however, should, not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Distr.*, 132 F.3d 902, 906 (3d Cir. 1997).

## ARGUMENT

**I.    THE COURT SHOULD DISMISS THE DEBTORS' FRAUDULENT TRANSFER AND PREFERENCE CLAIMS**

Four of the fourteen counts of the Debtors' Complaint seek to avoid and recover various transfers made from the Debtors to "Sharestates" – defined by the Debtors to include both Sharestates Investments and Sharestates Intercap. *See* Compl. at 2. No distinction is made in any of the avoidance counts between Sharestates Investments or Sharestates Intercap, and the Debtors make identical allegations with respect to each in those Counts. Specifically, the Debtors asserts that the avoidable "transfers" at issue include all loans, all mortgages, the Modification, the Forbearance Agreement, and a "Lender Release."[2]    Although Counts II, III, IV and V are brought

---

[2] Each of Counts I through V seeks to avoid or recover some combination of the Sharestates Entities' Loans and Mortgages, the Modification, the Forbearance Agreement, and the "Lender Release." *See,* Compl. ¶ 190 (seeking, through Count II, to avoid "the Loan, the Mortgages, Modification, Forbearance Agreement, and the Lender Release" as fraudulent transfers under section 548 of the Bankruptcy Code); *Id.* ¶ 200 (seeking, through Count III, to avoid the "Modification, Forbearance Agreement and… Lender Release" under the PUFTA and section 544 of the Bankruptcy Code); *Id.* ¶ 219 (seeking, through Count IV, to avoid various "Recent Mortgages," the Modification, the Forbearance

by "all Debtors" against the Sharestates Entities, there is no description or detail of any particular transfer made by any specific Debtor to either Sharestates Investments or Sharestates Intercap, the date upon which that transfer was made, the value of that transfer, the form that transfer took, or the method of the transfer. Further, while Counts II, III and IV appear to focus on the Modification and the Forbearance Agreement, several of the Debtors are not even parties to those agreements. *See* Modification at 1 (identifying 1121 Pier Village as the only Debtor signatory to the agreement); Forbearance Agreement at 1 (identifying Penn Treaty as the only Debtor signatory to the agreement).

Finally, the allegations made in support of the fraudulent transfer counts and the preference counts are contradictory, in that the Debtors allege both that the transfers were made for "no consideration" and that they were made on account of an antecedent debt. The preference claims and the fraudulent transfer claims are not pled in the alternative, and the Debtors make no attempt to explain how the same "transfer" can constitute both a preference and a fraudulent transfer.

Rule 8(a) of the Fed. R. Civ. P. requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); Fed. R. Bankr. P. 7008. A complaint must clear "two easy-to-clear hurdles" to satisfy Rule 8(a). *E.E.O.C. v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007); *see also, Padilla v. GMAC Mortgage Corp. (In re Padilla),* 389 B.R. 409, 414 (Bankr. E.D. Pa 2008).

First, the complaint must contain enough information to give the defendant "fair notice" of the claim. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). The complaint need not make detailed factual allegations but there must be at least some facts supporting each element of the claim. *Iqbal*, 556 U.S. at 678.

---

Agreement and Lender Releases as preferential transfers); *Id.* ¶¶ 224-229 (seeking, through Count V, to recover all "transfers" described in Counts I, II, III and IV).

Second, the complaint must plausibly suggest that the plaintiff has a right to relief, raising

that right above the speculative level. *Concentra*, 496 F.3d at 776; *Padilla,* 389 B.R. at 414.

Satisfying this standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me

accusation. A pleading that offers . . . a formulaic recitation of the elements of a cause of action

will not do." *Iqbal*, 556 U.S. at 678. Put another way, "[t]hreadbare recitals of elements of cause

of action, supported by mere conclusory statements, do not suffice." *Id.* Plaintiffs may not "merely

parrot the statutory language of the claims they are pleading . . . rather than providing some specific

facts to ground those legal claims . . . ." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Here, the Debtors have failed to satisfy the requirements of Rule 8(a) with respect to either

the fraudulent transfer claims or the preference claims, and dismissal is warranted with respect to

all three.

### A. The Debtors Fail to Identify Any Avoidable "Transfers" in Counts II and III of the Complaint.

The purpose of the fraudulent transfer provisions in either the Bankruptcy Code or PUFTA

is to protect creditors by preventing a debtor from placing assets otherwise available to pay

creditors out of the reach of those creditors. *Eisenberg v. Pa. State Univ. (In re Lewis),* 574 B.R.

536, 539 (Bankr. E.D. Pa 2017). "At its core, fraudulent transfer is a debt-collection device and

not a revenue generating tool; its mission is to prevent the unjust diminution of the debtor's estate."

*Id.* citing *Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 435 (Bankr. E.D. Pa. 2014). The focus

of the inquiry "must be on the specific transaction the trustee seeks to avoid, *i.e.,* the *quid pro-quo*

exchange between the debtor and the transferee, rather than an analysis of the transaction's overall

value to a debtor as it relates to the welfare of the debtor's business." *Balaber-Strauss v. Sixty-*

*Five Brokers (In re Churchill Mort. Inv. Corp.),* 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000).

In evaluating a fraudulent transfer claim, courts seek to ensure that there is an exchange of property that is a fair equivalent and "not disproportionately small as compared with the value of the property or obligation obtained." *Id.* Courts examine "the value of the goods and services provided, rather than the impact the goods and services had on the bankrupt enterprise." *Carroll v. Stettler,* 941 F. Supp. 2d 572, 582 (E.D. Pa. 2013) (quoting *In re Fin. Federated Title & Trust, Inc.,* 309 F.3d 1325, 1332 (11th Cir. 2002). "[U]nder § 548, in assessing the "value" of property, goods or services provided directly to the debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods, or serviced provided had objective value." *McHenry v. Dillworth (In re Caribbean Fuels Am., Inc.),* 688 F. App'x 890, 894-95 (11th Cir. 2017).

