**IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

---------------------------------------------------

| | | |
|---|---|---|
| **1121 PIER VILLAGE LLC,** | : | **Chapter 11** |
| **PENN TREATY HOMES LLC,** | : | |
| **2626 FRANKFORD LLC,** | : | **Lead Case No. 21-11466 (ELF)** |
| **285 KINGSLAND LLC,** | : | |
| **231 E 123 LLC,** | : | |
| **193 HANCOCK LLC,** | : | |
| | : | **(Joint Administration Requested)** |
| **Debtors.** | : | |

---------------------------------------------------:

| | | |
|---|---|---|
| **1121 PIER VILLAGE LLC,** | : | **Chapter 11** |
| **PENN TREATY HOMES LLC,** | : | |
| **2626 FRANKFORD LLC,** | : | |
| **285 KINGSLAND LLC,** | : | |
| **231 E 123 LLC,** | : | |
| **193 HANCOCK LLC,** | : | |
| | : | |
| **Plaintiffs,** | : | **Adversary No.** |
| | : | |
| **v.** | : | |
| | : | |
| **SHARESTATES INTERCAP LINE,** | : | |
| **LLC, SHARESTATES INVESTMENTS** | : | |
| **LLC, RAYMOND DAVOODI, RADNI** | : | |
| **DAVOODI, ALLEN SHAYANFEKR,** | : | |
| | : | |
| **Defendants.** | : | |

-----------------------------------------------------

## FIRST AMENDED ADVERSARY COMPLAINT

Plaintiffs 1121 Pier Village LLC ("Pier"), Penn Treaty Homes LLC ("Penn Treaty"), 2626

Frankford LLC ("Frankford"), 285 Kingsland LLC ("Kingsland"), 231 E 123 LLC ("123rd"), 193

Hancock LLC ("Hancock"), (collectively with Pier, Penn, Frankford, Kingsland, Hancock and

123rd, the "Debtors" or "Plaintiffs"), by and through proposed special counsel Obermayer

Rebmann Maxwell and Hippel LLP hereby bring this First Amended Adversary Complaint against

defendants Sharestates Intercap Line LLC ("Intercap"), Sharestates Investments LLC

("Investments", collectively with Intercap, "Sharestates") and their principals Raymond Davoodi

("Ray"), Radni Davoodi ("Radni" together with Ray, the "Davoodis"), and Allen Shayanfekr

("Shayanfekr" collectively with Sharestates and the Davoodis, the "Defendants"), and allege as

follows:

## I.    PRELIMINARY STATEMENT

1.      The Debtors in this case are an affiliate group that originally developed smaller-

multi-unit residential real estate projects, financed by construction lending from Sharestates.

Sharestates, through its principals the Davoodis and Shayafekr, represented itself to the Debtors

as a traditional construction lender.  It was actually a crowdfunding platform that promised

investors 8-12% annual interest, and did not have the liquidity to make disbursements it was

committed to make.

2.      Starting in 2017, the Debtors had an opportunity to develop substantially larger and

more profitable projects on the Delaware River known as Pier Village (the "Pier Village Project")

and Penn Treaty (the "Penn Treaty Project" together with the Pier Village Project the "Projects").

Because of their existing lending relationship, and the representations made by Defendants that

Sharestates could fund the Projects, the Debtors obtained construction funding from Sharestates.

Sharestates also reneged on its commitment to refinance the Stewart parcel, leading to a potential

loss of that property.

3.      Sharestates was now attempting to lend far beyond its means, and did not have the

liquidity to fund the Projects.  Instead, Sharestates delayed funding, demanded payments under its

cross default provisions, from entities not liable on the loans, manufactured defaults and loaded

Project financing with fees and charges to meet its obligations to investors.

4.      Sharestates intentionally delayed disbursements it was unable to make by falsely

claiming defaults or lack of documentation.  When even this strategy failed, Sharestates demanded

that the Debtors take loan disbursements to pay interest on other Debtors' loans, or all loans would be defaulted and all projects would fail.

5.      Even this was insufficient for Sharestates' investor-driven needs.  Sharestates then used its position of complete dominance over the Debtors' finances to change the draw process for the loans, in violation of the contract.  Sharestates forced the Debtors into a forbearance and modification of some existing debt in order to obtain protective releases for their past misconduct. These modifications and forbearances were illusory, as they were structured to favor only Sharestates, release Sharestates from existing liability and still inevitably cause the complete failure of the Debtors' projects.

6.      The Debtors' projects stalled, and necessitated the instant bankruptcy.  The Debtors now seek recovery of the damages caused by the Defendants' fraud and breaches of contract, as well as avoidance of releases extracted without reasonably equivalent value.

## II.      PROCEDURAL BACKGROUND

7.      On May 23, 2021 (the "Petition Date"), the Debtors, and each of them filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Code") in this Court.  These cases are jointly administered.

8.      Since the Petition Date, the Debtors have been operating as Debtors in possession, in custody and control of their respective assets and businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## III.      JURISDICTION AND VENUE

9.      The Debtors, and each of them are "debtors in possession".

10.     The Debtors Penn Treaty, Pier and Frankford have their principal assets located in or within the jurisdiction of this court.  The cases of Kingsland, 123rd and Hancock, are affiliate Debtor cases, with principal assets in the City of New York.

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334, and Sections 510, 544 and 548 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), as well pursuant to the Pennsylvania Uniform Voidable Transfer Act, 12 Pa.C.S. §5101, et seq. ("PUVTA"), and this court's "related to" jurisdiction.

12.     This suit contains both core matters under 28 U.S.C. §157(b)(2)(F),(H) and (K), and non-core matters, properly before this court under its "related to" jurisdiction under 28 U.S.C. §157(b)(1).

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The Debtors consent to final orders by this court.

15.     Defendant Sharestates is upon information and belief, a New York Limited liability company, owned and controlled by Raymond Davoodi ("Ray"), and Radni Davoodi ("Radni" with Ray, the "Davoodis"), as well as Allen Shayanfekr ("Shayanfekr").   Upon information and belief, Shayanfekr is an attorney licensed to practice in the State of New York.