Courts determine the objective value as of the date of the transfers, not on a post-transfer basis that considers whether the purchase was wise or impacted the financial picture of the debtor. *See, e.g., Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (N.D. Ga. 2009) ("Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors."). This is true even when the transaction in question might have ultimately diminished the debtor's bankruptcy estate. Debtors often engage in "improvident purchases or expenditures which have a detrimental effect on creditors and may even be a precipitating cause of bankruptcy." *In re Churchill Mortgage Inv. Corp.,* 256 B.R. at 681. "The fact that transactions may 'exacerbate the harm to creditors and diminish the debtor's estate' from an overall perspective does not mean that the debtor received less than reasonably equivalent value in respect of each particular transaction." *Id.*

Here, Counts II and III of the Complaint fail to adequately identify any "transfer" to any Defendant, much less any fraudulent transfer.   Instead, the allegations of the Complaint seek to

avoid, in the broadest language possible, "the Loans, Mortgages, Modification, Forbearance Agreement" and "Lender Release." Compl. ¶ 181 (seeking to avoid "the Loan, the Mortgages, Forbearance Agreement, and the Lender Release" pursuant to Section 548 of the Bankruptcy Code), *Id.* ¶ 200 (seeking to avoid the "Modification, Forbearance Agreement…[and] Lender Release" pursuant to the PUFTA).  Absent from the Complaint is any factual allegation to support Counts II and III which reference the date of the transfer(s) the Debtors seek to avoid, the amount of the transfer(s), the name of the transferor, or the name of the transferee – in essence the Complaint lacks any  "who, what, when, where or how.  These failures alone warrant dismissal of the claims."  *See Girerum v. Glick, et al. (In re Glick),* 568 B.R. 634, 670 (Bankr. N.D. Ill. 2017). Consistent with this overall lack of specificity, Counts II and III are made against "Sharestates" – which is defined by the Debtors to include both Sharestates Investments and Sharestates Intercap – and it is unclear from the allegations of the Complaint whether Sharestates Investments, Sharestates Intercap, or both, received the alleged fraudulent "transfers" from the Debtors. Similarly confusing is how the Debtors seek to avoid the "Loans" – which the Debtors acknowledge amounted to loans of over $70,000,000 to the Debtors, some of which were made years before the Petition Date – as a "transfer" to the Sharestates Entities.  While the "loans" might have involved transfers, they were transfers of value *to* the Debtors in the form of tens of millions of dollars, in amounts specified by the Debtors in the Complaint, and not transfers to the Sharestates Entities.  To the extent the Debtors contend otherwise, the rules require that the Debtors more-succinctly identify the particular transfers the Debtors now seek to avoid.

Another consequence of the Debtors' failure to identify the alleged fraudulent transfers with any specificity it that it becomes impossible for Defendants or this Court to determine if those alleged "transfers" are avoidable under the applicable law or if they are outside the recovery period.

By way of example, Section 548 of the Bankruptcy Code only permits avoidance of transfers within two years of the Petition Date, yet the Complaint confirms that the Sharestates Entities were making loans to the Debtors outside that window. Thus, it is almost certain that some of the "loans" and "mortgages" the Debtors seek to avoid are outside any avoidance period under Section 548, but the extent to which this is true cannot be ascertained by the Complaint because of the lack of specificity regarding any of the transfers.

**B. The Debtors Fail to Identify Any "Transfers" Avoidable as Preferential in Count IV of the Complaint.**

In Count IV of the Complaint, the Debtors seek to set aside the August 20, 2020, agreement as a preference pursuant to 11 U.S.C. § 547. As the Court is keenly aware, the plain text of the bankruptcy preference statute states that the look back period for non-insider transactions are those transfers that are "made within 90 days of the bankruptcy filing…." 11 U.S.C. § 547(b). Here, the Debtors filed their petitions for bankruptcy on May 23, 2021. Compl. ¶ 5. The Modification and Forbearance Agreement and Lender Releases were granted on August 14, 2020. *Id.* ¶ 215.

Pursuant to Section 547, a debtor may avoid any transfer of an interest of the debtor in property:

> (i)    to or for the benefit of a creditor;
>
> (ii)   for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (iii)  made while the debtor was insolvent;
>
> (iv)   made: (A) on or within 90 days before the date of the filing of the petition; or (B) between 90 days and one year before the date of the filing of the petition if creditor at the time of such transfer was an insider, and
>
> (v)    that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of [the Bankruptcy Code], (B) the transfer had not been made, and (C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

11 U.S.C. § 547(b).  In Count IV of the Complaint, the Debtors have sought to avoid "the Loans, Mortgages, Modification and Forbearance Agreement" and the "Lender Release," as those terms are defined in the Complaint. Compl. at 36 (Count IV prayer for relief).  With respect to each of the foregoing, however, the Debtors fail to plead sufficient facts that, if true, might entitle them to prevail on the preference claim.

### 1.    The Debtors Identify No "Transfers" Within the Applicable Preference Period

As set forth above, for a "transfer" to be avoidable pursuant to Section 547, it must be made within 90 days before the petition date, or "between 90 days and one year before the date of the filing of the petition if creditor at the time of such transfer was an insider."  11 U.S.C. § 547(b)(4). Here, the Debtors filed their petitions for bankruptcy on May 23, 2021. Compl. ¶ 5.  The Modification and Forbearance Agreement and Lender Releases were executed on August 14, 2020.[3] Id. ¶ 215.  The Complaint does not allege the existence of any "transfer" within the standard ninety-day preference period. Thus, to state a claim, Debtors must allege sufficient facts that, if true, would qualify Sharestates as an insider of the Debtors.  The Debtors fail to do so.