16.     Defendants the Davoodis and Shayanfekr are, upon information and belief, residents of the State of New York.

OMC\4834-7168-7935.v2-10/18/21

IV.    **FACTUAL BACKGROUND**

A.    The Debtors' Business and Projects

17.    The Debtors are single-purpose limited liability companies engaged in the development of residential real estate for rental and sale.

18.    Alex Halimi ("Halimi") and Saul Mazor ("Mazor" with Halimi the "Principals") are the principals of the Debtors' members, and the managers of the Debtors' day-to-day operations.

19.    Debtors Hancock, 123 and Kingsland and non-debtor affiliates obtained secured construction financing from Sharestates starting in 2015 for several projects located in New York. These projects were smaller multi-unit properties of less than 12 units.

20.    While engaged in these small-scale projects with Sharestates, the Debtors had opportunity to develop much larger projects: the Penn Treaty Project and Pier Village Project.

21.    The Penn Treaty Project and the Pier Village Project are located on Delaware Avenue, on the Delaware River, near the Rivers (formerly the Sugar House) Casino. The developments were purchased at different times with the Penn Treaty Project being acquired first.

22.    The Pier Village Project is a residential project, and originally consisted of fifty-seven (57) high-end residential units with prices starting at $1,500,000.00, with the potential for more.

23.    The Penn Treaty Project is directly next door, and consists of nineteen (19) high-end residential units overlooking Penn Treaty Park and the Delaware River.  Prices for these units start at $1,500,000.00.

24.    Because of their prior relationship, the Debtors approached Sharestates about funding the Projects.

25.    Sharestates provided acquisition funding for the Projects via loans secured by a mortgages, with the intent to refinance these loans into open-ended construction loans to fund development.

26.    The Debtors would not have borrowed the acquisition funding from Sharestates without the commitment from Sharestates to provide future construction funding.

27.    The Debtors did not have sufficient cash flow for construction apart from loan proceeds.

28.    Due to the complex nature of the Projects, and the Debtors' working capital needs, it was important that the moneys to finance the Projects were available and ready for use, as delays in the developments would be catastrophic.

29.    Sharestates expressed interest and assured the Principals that it had the present ability to fund the Debtors' cash needs to complete the Projects and finish funding the Hancock, 123 and Kingsland projects.

30.    Sharestates, through the Davoodis and others, including Shayanfekr, represented that they had the capacity and ability to timely and fully fund disbursements under the proposed loans for the Projects.

31.    The Debtors justifiably relied upon the representations by Sharestates, the Davoodis and Shayanfekr, as to the ability to fund fully and timely, the Debtors' obligations at the Projects.

32.    In reliance on these representations, the Debtors entered into construction financing for each Project.

OMC\4834-7168-7935.v2-10/18/21

33.     Pursuant to the promissory note executed by each Debtor, each Debtor's construction financing (the "Loans") was cross-defaulted with all other loans to any entity owned by the Principals.

34.     Each of the Loans was secured by an open-ended construction mortgage on each Debtor's property or on the units thereof (the "Mortgages").

B.  Sharestates' Crowdfunding Model

35.     Sharestates is not a traditional construction lender; Sharestates is a "crowdfunding" platform.

36.     Sharestates' website, relevant portions of which are attached as **Exhibit "A"**, represents the following to its "syndicate partners" – its crowdfunding investors:

- "Start with as little as $5,000*.  Register today to gain access to **institutional quality investments earning 8-12% annually with immediate cash flow."**
- "Individual accredited investors can access a large marketplace of institutional quality mortgage loans that have been sourced and underwritten by industry leaders.  **As an individual investor, you'll be participating side-by-side with large institutions in the same quality product.  You can even set up auto-invest to manage your investment strategy - delivering you peace of mind that you're never missing an opportunity.  Our investors earned over a 10% annualized return last year - get started today!"**
- "We offer investors direct access to real estate investments through our online marketplace – with net annualized returns between 8-12%...Crowdfunding make it easy for anyone to build a real estate portfolio and to fund a project."

37.     Unbeknownst to the Debtors, Sharestates did not have sufficient capacity to fund from a "warehouse line", or a sufficient line of credit to finance the entirety of the Projects.  It used predominately investor money.  Consequently, if Sharestates could not find investors for a particular loan, it could not fund draws upon that loan.

38.     The Defendants were misrepresenting – not only to the Debtors, but to individual investors and funders – the nature and quality of the loans they were making.

OMC\4834-7168-7935.v2-10/18/21

39.     In this instance, Sharestates was piecemealing the funding to the Debtors, and pedaling the loans "a la carte", to individual investors, instead of seeking a project-funding package in the amount needed to fund the Projects.

40.     The Debtors believe and therefore aver that at the time they executed the Loans for each Debtor, Sharestates did not have institutional investors in place to commit *in toto* to the Loans to the Debtors, or that the institutional investors constituted a *de minimus* amount of dollars available for funding.

41.     By committing to lend more than it was able to fund, Sharestates was placed in an irreconcilable conflict between its legal and contractual duties to disburse funds to the Debtors and to return money to its investors.

C.   Sharestates' Lending Misconduct

42.     Following the commitment to loan construction funds for the Projects, Sharestates began to stall underwriting and disbursements.

43.     Upon information and belief, Sharestates imposed obstacles to funding because it lacked the current ability to honor its commitments and the loan requests made by the Debtors.

44.     Sharestates utilized several methods to improperly extract money from the Debtors.

45.     Sharestates demanded that the mortgages on the Projects be recorded on a unit-by-unit basis, and that a new title search and distinct loan closing costs were imposed for each of the 19 units at the Penn Treaty Project and the 37 units mortgaged for the Pier Village Project.  As part of its agreement to refinance the Stewart parcel, Sharestates insisted that those units be separately identified in connection with its promise to refinance the Stewart parcel.