"Insiders" are defined by the Bankruptcy Code to include: (i) a director of the debtor, (ii) an officer of the debtor, (iii) a person in control of the debtor, (iv) a partnership in which the debtor is a general partnership, (v) a general partner of the debtor, or (vi) a relative of a general partner, director, officer or person in control of the debtor.   11 U.S.C. §101(31).   Additionally, in light of the statute's use of the term "includes," courts have identified a category of creditors, sometimes called "non-statutory insiders," who fall within the definition but outside of any of the enumerated categories. *Schubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 554 F.3d 382, 395 (3rd

---

[3] The Complaint alleges that both the Modification and Forbearance Agreement were executed on August 14, 2020, but the Modification appears to be dated August 20, 2020.  For purposes of this Motion, Defendants have taken the allegations of the Complaint as true, but reserves all rights to dispute the date the Modification and Forbearance Agreement were executed.

Cir. 2009). A court cannot assign non-statutory insider status to a creditor merely because it finds the creditor and debtor share a close relationship. *U.S. Bank N.A. v. Vill. at Lakeridge, LLC,* 814 F. 3d 993, 1001 (9th Cir. 2016). Instead, "the question is whether there is a close relationship between debtor and creditor and…anything other than closeness to suggest that any transactions were not conducted at arm's length." *In re Winstar Communs., Inc.*, 554 F.3d at 396-7.

Here, there was no close relationship between the Debtors and the Defendants. Defendants do not qualify for any of the statutory relationships enumerated in Section 101(31), and the Debtors do not allege otherwise in the Complaint. Instead, the relationships between these parties were limited to the written agreements between them, which established a creditor-debtor relationship. *In re Winstar Communs., Inc.,* 554 F.3d at 399, *citing Johnson v. NBD Park Ridge Bank (In re Octagon Roofing)*, 124 B.R. 522, 530 (Bankr. N.D. Ill 1991)("It is well established that the exercise of financial control…incident to the creditor-debtor relationship does not make the creditor an insider.").

While the Debtors assert, without factual support, that the Sharestates "exercised its dominant position to force the Debtors into modifications of existing rights on terms that were negotiated at less than arm's length," that allegation, without more, is insufficient to state a preference claim.

First, the question of whether a transaction was at arm's length, is a mixed question of fact and law. *In re Winstar Communs., Inc.,* 554 F.3d at 395. Simply asserting that various transactions between the parties were "negotiated at less than arm's length" does not constitute a well-pled fact sufficient to state a claim. *Iqbal,* 556 U.S. at 678 citing *Twombly,* 550 U.S. at 544 ("Although for purposes of a motion to dismiss we must take all of the factional allegations in a complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").

Moreover, even were Debtors' assertion regarding the lack of arm's length negotiations construed to be something more than a conclusory allegation, the Complaint fails to allege that the transactions occurring on August 14, 2020, including the Modification and the Forbearance Agreement, were not negotiated at arm's length. The language of Section 547(b)(4)(B) clearly states that an insider relationship is to be determined on the *exact date* of the challenged transfer. *Wilen v. Pamrapo Sav. Bank, S.L.A. (In re Bayonne Med. Ctr.),* 429 B.R. 152, 183 (Bankr. D.N.J. 2010). Mere potential to deal at other than arm's length is not enough. *Id.* at 184.

The Complaint does not allege that the Modification and the Forbearance Agreement, or any of the transactions or negotiations between the parties on August 14, 2020, were not negotiated and executed at arm's length. The Debtors cannot make such an allegation as it would be directly contradictory to the provisions of the Forbearance Agreement, a copy of which is attached to the Complaint as Exhibit C, which expressly affirms that Penn Treaty was "fully aware of the terms set forth in the [Forbearance Agreement] and ha[d] had an opportunity to review [the Forbearance Agreement] with an attorney, and ha[d] voluntarily, and without coercion or duress of any kind, entered into [the Forbearance Agreement] intending to be legally bound by its terms." Forbearance Agreement § 10. Given this express representation and warranty, and even assuming, *arguendo*, that the relationship between the parties had, at some point, been sufficiently close to establish something beyond a mere debtor-creditor relationship, there can be no plausible contention by the Debtors that the transactions on August 14, 2020 were executed under duress or not at arm's length. Forbearance Agreement § 10. As such, the Court must as a matter of law conclude that the Sharestates Entities were not insiders of the Debtors on August 14, 2020 when the Modification and the Forbearance Agreement were executed, and any "transfers" arising out of the Forbearance Agreement or Modification, or any transaction on August 14, 2020, are outside the applicable

preference period.[4]

Since the Complaint fails to identify any transactions between the Debtors and the Sharestates Entities other than the Forbearance Agreement or Modification during the year before the petition date, the preference claim must fail in its entirety.[5]

### 2. The Complaint Fails to Adequately Identify the Preferential "Transfers" Debtors Seek to Avoid.

As with Counts II and III, Count IV of the Complaint must also be dismissed because the Debtors fail to identify any particular "transfer" subject to avoidance. Pursuant to Section 101(54) of the Bankruptcy Code, the term "transfer" means:

> (A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (d) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with (i) property, or (ii) an interest in property.

11 U.S.C. § 101(54).

With respect to those transactions that occurred during any conceivable preference period – namely, the Modification, the Forbearance Agreement, the Recent Mortgages and the Lender Release – the Debtors fail to identify any "transfer" which might constitute a preference subject to avoidance.