8

46.     Sharestates required that the Debtors use a title company called Atlantis National Services, Inc. ("Title").

47.     Upon information and belief, the Davoodis and/or Shayanfekr are the owners, investors or otherwise the direct beneficiaries of Title.

48.     For the title searches and policies demanded by Sharestates, Title charged costs above the legal rate and charged improper disbursement fees.

49.     By requiring a separate Mortgage on each unit, a new Mortgage upon each alteration of the lending relationship, and a new title search for each new Mortgage, Sharestates churned excessive and illegal fees for itself and its affiliate Title.

50.     Sharestates also delayed closing and funding on these construction loans by performing extensive, unnecessary "due diligence".

51.     This alleged due diligence consisted of repeatedly requesting the same documents and financial information from the Debtors after it had already been provided.

52.     Sharestates has not alleged whether it even performed its own independent due diligence.

53.     This due diligence was illusory; Sharestates admits that it relied entirely on the disclosures made by the Debtors.

54.     By extending the alleged due diligence period, Sharestates permitted itself to run interest upon the Loans before refinancing them.

55.     Because of the high interest rates, charges, fees and expenses on the outstanding mortgages, and lack of working capital, these delays in funding by Sharestates caused the Debtors to incur as much as $250,000.00 per week in charges.

9

56.    At each alteration of the lending relationship, Sharestates represented that some of the institutional investors could not agree to the terms proposed, and required terms more favorable to Sharestates.  As a consequence, Sharestates had ever-shifting requirements for its loans, beyond the original commitment.

57.    At one juncture during the financing, Sharestates lacked the liquidity to make committed-to advances, and forced the Debtor to refinance the Penn Treaty loan again, at great expense to the Debtors, including costs and title charges, in order to create a liquidity event for Sharestates, i.e., to free up capital to be loaned again.

58.    The alleged refinance was not of any benefit to the Debtor, but rather was a manipulation intended to garner further investors' interest in investing in the Sharestates loans to the Debtors.

59.    Upon information and belief, Sharestates intentionally delayed funding in order to delay the Debtors' projects, knowing the delays ultimately would provide Sharestates' investors more lucrative returns through the added accrual of charges, interest and fees.

60.    The Loans only permitted Sharestates to charge interest on amounts actually loaned to the Debtors.  Sharestates charged Hancock, 123, and Penn Treaty on the entire construction loan, even if not drawn, in violation of the Loans.

61.    Whenever one Debtor was unable to make an interest payment on its Loan, Sharestates demanded that the Principals cause some other Debtor to make a draw on its Loan and use those proceeds to pay the interest payment for a different Debtor.

62.    By requiring the Debtors to draw on the Loans to pay interest on other Loans, Sharestates ensured it was paid but that there would not be funds available for construction on the Debtors' projects.

OMC\4834-7168-7935.v2-10/18/21

63.    In effect, Sharestates administered the Loans as though they were both one Loan and separate Loans, depending on which posture benefited it most in the short term.

D.    Sharestates Violates the Draw Process to Extract Releases

64.    The Loan documents did not explicitly lay out the draw process by which the Debtors could demand incremental disbursements under the Loans.

65.    As a condition for funding draws on the Projects, the Debtors were originally required to submit unpaid invoices and proof of release of liens for prior work, followed by a certification of completion by a construction professional.    Once the professional verified completed work, Sharestates was required to fund.

66.    The Debtors and Sharestates agreed upon this particular draw process (the "Original Draw Process"), and it became the binding process for claiming draws under the Loans.

67.    Sharestates immediately breached the Loan by insisting that only paid invoices would be reimbursed.

68.    The Debtors were now forced to pay the hired contractors first; Sharestates would disburse an amount sufficient to reimburse for paid invoices only upon review and approval by Sharestates' professional.

69.    Delays in funding caused by Sharestates damaged the Debtors in that they were obtaining engineered construction materials, for which prepayment was required.

70.    On many occasions, Sharestates' unreasonable delay caused the Debtors to lose its spot in the fabrication process, with each week delay causing the Debtor to incur over $250,000.00 in charges.

OMC\4834-7168-7935.v2-10/18/21

71.     Without contractual authorization, Sharestates also required Penn Treaty to take Loan disbursements in $5 million tranches, even if that was more than necessary to fund present invoices.

72.     Sharestates established an interest reserve of $5 million for Pier, which it purportedly held in an account under its own control.  Sharestates never provided proof of escrowed funds.  Sharestates charged for amounts in excess of those to which it was entitled, and charged interest on the entire $5 million loan tranche, even if it was not advanced.

73.     This interest reserve was allegedly funded by a portion of the Loans and was used by Sharestates to pay itself interest on the portions of the Loans that had been funded.

74.     Sharestates charged points on the entire loan commitment even though the Debtors had not drawn on it.

75.     By requiring the Debtors – especially Pier and Penn Treaty – to take out more money than was due, and then charging interest on this over-borrowing, Sharestates depleted the remaining amount of credit the Debtors could draw on, and exacerbated the Debtors' cash flow and working capital issues, without a contractual basis, and for the sole benefit of Sharestates.

76.     Sharestates continually delayed reimbursement and funding, causing the Debtors operational issues through, among other things, the inability to promptly schedule specialized suppliers and materialmen, contractors and other construction professionals at the Projects.

77.     The Debtors complained bitterly that they were going to fail, because of the delays caused by Sharestates' violation of the Original Draw Procedures.  The Debtors warned of a financial failure, if funding was not timely and completely made under the Original Draw Process.

78.     Aware of the issues raised by the Debtors, Sharestates began to refuse funding for Project related expenses, in violation of the Original Draw Process.

12

79.     Sharestates began insisting that the Debtors fund payment of all vendors first, show wire receipts, and then submit invoices showing the vendor was paid before Sharestates would reimburse the Debtors (the "Modified Draw Process").  Sharestates' demands exacerbated the Debtor's working capital shortages by insisting on the Modified Draw Process.  Moreover, under these modified procedures, Sharestates began interfering with the Debtors' contractors by questioning payments made by the Debtor.