The Modification and the Forbearance Agreement, taken as a whole, are contracts with

---

[4] The prayer for relief related to Count IV of the Complaint seeks to avoid as preferential the "Loans," the "Mortgages, the "Modification," the "Forbearance Agreement," and the "Lender Release." By the Debtors' own admission, many of these "transfers" the Debtors now seek to avoid arose well-outside any preference period, regardless of Sharestates' insider status, and the Debtors fail to allege any basis to avoid those "Loans" or "Mortgages." *See, e.g.,* Forbearance Agreement, a copy of which is attached to the Complaint as Ex. C, pp. 1-8 (detailing multiple loans and mortgages made by Sharestates to the Debtors between November 2017 and February 2019 – all outside any conceivable preference period – which the Debtors seek to avoid through Count IV).

[5] Count IV of the Complaint makes reference to "Recent Mortgages" which they define as "certain mortgages…granted within a year of the petition date," but fails to include any other information that would allow Sharestates or this Court to identify those Recent Mortgages in any detail, including the property such Recent Mortgages encumber, which Debtor was the mortgagor, which Defendant was the Lender, the particular dates they were granted, or the transactions from which they arise.

rights and obligations due and owing from all parties, not "transfer[s] of an interest of the [Debtors] in property." 11 U.S.C. § 547(b). If some component of those contracts constitutes a transfer an interest of the Debtors in property, in contrast to the contracts in their entirety, the Complaint fails to identify the same. Pursuant to Rule 8 of the Fed. R. Civ. P., the Sharestates Entities must not be made to guess as to what those transfers might be. Without more, the Complaint fails to state a claim.

Similarly, while references to "Lender Releases" or the "Recent Mortgages" might suggest the existence of a "transfer," the Debtors fail to allege other critical elements of a preferential transfer in connection with those "Lender Releases" or "Recent Mortgages." *See* Compl. ¶ 216 (alleging that the "Modification and Forbearance Agreement" were made "on account of the Debtors' antecedent debt, but making no such allegation with respect to the Lender Releases or the Recent Mortgages); *Id.* ¶ 222 (alleging that the "Recent Mortgages and Forbearance Agreement allowed Sharestates…to receive far more than it would have absent these transfers," but making no similar allegation with respect to the Lender Releases).

The Recent Mortgages, in particular, are a mystery in that the Debtor fails to identify those Recent Mortgages in any way, including the dates they were granted, the property they encumbered, or other basic details of the transactions from which they arose. In this way, Count IV of the Complaint fails to allege even rudimentary elements of its cause of action, much less well-pled facts that support a valid preference claim.

### 3. The Complaint Fails to Identify Any "Transfer" that Permitted the Sharestates Entities to Recover More Value Than They Would Have, Absent the Transfers

As set forth above, in order to state a valid preference claim, the Debtors must allege that a "transfer" permitted the Sharestates Entities to "receive more than such creditor would receive

if…the transfer had not been made…."  11 U.S.C. §547(b)(5).  The Complaint only alleges this

element with respect to two alleged "transfers":  (i) the Recent Mortgages, and (ii) the Forbearance

Agreement.  Compl. ¶ 222.  As detailed above, the Complaint does not identify any mortgages

granted by the Debtors or recorded by any Defendant within the preference period.  Similarly, the

Forbearance Agreement is a contract, not a "transfer," as that term is defined in Section 101(54)

of the Bankruptcy Code.  Yet, even were Defendants to speculate about what the Debtors might

have identified as a "transfer" within the Forbearance Agreement – something Sharestates should

not be obligated to do under Rule 8 of the Fed. R. Civ. P. – the Sharestates Entities are unable to

identify any such transfer of value contained therein.

The Debtors have referenced in their allegation certain "Lender Releases," but have failed

to identify any value associated with those releases.  Instead, the express language of the

Forbearance Agreement confirms that no claims existed that might have conferred value upon the

execution of any release.  Specifically, the Forbearance Agreement contains an express

representation that "as of the Effective Date, there are no existing defenses, *claims, counterclaims,

or rights of recoupment or set-off against [the Sharestates Entities] or any affiliated lenders,

holding companies or subsidiaries* in connection with the negotiation, preparation, execution,

performance or any other matters relating to [the Forbearance Agreement] or the Loan

Documents."  Forbearance Agreement § 9 (emphasis added).  Given the foregoing, even were this

Court to characterize the release as a potential transfer, it is a transfer without value, because the

claims covered by the release did not, by Debtor Penn Treaty's own admission, exist.


**II.    THE COURT SHOULD DISMISS ALL TORT AND CONTRACT CLAIMS
         BECAUSE OF THE MODIFICATION AND FORBEARANCE AGREEMENT.**

The Court should dismiss Count VII (equitable subordination), Count VIII (breach of good

faith and fair dealing), Count IX (fraud in the inducement), Count X (civil RICO), Count XI (fraud), Count XII (civil conspiracy), Count XIII (aiding and abetting), and Count XIV (recharacterization) because of the releases that are contained in the agreements attached to the Complaint as Exhibits "B" and "C," and the express representation in the Forbearance Agreement that no claims existed as of August 2020.

A release is an affirmative defense that must be asserted in a responsive pleading. Fed. R. Civ. P. 8(c). The law of the Third Circuit, however, permits a party to submit a defense by motion if it is apparent on the face of the complaint that no development of the record is necessary. *Rycoline Products, Inc. v. C & W Unlimited,* 109 F. 3d 883, 886 (3d Cir. 1997). Here, like *PPG Indus., Inc. v. Generon IGS, Inc.,* 760 F. Supp. 2d 520, 525 (W.D. Pa 2011), the Court considered a release that was attached to the complaint at the motion to dismiss stage.

The enforceability of the agreements attached to the Complaint are determined in accordance with contract law. It is well settled that for an enforceable contract to exist, there must be a "meeting of the minds," whereby both parties mutually assent to the same thing, as evidenced by an offer and its acceptance." *Lal v. Amerquest Mortg. Co.,* 2004 PA Super 302, ¶ 11, 858 A.2d 119, 123. This is basic contract law.