80.     The Modified Draw Process breached the Loans, and forced the Debtors to fund all expenses and then wait for the vagaries of Sharestates' newly created draw process for reimbursement.

81.     Intentionally disregarding the Original Draw Process, Sharestates forced the Debtors in a "Catch-22" situation: they were now required to incur debts that had to be paid from cash flows that did not exist, in order to obtain the contractually-due advances.  Sharestates demanded interest payment from any party obligated to Sharestates including non-debtors.

82.     In the summer of 2020, when Sharestates demanded the Loans now use the Modified Draw Process, the Debtors were owed over $2,000,000.00 in construction cost reimbursements.

83.     At this point, the amounts owed on each Loan exceeded the as-built value of each Debtor property.

84.     Without present equity or any hope for alternative financing for underwater projects, the Debtors had no alternative but to accede to Sharestates' demands.

85.     On August 14, 2020, the Debtor Pier entered into a Confirmation, Modification and Ratification of Loan documents agreement ("Modification").  A true and correct copy of the Modification is attached hereto as **Exhibit "B"**.

13

86.    On August 14, 2020, the Debtor Penn Treaty also entered into a forbearance agreement (the "Forbearance Agreement"). A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit "C"**.

87.    The stated consideration for the Modification is ten ($10.00) dollars.

88.    Sharestates coerced Pier into entering into the Modification, and agreeing to the Modified Draw Process in order to obtain the overdue moneys to which Debtors were entitled to under the Loan.

89.    At the same time that the Debtors were coerced into entering into the Modification, Penn Treaty was coerced to enter into a separate Forbearance Agreement with Sharestates.

90.    The combined effect of Modification and Forbearance Agreement was the waiving the right to reimbursement of the $2,000,000.00 owed to the Debtors under the original Loans, and the granting of a broad release to Sharestates.

91.    Under the Modification and Forbearance Agreement:

a.    The Debtors and Sharestates formally adopted the Modified Draw Process;

b.    Pier waived the right to be reimbursed for $2,061,801.70 pursuant to a draw request made on May 3, 2020;

c.    Pier and Penn Treaty waived all of their respective claims against Sharestates, and granted a lender release to Sharestates (the "Lender Release").

92.    The Modification and Forbearance Agreement further modified draws by a formula imposed by Sharestates where it would recalculate advances, subtract certain "equity" contributions it expected from the Debtors, and recalculate moneys due, based upon a 75%/25% split between Sharestates and the Debtors.

14

93.     The actions of Sharestates effectively wrested control of the Debtors' finances from the Debtors and left Sharestates in a position to control and dominate the Debtors' finances, and because of the cross-defaults, foreclose on the Debtors' projects.

94.     The Debtors were predictably unable to pay contractors prior to reimbursement.

95.     Due to the purported defaults, and its indiscriminate collection of interest from whichever Debtor could pay, Sharestates impaired the ability to complete the New York projects, which were at or near completion and almost ready to rent to tenants.

96.     Construction on all Debtor projects ceased after the summer of 2020, and has not resumed.

97.     The entire Sharestates funding scheme, and each of the Loans made to the Debtors, and the Mortgages granted thereunder, was fraudulent as to the Debtors, and their creditors, and placed the Debtors in a position where financial failure was a foregone conclusion.

98.     As a result of Sharestates' need to manufacture defaults, generate liquidity events and pay investors, all of the Debtors' projects became impossible to complete and necessitated the filing of these bankruptcy cases.

99.     Rather than fund 100% of construction Sharestates insisted that the Debtors pay 25% of any request for funding, further exacerbating the Debtors' cash flow issues.

100.    As of the filing of the bankruptcy cases, Sharestates alleged it was owed far more that the fair market value of each property.

## COUNT I: AVOIDANCE OF PIER VILLAGE MORTGAGES UNDER 11 U.S.C. §544
### Debtors v. Sharestates

101.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

OMC\4834-7168-7935.v2-10/18/21

102.    Sharestates encumbered each of units 18 through 54 of the Pier Village Project with individual mortgages (the "Pier Village Mortgages"), which encumbrance is a transfer.

103.    Pursuant to their written terms, the Pier Village Mortgages each encumber the "Mortgaged Property," which is defined in each mortgage as a specific individual unit at the Pier Village Project.

104.    Sharestates does not have any recorded, unsatisfied mortgage against the entire Pier Village Project "in gross."

105.    Vertical construction has not begun on the Pier Village Project, which is currently a lot of land ready for construction.

106.    The collateral securing the Pier Village Mortgage – the individual units – does not yet exist.

107.    The Pier Village Mortgages are inchoate, and have not attached to any extant collateral.

108.    A creditor that extended credit to the Debtors on the petition date could have obtained a judicial lien or an execution on the Pier Village Project "in gross" with rights superior to the Pier Village Mortgages.

109.    Following the recording of the Pier Village Mortgages, Pier entered into the Modification with Sharestates.

110.    Sharestates did not record new mortgages consistent with the Modification.

111.    The Modification of the underlying loan obligations rendered the Pier Villages Mortgages unperfected as against a future purchaser.

112.    A bona fide purchaser of the entire Pier Village Project in gross would take title free and clear of the Pier Village Mortgages.

113.    A perfected lien or execution creditor would obtain superior priority to the Pier Village Mortgages.

114.    Pursuant to 11 U.S.C. §544(a)(1), (2), (3), the Debtors may avoid the Pier Village Mortgages.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates avoiding the Pier Village Mortgages and providing such other and further relief as the court deems just and equitable.

## COUNT II: AVOIDANCE OF MORTGAGES, MODIFICATION, FORBEARANCE AGREEMENT AND LENDER RELEASE AS A FRAUDULENT CONVEYANCE UNDER 11 U.S.C. §548 OF THE BANKRUPTCY CODE
### Debtors v. Sharestates

115.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

116.    At the time they entered into the Mortgages, Modification, Forbearance Agreement, and granting the Lender Release, the Debtors were insolvent or became insolvent as the result of the transaction as the fair market value of their assets exceeded their debts.