The consideration for the Forbearance Agreement is set forth on its face. The Debtors admitted that all nineteen loans were in default at the time the Forbearance Agreement was negotiated and executed.[6] Moreover, the Forbearance Agreement sets forth that in consideration

---

[6] The Forbearance Agreement sets forth: "**WHEREAS**, [Penn Treaty], Mazor and Halimi admit, warrant and represent that they have defaulted on their obligations to Sharestates by failing to satisfy the balances due by the maturity dates for the loans secured by Units 10 through 19, and by failing to make the monthly interest payments for the months of June and July 2020 and owe the fund due under Notes 10 through Note 19 thereof as set forth herein above and admit, warrant and represented that Lender is entitled to exercise its rights and remedies under the Loan Documents" and "**WHEREAS**, [Penn Treaty], Mazor and Halimi admit, warrant and represent that they have defaulted on their obligations to [Sharestates Intercap] for the loans secured by Units 1 through 9 by failing to make the monthly interest payments for the months of June and July 2020 and owe the funds due under Notes 1 through Note 9 thereof as set forth herein above and admit, warrant and represent that Lender is entitled to exercise its rights

for those Debtors and Guarantors executing it, Debtors and Guarantors would receive value including:

1. **Forbearance**.    Sharestates and Intercap agree to forbear from exercising their respective rights and remedies under the Loan Documents during the applicable period commencing on the execution of this Forbearance Agreement and ending on the earlier of (a) September 1, 2020 or (b) the date on which any terminating event or default occurs;

2. **Payment Deferral**.    Sharestates and Intercap agree to defer the outstanding interest payments on Amended Notes 1-9 and Notes 10-19 for the months of June 2020, July 2020 and August 2020 ("Accrued Interest").    The Accrued Interest shall be due and payable at the time of the acceleration of the amount due or payoff.

3. **Maturity Extension**.    Sharestates extends the Maturity Dates on Notes 10 through 19 from June 30, 2020 to February 28, 2021, and on Notes 1 through 9 to February 28, 2021, at which time all amounts due shall be due and payable without further extension.

*Forbearance Agreement,* at §§ 2-4 (Compl. at Ex. "C").    As the Court is keenly aware, when a creditor gives a defaulting debtor extra time to make payments and a promise not to exercise its rights, it gives that debtor consideration. *Third Nat' l Bank & Tr. Co. v. Rodgers*, 330 Pa. 523, 526, 198 A. 320, 321 (1938) (stating that the promise to forbear from exercising a legal right is consideration); *Cardamone v. Univ. of Pittsburgh*, 253 Pa. Super. 65, 72 n.6, 384 A.2d 1228, 1232 (1978)(holding that "valid consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise bargained for and given in exchange for the original promise).

---

and remedies under the Loan Documents."

Here, pursuant to the Modification, in or about August of 2020, nine months prior to the

commencement of this proceeding, the parties reached a settlement or a meeting of the minds.

Among other things, the parties agreed to the following:

SECTION 5.  RELEASE OF LENDER

Section 5.1.    Borrower and/or Guarantors, and all of their respective heirs,
personal representatives, predecessors, successors, and assigns (individually and
collectively, the "*Releasors*"), hereby fully release, remise, and forever discharge
Lender, its holding company  and all other affiliates, subsidiaries and predecessors
of Lender, and all past and present officers, directors, agents, employees, servants,
partners, shareholders, attorneys, and managers of Lender ("Lender Released
Parties"), for, from, and against any and all claims, counterclaims, liens, demands,
causes of action, controversies, offsets, obligations, losses, damages, and liabilities
of every kind and character whatsoever, including without limitation any action,
omission, misrepresentation, or other basis of liability founded either in tort or
contract and the duties arising thereunder, that the Releasors, or any one or more of
them, has had in the past, now has, whether known or unknown, whether asserted
or unasserted, by reason of any matter, cause, or thing set forth in, relating to, or
arising out of, in any way connected with or resulting from this Agreement or the
Loan Documents, and any documents related to the Loan Documents or any other
Loan Documents or transactions between Borrower and/or Guarantors and lender
related parties.  This release provision is not intended to release the Lender from
any obligations or claims relating to this Modification or any for any claims arising
after the execution of this Modification.

Modification §5.1 (Compl. at Ex. "B").

In addition, the Forbearance Agreement contains the following provisions:

**9.      No Defenses.**  Borrower and Guarantors hereby confirm and affirm that, as
of the Effective Date, there are no existing defenses, claims, counterclaims, or
rights of recoupment or set-off against Sharestates, Intercap or any affiliated
lenders, holding companies or subsidiaries in connection with the negotiation,
preparation, execution, performance, or any other matters relating to this
Agreement or the Loan Documents.  Borrower and/or Guarantors further
acknowledge and agree that, notwithstanding anything to the contrary set forth in
this Agreement, neither Sharestates nor Intercap have any obligation to further
amend the Loan Documents, or enter into any other instruments, agreements, or
documents regarding any of the same with Borrower and/or Guarantors and that
Sharestates, Intercap or their representatives have not made any agreements with,
or commitments or representations or warranties to, Borrower and/or Guarantors,
either in writing or orally, other than those as expressly stated in this Agreement.

9.    **No Coercion or Duress.**    Borrower and/or Guarantors each hereby represent and warrant that they are fully aware of the terms set forth in this Agreement and have had an opportunity to review this Agreement with an attorney, and have voluntarily, and without coercion or duress of any kind, entered in this Agreement intending to be legally bound by its terms.