117.    At the time they entered into the Mortgages, Modification, Forbearance Agreement, and the granting of the Lender Release, the Debtors were unable to pay their debts as they came due.

118.    At the time they entered into the Mortgages, Modification, Forbearance Agreement, and the granting of the Lender Release, the Debtors were engaged in business or about to engage in business for which the Debtors had unreasonably small capital.

119.    The Mortgages created encumbrances on the Debtors' property, which constitutes a transfer.

120.     The Debtors received fraudulent promises of construction financing in exchange, which illusory promises are not reasonably equivalent value.

121.     The Modification, Forbearance Agreement, and Lender Release constitute transfers of property because with respect to each, the Debtors gave up valuable rights under the applicable contracts and released valuable causes of action.

122.     For each of these transfers, the Debtors received a technical months-long cessation of foreclosure activity which was not reasonably equivalent to the valuable rights and causes of action transferred away.

123.     Even this temporary cessation was illusory, as the Debtors had no means to restart construction.  The cessation provided the Debtors no value because Sharestates knew it could immediately resume collections activity once it was over.

124.     The Mortgages, Modification, Forbearance Agreement, and Lender Release are avoidable transfers under Section 548(b) of the Bankruptcy Code.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates, avoiding the Mortgages, Modification, Forbearance Agreement and Lender Release and providing such other and further relief as the court deems just and equitable.

### COUNT III: AVOIDANCE OF MORTGAGES, MODIFICATION, FORBEARANCE AGREEMENT AND LENDER RELEASE AS A FRAUDULENT CONVEYANCE UNDER 11 U.S.C. SECTION 544 OF THE BANKRUPTCY CODE AND PUVTA
**Debtors v. Sharestates**

125.     Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

126.     Sharestates' claim, or right to payment by the Debtors, arose after the Debtors granted Sharestates Mortgages on the Project property.  12 Pa.C.S. §5104(a).

OMC\4834-7168-7935.v2-10/18/21

127.    The Debtors entered into the Mortgages, Modification, Forbearance Agreement and Lender Release without receiving reasonably equivalent value in exchange.

128.    In entering into the Loans, and in granting the Mortgages, the Debtors engaged in or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.  12 Pa.C.S. §5104(a)(2).

129.    At all relevant times, Sharestates was aware of the Debtors' precarious financial condition, and insolvency.

130.    In entering into the Mortgages, Modification and Forbearance Agreement, and granting the Lender Release, the Debtors engaged in or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.  12 Pa.C.S. §5104(a)(2).

131.    In entering into the Modification and Forbearance Agreement, and granting the Lender Release under the Forbearance Agreement the Debtors gave up valuable claims against Sharestates, without supporting consideration, or equivalent exchange.

132.    In granting the Mortgages on the Debtor project properties, the Debtors intended to incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.  12 Pa.C.S. §5104(a)(2).

133.    The Mortgages, Modification, Forbearance Agreement and Lender Release are voidable as to existing and future creditors.  12 Pa.C.S. §5104(a); 11 U.S.C. §544.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates avoiding the Mortgages, Modification, Forbearance Agreement and Lender Release and providing such other and further relief as the court deems just and equitable.

OMC\4834-7168-7935.v2-10/18/21

## COUNT IV: RECOVERY UNDER 11 U.S.C. §550 AND PRESERVATION OF AVOIDED TRANSFER UNDER 11 U.S.C. §551
### Debtors v. Sharestates

134.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

135.    The transfers described in Counts I, II and III (the "Transfers") above are avoidable.

136.    Intercap and Investments are the initial, immediate or mediate transferees of the Transfers.

137.    Intercap and Investments had intimate knowledge of the substance of the Transfers before they occurred because they dictated the substance of those Transfers.

138.    Intercap and Investments received the Transfers in bad faith, for no value, with knowledge of the voidability of the Transfers.

139.    Debtors may recover the property transferred in the Transfers, or the value thereof, from Intercap and Investments.

140.    The Transfers avoided in Counts I, II and III must be preserved for the benefit of the estate.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates in the amount of or the value of the property transferred in the avoided Transfers, preserving such Transfers for the benefit of the estate and providing such other and further relief as the court deems just and equitable.

## COUNT V: EQUITABLE SUBORDINATION
### Debtors v. Sharestates

141.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

OMC\4834-7168-7935.v2-10/18/21

142.    Sharestates engaged in inequitable conduct as more fully set forth in this Complaint.

143.    Sharestates engaged in misrepresentations about its ability and willingness to fund loans to the Project, including that Sharestates had the ability to fully fund the Loans.

144.    Sharestates engaged in fraud in the inducement of the Loan.

145.    Sharestates engaged in unconscionable acts including unilaterally changing the draw process and using that change to force the Debors to grant the Lender Release.

146.    Sharestates overcharged routinely for title insurance obtained through Title, an affiliate.

147.    Sharestates made loans without any lender discipline, i.e., without an understanding of how the loans would be repaid.

148.    Sharestates created inadequacies in the Debtor's capital structure that showed an inability to repay the Loans.

149.    Sharestates made the loans in the face of information that should have led Sharestates to conclude the loans were not reasonable.

150.    Sharestates took Mortgages for the full amount of the Loans before disbursing any Loan proceeds.

151.    Sharestates' only concern was originating more loans to entice more individual investors for their crowd-funded or syndicated lending business, regardless of the actual risks and supporting collateral for those loans.

152.    In massively over-encumbering the Project with undersecured loans, Sharestates prevented the Debtors from qualifying for loans with any other lender.

21

153.    Sharestates then required the Debtors to draw on Loans for one project in order to pay Sharestates for another.

154.    By encumbering all of the Debtors' equity in their assets, including the Projects, Sharestates set the Debtors on a disastrous downward spiral from which they could not recover.