10.    **Release of Lenders.**    Borrower and/or Guarantors, and all of their respective heirs, personal representatives, predecessors, successors, and assigns (individually and collectively, the "*Releasors*"), hereby fully release, remise, and forever discharge Sharestates and Intercap, the holding company of each, and all other affiliates, subsidiaries and predecessors of Sharestates or Intercap, and all past and present officers, directors, agents, employees, servants, partners, shareholders, attorneys, and managers of Sharestates or Intercap ("Lender Released Parties"), for, from, and against any and all claims, counterclaims, liens, demands, causes of action, controversies, offsets, obligations, losses, damages, and liabilities of every kind and character whatsoever, including without limitation any action, omission, misrepresentation, or other basis of liability founded either in tort or contract and the duties arising thereunder, that the Releasors, or any one or more of them, has had in the past, now has, whether known or unknown, whether asserted or unasserted, by reason of any matter, cause, or thing set forth in, relating to, or arising out of, in any way connected with or resulting from this Agreement or the Loan Documents, and any documents related to the Loan Documents or any other Loan Documents or transactions between Borrower and/or Guarantors and lender related parties.

Forbearance Agreement §§ 9-11 (Compl. at Ex. "C").

In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language. *Taylor v. Solberg*, 566 Pa. 150, 155, 778 A.2d 664, 667 (2001). Parties with possible claims may settle their differences upon such terms as are suitable to them. *Buttermore v. Aliquippa Hosp.*, 522 Pa. 325, 329, 561 A.2d 733, 735 (1989). Here, the language of the Releases is clear and unambiguous. It is in writing. The Debtors were represented by the same counsel who filed this proceeding about those contracts. With respect to Penn Treaty and 1121 Pier Village, clearly, there was a meeting of the minds. The Court should as a matter of law enforce these clear and unambiguous releases and dismiss all claims against Sharestates as a matter of law.

Further, although all "Debtors" are named as claimants under Counts VI, VII, VIII, IX, X,

XI, XII, XIII and XIV, the only facts alleged therein appear to be made with respect to Penn Treaty

and 1121 Pier Village.  There is no recognition in the Complaint that the Debtors are separate

entities, with distinct collateral, that each entered into their own loans with the one or more of the

Sharestates Entities at different times and as part of different transactions.[7]  The Debtors have not

sought substantive consolidation, and remain distinct legal entities, yet the Complaint consistently

refers to the Debtors on a consolidated basis, and fails to make anything more than a passing

reference to 2626 Frankford, 285 Kingsland, 231 E 123 or 193 Hancock.    To the extent any

Debtor other than Penn Treaty or 1121 Pier Village asserts claims under these nine counts, those

claims are not supported by any well-pled fact, and do not meet the requirements of Fed. R. Civ.

P.  8 or 9(b).

### III.    THE COURT SHOULD DISMISS THE CIVIL CONSPIRACY CLAIMS BECAUSE A CORPORATION CANNOT CONSPIRE WITH ITS OFFICERS, DIRECTORS, AGENTS OR EMPLOYEES.

The Court should dismiss the Civil Conspiracy claim in Count XII as a matter of law

because a corporation cannot conspire with its agents, employees, officers, directors, or legal

counsel.  In order to state a cause of action for civil conspiracy under Pennsylvania law, a

complaint must allege the existence of all elements necessary to such a cause of action.

*Rutherfoord v. Presbyterian-University Hosp.*, 417 Pa. Super. 316, 333-34, 612 A.2d 500, 508

(1992).  To state a claim for civil conspiracy:

> It must be shown that two or more persons combined or agreed with intent to do
> an unlawful act or to do an otherwise lawful act by unlawful means.   Proof of
> malice, *i.e.* an intent to injure, is an essential part of a conspiracy cause of action;
> this unlawful intent must also be without justification.  Furthermore, a conspiracy
> is not actionable until some overt act is done in pursuance of the common purpose
> or design, and actual legal damage results.

---

[7] To emphasize this point, Count VII of the Complaint refers repeatedly to the "Loan contract" or the "Loan" without recognizing that there were many loans between the Sharestates Entities and the Debtors, each of which was largely independent but for the cross-default provisions.

*Id.*  It is well settled, under Pennsylvania law, that an "entity cannot conspire with itself and similarly, agents of a single entity cannot conspire among themselves."  *Rutherfoord v. Presbyterian-University Hosp.*, 417 Pa. Super. 316, 333-34, 612 A.2d 500, 508 (1992).  Here, Debtors' Complaint alleges that "Sharestates is upon information and belief, a New York Limited liability company, owned and controlled by Raymond Davoodi ('Ray'), and Radni Davoodi ('Radni' with Ray, 'Davoodis'), as well as Allen Shayanfekr ('Shayanfekr')."  Compl. ¶ 13.  Moreover, the Complaint alleges, "the Davoodis and Shayanfekr are the individuals in control of the operations and finances the [sic] Defendants Sharestates and Title [Atlantis]" and "the actions taken by Sharestates and Title were taken at the behest of and direction of Davoodis and Shayanfekr."  Compl. ¶¶ 14-15.  The Complaint alleges that the Defendants engaged in a civil conspiracy, orchestrated by the Davoodis and Shayanfekr:

1.  "unlawfully seiz[ed] control of the Debtors' properties and operations by committing to loans it was not in a position to make, or the Debtors in a position to repay";

2.  "remove[d] all of the equity in the Debtors' companies, leav[ing] them in a state of undercapitalization, and without finances, in order to obtain the assets through foreclosure";

3.  "were aware of the frailty of the Debtors' capital structure, and knew that the loans being made could not be repaid";

4.  "had a secret and undisclosed agreement to take the Debtor's projects by burdening the Debtor's finances with high interest rate obligations, to violating the loan agreements, delay funding, and charge excessive interest and other charges to the Debtors for title insurance."

Compl. ¶¶ 363-366.  Because the Davoodis and Shayanfekr were acting on behalf of Sharestates and Title in their respective roles with those entities the civil conspiracy claim fails as a matter of law.