155.    Sharestates' overreaching during the lending relationship gave it an improper advantage over the Debtors and all other creditors of the Debtors.

156.    Sharestates breached duties owed to the Debtor, and was able to succeed because of its dominance and control of all of the Debtors' finances.

157.    Sharestates' actions ensured that no other creditors could be paid out of the Debtors' assets by encumbering them so fully that all equity was removed.

158.    Equitable subordination of Sharestates' claims is not inconsistent with any provision of the Bankruptcy Code.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates pursuant to Section 510 of the Bankruptcy Code, subordinating any claim made by Sharestates or on behalf of the Loans or Mortgages, to all other claims against the Debtors, and providing such other and further relief as the court deems just and equitable.


## COUNT VI: LENDER LIABILITY – BREACH OF CONTRACT/BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### Debtors v. Sharestates

159.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

160.    Sharestates required the Debtors to refinance or modify the Loans at several points during their lending relationship.

161.    Each time Sharestates required such a refinancing or modification, Sharestates delayed actually executing the refinancing or modification for several months, purportedly to perform "underwriting" of the refinanced loan.

162.    Because of the Debtor's elephantine interest obligations to Sharestates, and its cash needs at the Project, every month of delay costs the Debtors nearly $500,000.00 in interest charges, and $250.000.00 in delay costs.

163.    Further, with respect to the construction, the Debtors had contracts to build trusses and other architectural components for the Projects.  Without the cash needed to procure the materials, orders at the manufacturer were taken out of rotation, causing further delays.

164.    Sharestates did not actually perform underwriting for these modifications, and admits that it relied entirely on the existing representations and financials provided by the Debtors.

165.    Because it was not actually evaluating any underwriting information, Sharestates would have been able to execute the modifications immediately.

166.    Instead, Sharestates placed the loans in purported underwriting for several months, and disbursed loan proceeds to itself to cover interest due on the loans during the underwriting period.

167.    In intentionally slowing down the refinancing process once it had already committed to refinance, Sharestates generated hundreds of thousands of dollars in interest, greatly reducing the Debtors' working capital.

168.    Sharestates demanded a new title search by Title for each such re-execution of a Mortgage, even when a title search was not legally necessary.

169.    Sharestates' demands for re-execution and the attendant fees paid to Title were not actually required to safeguard Sharestates' position.

170.    Upon information and belief, Sharestates made these demands to churn fees for its affiliate and drag out the re-execution process to increase the interest it paid itself from Loan proceeds and increase the amount owed on the mortgages.

171.    In demanding unnecessary re-executions and title searches, Sharestates breached its duty of good faith and fair dealing.

172.    Sharestates also demanded that certain Debtors take disbursements on their Loans, then lend this disbursements to other Debtors to allow the recipients to make interest payments to Sharestates.

173.    Sharestates later alleged that these Debtors had drawn too much of their loan without appropriate progress on the Projects and sought to withhold draws.

174.    Sharestates required the Debtors to take these actions, then alleged a default as a result.

175.    As set forth more fully above, Sharestates and the Debtors entered the Loan contract without specifying how draws from Loan proceeds would be authorized and disbursed to the Debtors.

176.    After entering the Loan, Sharestates and the Debtors agreed to the authorization and disbursement mechanism of the Original Draw Process.

177.    By their agreement and course of performance, the Original Draw Process became a binding term of their lending arrangement.

178.    The Debtor gained legally enforceable rights by virtue of its course of dealing with Sharestates and the Original Loan Agreement.

179.    In 2020, Sharestates ceased to comply with the Original Draw Process and unilaterally demanded that the draw process be altered in its favor of the Modified Draw Process, or else it would not disburse further funds.

180.    Through the draw process, Sharestates controlled and dominated the Debtors' finances.

181.    Under duress and without any other options aside from complete financial ruin, the Debtors executed the Modification, waived the right to recover contractually obligated payments from Sharestates under the Original and Modified Draw Processes.

182.    Under the Modification, at paragraph 1.1, the Debtors waived the right to a distribution they had validly demanded and that Sharestates was obligated to pay under the Original Draw Process.  The Modification also provided a Lender Release.

183.    The Modification adopted a reimbursement-based Modified Draw Process that only favored Sharestates.

184.    Sharestates' refusal to disburse funds under the Original Draw Process was a breach of the duty of good faith and fair dealing.

185.    Sharestates' breach improperly forced the Debtors into the Modification and Forbearance Agreement, waiving valuable causes of action and their contractual right to the reimbursement of over $2,000,000.00 already used for the Projects.

186.    The waiver of the reimbursement of expenses under the Modification and Forbearance left the Debtors in an undercapitalized state.

187.    Sharestates' breach caused the Projects to stall, as the Debtor concluded no other or further advances would be made.

25

188.    Sharestates knew that the Debtors did not have capital aside from that reimbursed by Sharestates.

189.    Sharestates reasonably knew that a stall in the Projects would mean that construction could never be restarted, and ultimately would cause the financial collapse of all of the Debtors.

190.    Sharestates knew that by forcing a waiver, it could recover the Projects and the value of the Debtors' squandered working capital.

191.    By using their own breach of contract to exert improper pressure, and force concessions, Sharestates forced the Debtors into the Modified Draw Process in the Modification and the Forbearance Agreement, requiring the Debtors to source millions of new dollars to pay contractors before construction could resume, and further, releasing Sharestates for its bad acts and breaches.

192.    The Debtors were predictably unable to do so.

193.    The Debtors were damaged by Sharestates' breaches of the contracts and the duty of good faith and fair dealing, in an amount yet to be determined, including increased costs to restart the stalled Projects and the loss of the profits from the Projects, as well as the loss of the other Debtor projects.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates for (a) damages in the amount caused by Sharestates' breaches, (b) consequential damages; and (c) providing such other and further relief as the court deems just and equitable.