Further, to the extent the Debtors allege some claim for civil conspiracy arises out of the conduct of any Defendant other than the Davoodies and Shayanfekr, they have not adequately

alleged the same.    Nowhere in the factual allegations supporting Count XII are the Sharestates

Entities or Title even mentioned by name, nor are any of the Debtors.  Although the Debtors refer

to an "unlawful scheme and conspiracy" on two different occasions within the allegations of Count

XII, they fail to identify any details of the alleged scheme or conspiracy with any specificity.

Critically, they also fail to allege that any Defendant acted with malice or intent to injure, an

"essential part" of any civil conspiracy claim.  *Rutherford,* 417 Pa. Super. at 333.

        A careful review of the Complaint demonstrates that there is no specific act or event

identified by the Debtors as the basis for Count XII, nor is there any hint provided by the Debtors

with respect to when this conspiracy took place.  In their prayer for relief, the Debtors refer to

Defendants' "fraudulent activities" but fail, yet again, to identify any "who, what, when, where or

how" of the alleged fraud.    Finally, even were such allegations supported by well-pled facts, the

Debtors have not identified damages incurred by any Debtor as a result of any action by

Defendants.   As it stands, none of the Debtors' properties or operations have been "seized" – the

Debtors remain in possession and control of the same.  *Complaint,* ¶ 363.  The Debtors equity-

holders remain in control of the Debtors' companies, and the Debtors do not suggest otherwise.

*Id,* ¶ 364.  If facts exist that would entitle the Debtors, or any one of them, to state a civil conspiracy

claim, those facts have not been pled in the Complaint.


**IV.    THE CIVIL RICO CLAIM MUST BE DISMISSED AS A MATTER OF LAW.**

        Civil RICO prohibits conducting an "enterprise's affairs through a pattern of racketeering

activity."  18 U.S.C. §1962.  A plaintiff must plead the following to assert a proper RICO violation:

"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Lum v. Bank

of Am.,* 361 F.3d 217, 223 (3d. Cir. 2004).  The phrase "racketeering activity," is defined in terms

of activity that violates other laws, including more than fifty (50) specifically mentioned federal statutes, which forbid, for example, murder-for-hire and extortion.  See 18 U.S.C. § 1961(1); *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 183 (1997).  Although RICO is generally criminal in nature, it also provides for civil remedies.  Here, the Court should dismiss Debtors' civil RICO claims because: (1) they fail to allege a RICO enterprise; (2) alternatively, the Debtors should provide a more definite statement in the form of a RICO case statement; and (3) they fail to set forth racketeering activities.

One of the crucial assertions that a plaintiff in a RICO action must plead is the existence of an "enterprise."  RICO defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union of group of individuals associated in fact although not a legal entity." 18 U.S.C § 1961(4).

The United States Supreme Court has explained that "an enterprise" is not a "pattern of racketeering activity" but an entity separate and apart from the pattern of activity in which it engages."  *United States v. Turkette*, 452 U.S. 576, 577 (1981).

Here, the Debtors have failed to allege the existence of an enterprise. The Third Circuit Court of Appeals has held in order to establish a RICO enterprise the following must be presented: "evidence of an ongoing organization, formal or informal and evidence that the various associates function as a continuing unit.  In addition, the enterprise must be shown to have an existence separate and apart from the pattern of activity of which it engages."  *United States v. Riccobene,* 709 F.2d 214, 221 (3d. Cir. 1983, overruled on other grounds, *Griffin v. United States,* 502 U.S. 46 (1991).  In *McClure Enters v. Fellerman,* 2007 U.S. Dist. LEXIS 35374 * 9-10 (M.D. Pa. 2007), the Court dismissed a civil RICO where, as is the case here, that the Plaintiffs/Debtors had "not alleged a structure to the organization beyond which was inherent in the alleged acts of

racketeering activity." (quoting *Chang v. Chen*, 80 F.3d 1293, 1300 (9th Cir. 1996)).

In addition, the Debtors did not plead sufficient facts as required to set forth a Civil RICO claim.  Under Fed. R. Civ. P. 9(b), the pleading requirements are heightened.  *Bonavitacola Elec. Constr., Inc. v. Boro Developers, Inc.,* 87 Fed. Appx. 227, 231 (3d Cir. 2003).  To sufficiently plead the requisite "pattern of racketeering activity," a RICO plaintiff must allege predicate acts that are related and amount to or pose a threat of continued criminal activity.  *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989).  Here, the Debtors have not plead any of the requisite elements required to meet the heightened pleading standard required to maintain a Civil RICO action.  The Complaint does not allege any "racketeering activities." Moreover, it does not allege a criminal enterprise or predicate acts.  Hence, the Court should dismiss RICO claim in Count X.

## V.    DEBTORS COMPLAINT DOES NOT PLEAD FRAUD WITH PARTICULARITY.

Debtor's complaint does not plead fraud with particularity.  In order to comply with Fed. R. Civ. P 9(b) the Debtors were required to plead with particularity "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786 (3d Cir. 1984), cert. denied, 469 U.S. 1211 (1985).  Here, the Debtors have failed to provide specifics with respect to the fraud (and Civil RICO) claims.  Rather, they generally allege fraud.  They have not satisfied the heightened pleading standard required to set forth a fraud claim in Counts IX, X or XI.  As such, these fraud claim should be dismissed as a matter of law.

## VI.    PENNSYLVANIA DOES NOT ALLOW A COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM SEPARATE FROM A BREACH OF CONTRACT CLAIM.