OMC\4834-7168-7935.v2-10/18/21

## COUNT VII: FRAUD IN THE INDUCEMENT
### Debtors v. Sharestates

194.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

195.    At the time each Debtor entered into a Loan or a modification or refinance thereof, Sharestates represented that it had the ability to timely fund draws consistent with the contract.

196.    Sharestates contractually agreed to fund construction requests and release moneys on two (2) to three (3) days' notice.  Sharestates never complied with its contractual obligations to fund in two to three days.

197.    During the several renegotiations, Sharestates extracted additional favorable terms from the Debtors after already agreeing to refinance or extension terms by falsely representing that one or more underlying investors were holdouts that could veto the renegotiated terms.

198.    In the alternative, Sharestates negotiated and bound the Debtors to renegotiated terms without appropriate authority from all underlying investors.

199.    Sharestates' representations about its ability to fund and its authority or ability to renegotiate terms were material in that the Debtors would not have entered the original loan, or agreed to the additional terms in the renegotiation, if Sharestates had not made those representations.

200.    The misrepresentations were repeatedly made by Ray and Shayanfekr in order to induce the Debtors to enter into the Loans or renegotiate them on terms more favorable to Sharestates.

201.    The Debtors justifiably relied upon the misrepresentations of Sharestates through its principals.

202.    Sharestates intentionally delayed funding, creating cash flow issues, and burning off needed working capital, for the purpose of triggering defaults, and forcing the Project to fail, which it did.

203.    Due to Sharestates' false material representations, the original loan agreement and all subsequent modifications thereto are voidable.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates (a) voiding the original and subsequent lending contracts, (b) for damages in the amount caused by Sharestates' fraudulent inducement, attorney fees and costs; and (c) providing such other and further relief as the court deems just and equitable.

## COUNT VIII: FRAUD
### Debtors v. All Defendants

204.    The Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein and at length.

205.    At all material times the Davoodis and Shayanfekr were in control of the finances, loan origination, lending, administration, collection activities and operations of Sharestates and Title.

206.    As detailed herein, the Davoodis and Shayanfekr, made material misrepresentations about the suitability of the Debtors for their financing products.

207.    Those representations included: (a) that Sharestates had a ready source of funds warehoused, that they would advance and then syndicate to investors; (b) that money was in hand and did not need to be raised; (c) that the format was often used to fund and complete construction projects like the Debtors; (d) that money needed for construction could be released within (3) three days of the requests; (d) that Sharestates investors were institutional in nature, not individuals.

28

208.    What the Debtors did not know, that Sharestates and the Davoodis and Shayanfekr knew, was that Sharestates was obligated to provide a return to investors from the moment Sharestates received the investors' money, so Sharestates had to continue to provide returns to investors even if the money sat with Sharestates.

209.    Driven by an overriding desire to get investor money on the streets and making the credit card returns promised, Sharestates ignored its Loan and Commitments, and conducted business in a way which maximized investor returns but doomed the Debtors to failure.

210.    Accordingly, no money was in fact "available" under Sharestates' model, so no money could be made "available" until requested in a draw or reimbursement request.

211.    Because of the Sharestates lending platform, money was never available when needed, and caused unnecessary and expensive delays on the projects.

212.    Sharestates also contractually agreed to release moneys on a one (1) to two (2) business days window.  Sharestates never timely advanced or reimbursed money on this schedule, and in fact, each request was followed by weeks of inexplicable and commercially unreasonable delays.  Sharestates later unilaterally changed the timeline to five (5) to seven (7) days.

213.    The representations that Sharestates could timely and efficiently fund the Debtors' projects, including the Project, on one (1) to two (2) days' notice, were false and knowingly false because Sharestates did not have an approved line of credit and its ability to loan was and is a function of its ability to raise money through crowdfunding.  The statements were made to cause the Debtors and their Principals to believe construction funding would be timely and seamless, and induce the loans.

214.    Sharestates failed to disclose that the process for Sharestates to acquire loans, and to get proceeds to the Debtors was not assured, and had to be reviewed at each advance, making

the process cumbersome, time consuming and expensive.  While Sharestates dallied with each advance, the Debtors burned off working capital needed to complete the Debtor Projects.

215.    The Debtors justifiable relied on the misrepresentations of Sharestates, only to be exposed to unjustified and inexplicable delays, excess charges, missed funding deadlines, and losses.

216.    The misrepresentations were for the express purpose of inducing the Debtors to tie up all of their assets with high interest rate obligations, in order to maximize the returns to Sharestates' alleged investors.

217.    The misrepresentations allowed Sharestates, the Davoodis and Shayanfekr to remove all of the equity from the Debtors' Projects, as well as the working capital, and poised them for recovery by Sharestates through foreclosure.

218.    The Debtors believe and therefore aver that Sharestates, under control of the Davoodis and Shayanfekr, had no regard for their actual contractual commitments, and simply changed the deal as they saw fit along the way.

219.    Title, also controlled by the Davoodis and Shayanfekr, charged the Debtors for unnecessary and unneeded title policies, which policies and payments inured to the benefit of the Davoodis and Shayanfekr.

220.    The charges were illegal, fraudulent, excessive and violated Pennsylvania law.

221.    Sharestates, through the control of the Davoodis and Shayanfekr, charged excessive and unwarranted "due diligence" fees it agreed it would not collect.

222.    The collection of the waived fees was fraudulent as to the Debtors.

223.    Defendants required the Debtors to use Republic for certain appraisals at excessive cost because Republic and Sharestates had a tacit or explicit agreement to over-value properties

as necessary to permit Sharestates to over-lend while pretending to fulfill their commitments to investors.

224.    Defendants always knew the appraisals produced by Republic were inflated, but required the Debtor to accept them as accurate and pay the excessive fees in order to continue generating unjustifiably-large loans to be sold to investors.

225.    If the Debtors had known of this rationale for the use of Republic, they would never have used Republic for appraisals.