Pennsylvania courts have made clear – and the Third Circuit Court of Appeals has recognized – that Pennsylvania does not allow for an action for breach of the covenant of good faith and fair dealing as an independent cause of action. *Landam v. Wal-Mart Real Estate Bus. Trust,* 775 Fed. Appx. 39 (3d Cir. 2019); *David v. Wells Fargo,* 824 F.3d 333, 352 (3d Cir. 2016) (affirming dismissal of plaintiff's good faith and fair dealing claim upon defendant's Rule 12(b)(6) motion to dismiss on the basis that Pennsylvania does not allow an independent action for breach of the covenant of good faith and fair dealing).

Count VIII of Debtors' Complaint asserts a stand-alone Breach of the Covenant of Good Faith and Fair Dealing. Because Pennsylvania does not recognize that claim as a stand-alone cause of action, it must be dismissed as a matter of law.

## VII.    THE MORTGAGES AGAINST 1121 PIER VILLAGE ARE NOT AVOIDABLE UNDER SECTION 544 OF THE BANKRUPTCY CODE.

Count I of the Complaint seeks to avoid all of the mortgages securing the loans made to 1121 Pier Village (collectively, the "1121 Pier Mortgages") pursuant to Section 544 of the Bankruptcy Code. On October 11, 2019, 1121 Pier Village caused the Declaration of Pier Village, a Planned Community (the "Planned Community Declaration") to be executed, pursuant to which it set forth legal descriptions, plats and plans for a planned community (the "Planned Community") consisting of fifty-seven (57) units (each a "Unit" and, collectively, the "Units"). The Planned Community Declaration, a copy of which is attached hereto as Exhibit A, was recorded December 3, 2019, as Document No. 53599390, and is a matter of public record. As such, it may be considered by this Court as part of the motion to dismiss. *Padilla,* 389 B.R. at 414 ("[i]n assessing a Rule 12(b)(6) motion to dismiss, a court may consider the allegations in the complaint, exhibits attached to the complaint and matters of public record.") (internal citations omitted).

In the Complaint, the Debtors assert that "no units actually exist at the Pier Village Project." Compl. ¶ 174.  While there may not be completed physical improvements on the property – in the form of walls and floorboards – the Debtors' assertion is incorrect as the real property records recognize separate and legally distinct units designated by, among other things, unique parcel identification numbers.  "Pier Village" was validly created as "planned community" under the PA Uniform Planned Communities Act, 68 Pa.C.S. §§5101 – 5414 (the "Act"), by the adoption and recording of the Planned Community Declaration in the Philadelphia County real estate recording offices.

There is no well-pled factual allegation in the Complaint, in support of Count I, or otherwise, which suggests that the real property was not divided into individual units in accordance with the Planned Property Declaration and the Act.  To the contrary, the Complaint merely suggests that physical improvements had not yet been built, which is insufficient to state a claim for relief under Section 544 of the Bankruptcy Code.  As a matter of law, the 1121 Pier Mortgages have each attached to legally-recognized unique parcel identification numbers that delineate the interest in a particular Unit within the Planned Community, regardless of the existence of any physical structure.

## VIII.    THE DEBTORS HAVE FAILED TO STATE A CLAIM FOR RECHARACTERIZATION

Finally, Count XIV of the Complaint seemingly seeks to recharacterize all of the Sharestates Entities' loans from debt to equity.

The inquiry in a recharacterization claim is whether "a debt actually exists." *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.),* 432 F.3d 448, 454 (3d Cir. 2006).  In defining a recharacterization inquiry, courts "attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else." *Id.* at 456.  "Which course a court

discerns is typically a commonsense conclusion that the party infusing funds does so as a banker
(the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds
are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; therefore,
the funds are debt). *Id.* "[T]he determinative inquiry in classifying advances as debt or equity is
the intent of the parties as it existed at the time of the transaction." *Id.* at 457.

No particular loan is highlighted by any of the allegations in support of the
recharacterization claim, and there is no recognition of any separation or distinction between the
Sharestates Entities, the Debtors, the properties or projects in Pennsylvania or New York, or the
loans. Instead, the Debtors merely suggest that "[the Sharestates Entities]…intended to take an
equity-like interest in the overall Debtor affiliate group, not a debt-like interest." Compl. ¶ 382.

Notably, none of the allegations in the Complaint suggest that the Sharestates Entities only
expected to be repaid based "on the borrower's fortunes." Instead, the Debtors acknowledge that
each of the loans had a fixed maturity date and accrued interest, each was secured by a mortgage,
and that the Sharestates Entities pursued defaults under the loans. Compl. ¶ 96 (referencing interest
accrual under the loans); *Id.* ¶ 376 (referencing maturity dates); *Id.* ¶ 379 (referencing the
Sharestates Entities pursuit of defaults). Each of these facts is inconsistent with the notion that the
Debtors and the Sharestates Entities contemplated an equity contribution and not a loan, much less
in the form of more than 70 separate promissory notes secured by 70 separate mortgages.
*Complaint,* ¶ 64. Further, absent the single conclusory statement that the Sharestates Entities
"intended to take an equity-like interest," the Complaint is void of any fact that would support
recharacterization.

Here, the Debtors have made broad and conclusory statements that jumble together loans,
lenders, Debtors and time periods, but fail to identify any particular transaction that was intended

by the parties to constitute an equity contribution at the time it was made.  Or at any other time. In this way, the Complaint fails to state a recharacterization claim with respect to any particular loan.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Honorable Court grant Sharestates Intercap Line, LLC ("Sharestates Intercap"), Sharestates Investments, LLC ("Sharestates Investments"), Raymond Davoodi, Radni Davoodi and Allen Shayanfekr pre-answer motion to dismiss.

Respectfully Submitted,

STARK & STARK, P.C.

Date:    August 27, 2021                By: _____
SCOTT I. UNGER, ESQ.
Attorney I.D. No.   93231
777 Township Line Road, Ste. 120
Yardley, PA 19067-5559
tel. 267.907.9600/fax 267.907.9659
*Attorneys for Defendant,*