226.    As a direct and proximate cause of the fraud of the Defendants, as herein alleged, the Debtors suffered damages, the full extent to which has yet to be determined.

227.    The Debtors were damaged in their operations and finances by the fraudulent activities of the Defendants, including the potential loss of the Debtors' entire investment in the projects.

228.    The actions of the Defendants, and each of them, are outrageous, wanton and without legal rustication, justifying the imposition of punitive damages.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates, the Davoodis and Shayanfekr for (a) damages occasioned by their fraudulent activities, (b) punitive damages; and (c) providing such other and further relief as the court deems just and equitable.

## COUNT IX: OBJECTION TO PROOFS OF CLAIM UNDER 11 U.S.C. §502(b)(1)
### Debtors v. Sharestates

229.    The Debtor incorporates by reference the foregoing paragraphs as if set forth fully herein and at length.

230.    Sharestates filed proofs of claims in the Debtors' cases (the "POCs").

231. The POCs alleged debts based upon a writing, but do not attach any writing evidencing the obligation.

232. The POCs allege certain amounts for interest, fees, charges and escrow advances without any supporting documentation.

233. Upon information and belief, these additional amounts are not permitted by the applicable lending contracts, unreasonable or not actually incurred.

234. The POCs are not self-supporting, and must be disallowed.

235. In the alternative, the amounts attributable to uncollectable interest, fees and charges must be disallowed.

WHEREFORE for all the above reasons contained in this Count, the Debtors respectfully request the entry of a judgment disallowing the POCs, or in the alternative the portions of the POCs attributable to unenforceable fees and charges, and such other relief as is just.

## COUNT X: DETERMINATION OF SECURED CLAIM AND BIFURCATION OF CLAIM UNDER (11 U.S.C. §506(a)(1)) Debtors v. Sharestates

236. The Debtors incorporate by reference the foregoing paragraphs as if set forth fully herein and at length.

237. "An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and

OMC\4834-7168-7935.v2-10/18/21

of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."  11 U.S.C §506(a)(1).

238.    A party in interest may make a request determine "the amount of a secured claim under §506(a) of the Code."  Fed. R. Bankr. P. 3012(a)(1).

239.    To the extent that Sharestates has an Allowed Claim, the value of each Debtor's property securing the claim is far below the amount of the claim.

240.    Any allowed claim by Sharestates must be bifurcated into a secured claim in the amount of the value of that Debtor's liened property, and an unsecured claim for the remainder.

WHEREFORE for all the above reasons contained in this Count, the Debtors respectfully request the entry of a judgment determining that bifurcating the claim into secured and unsecured portions, and provide such other and further relief as is just.

## COUNT XII: LIEN STRIP OF UNSECURED CLAIM UNDER 11 U.S.C. §506(d)
### Debtors v. Sharestates

241.    The Debtors incorporate by reference the foregoing paragraphs as if set forth fully herein and at length.

242.    Pursuant to 11 U.S.C. §506(d)(1), "to the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void."

243.    To the extent that Sharestates claims are unsecured, this Court must enter a judgment voiding the lien upon that Debtor's property.

WHEREFORE, the Debtors respectfully request the entry of a judgment voiding the liens on each Debtor's property to the extent that the lien exceeds the value of the Allowed Secured Claim and such other relief as is just.

## COUNT XIII: SURCHARGE LIEN FOR PRESERVATION AND DISPOSITION COSTS UNDER 11 U.S.C. §506(c)
### Debtors v. Sharestates

244.    The Debtors incorporate by reference the foregoing paragraphs as if set forth fully herein and at length.

245.    Pursuant to 11 U.S.C. §506(c), a debtor-in-possession "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

246.    To the extent that Sharestates has an allowed Secured Claim, that Claim is secured by the Debtor's real property and rents from tenants.

247.    Postpetition, the Debtors have rented certain properties to tenants and prepared to sell the real properties through an auction and sale process.

248.    As part of the sale process, the Debtors seek postpetition lending to complete construction on Hancock, Kingsland and 123, which construction will increase the value of those properties for Sharestates' benefit.

249.    Postpetition, the Debtors have paid for, and will pay for, insurance and repairs and real estate taxes.

250.    These improvements and payments have or will preserve or increase the value of the real properties securing Sharestates' claims to Sharestates' direct benefit.

251.    The costs incurred by the Debtors for attorney and professional fees and transaction costs in accomplishing the sales of real property are costs incurred in disposing of Sharestates' collateral.

OMC\4834-7168-7935.v2-10/18/21

252.    All these costs and expenses benefited Sharestates by maintaining paying rentals, improving the collateral or preventing its depletion and preventing the imposition of priming liens that would have lessened Defendants' collateralized interest.

253.    These costs and expenses further allowed the Debtors to dispose of the collateral without the necessity of costly action by Sharestates.

254.    The Debtors are entitled to an equitable lien pursuant to Section 506(c) of the Bankruptcy Code in the amount of these costs and expenses.  This lien must, pursuant to contracts with postpetition lenders, be subordinate to any debtor-in-possession priming lien pursuant to 11 U.S.C. §365(d), but superior to Sharestates' liens.

WHEREFORE, for all the above reasons contained in this Count, the Debtors respectfully request the entry of a judgment surcharging the Debtors' property securing Sharestates' liens via a lien subordinate only to any applicable debtor-in-possession priming lien pursuant to 11 U.S.C. §365(d), and provide such other relief as is just.

Respectfully submitted,

Dated: October 18, 2021

By:    */s/ Edmond M. George*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
PA Bar No. 45969 (EMG)
PA Bar No. 78374 (MDV)
OBERMAYER REBMANN MAXWELL
& HIPPEL LLP
Centre Square West, Suite 3400
1500 Market Street
Philadelphia, PA 19102
P: 215.665.3000
F: 215.665.3165
Email:  edmond.george@obermayer.com
Email:  michael.vagnoni@obermayer.com
*Proposed Special Counsel for Debtors*

OMC\4834-7168-7935.v2-10/18/21