**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

--------------------------------------------------------

| | | |
|---|---|---|
| 1121 PIER VILLAGE LLC, | : | **Chapter 11** |
| PENN TREATY HOMES LLC, | : | |
| 2626 FRANKFORD LLC, | : | **Lead Case No. 21-11466 (ELF)** |
| 285 KINGSLAND LLC, | : | |
| 231 E 123 LLC, | : | |
| 193 HANCOCK LLC, | : | |
| | : | **(Joint Administration Requested)** |
| Debtors. | : | |

--------------------------------------------------------:

| | | |
|---|---|---|
| 1121 PIER VILLAGE LLC, | : | **Chapter 11** |
| PENN TREATY HOMES LLC, | : | |
| 2626 FRANKFORD LLC, | : | |
| 285 KINGSLAND LLC, | : | |
| 231 E 123 LLC, | : | |
| 193 HANCOCK LLC, | : | |
| | : | |
| Plaintiffs, | : | **Adversary No.** |
| | : | |
| v. | : | |
| | : | |
| SHARESTATES INTERCAP LINE, | : | |
| LLC, SHARESTATES INVESTMENTS | : | |
| LLC, ~~ATLANTIS NATIONAL~~ | : | |
| ~~SERVICES, INC.,~~ | : | |
| RAYMOND DAVOODI, RADNI | : | |
| DAVOODI, ALLEN SHAYANFEKR, | : | |
| | : | |
| Defendants. | : | |

--------------------------------------------------------

~~ADVERSARY COMPLAINT SEEKING RECOVERY OF TRANSFERS PURSUANT TO
11 U.S.C. §§ 544, 547, 548 AND 550, TO SUBORDINATE THE CLAIMS OF
DEFENDANTS PURSUANT TO SECTION 510 OR FOR RECHARACTERIZATION,
AND TO RECOVER CIVIL DAMAGES UNDER STATE LAW AND THE
RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C.
§1962(e)~~

**FIRST AMENDED ADVERSARY COMPLAINT**

Plaintiffs 1121 Pier Village LLC ("Pier"), Penn Treaty Homes LLC ("Penn Treaty"), 2626

Frankford LLC ("Frankford"), 285 Kingsland LLC ("Kingsland"), 231 E 123 LLC ("123rd"), 193

Hancock LLC ("Hancock"), (collectively with Pier, Penn, Frankford, Kingsland, Hancock and 123rd, the "Debtors" or "Plaintiffs"), by and through ~~their undersigned~~proposed special counsel Obermayer Rebmann Maxwell and Hippel~~,~~ LLP hereby bring this First Amended Adversary Complaint against ~~Defendants~~defendants Sharestates Intercap Line LLC ("Intercap"), Sharestates Investments LLC ("Investments", collectively with Intercap, "Sharestates") and their ~~affiliate Atlantis National Services, Inc. ("Title"),~~principals Raymond Davoodi ("Ray"), Radni Davoodi ("Radni" together with Ray, the "Davoodis"), and Allen Shayanfekr ("Shayanfekr" collectively with Sharestates~~, Title~~ and the Davoodis, the "Defendants"), and allege as follows:

I.    **PRELIMINARY STATEMENT**

~~1.    This matter arises from Defendants' unlawful practices, undisciplined and unregulated lending practices, illegal overcharges and kickbacks, fraud, abuse of its superior leverage and unequal bargaining power over Debtors, both directly and through its actions of its affiliate Title, and a pattern of racketeering activities.~~

1.    ~~Sharestates misrepresented its ability to timely and adequately fund the Debtors multimillion dollar projects, exercised excessive control and dominance over the Debtors and their finances. These unlawful and predatory activities resulted in costly construction delays and increased cash flow demands, which removed the Debtor's working capital, destroyed the Debtors' pending projects, including the largest developments~~The Debtors in this case are an affiliate group that originally developed smaller-multi-unit residential real estate projects, financed by construction lending from Sharestates.  Sharestates, through its principals the Davoodis and Shayafekr, represented itself to the Debtors as a traditional construction lender.  It was actually a crowdfunding platform that promised investors 8-12% annual interest, and did not have the liquidity to make disbursements it was committed to make.

OMC\4834-7168-7935.v2-10/18/21

2.    Starting in 2017, the Debtors had an opportunity to develop substantially larger and more profitable projects on the Delaware River known as Pier Village (the "Pier Village Project") and Penn Treaty (the "Penn Treaty Project" together with the Pier Village Project the "Projects"), and made the Debtors' efforts to succeed unattainable.  As a result of the acts of the Defendants, the Debtors were robbed of working capital, rendered insolvent, and saddled with excessive debt. The Defendants, and each of them, exerted such complete and utter dominance and control over the finances of the Debtors that the Debtors had no independence").  Because of their existing lending relationship, and the representations made by Defendants that Sharestates could fund the Projects, the Debtors obtained construction funding from Sharestates.  Sharestates also reneged on its commitment to refinance the Stewart parcel, leading to a potential loss of that property.

3.    Through fraud, misrepresentation, and excessive control exhibited through continued financial pressure, Sharestates committed fraud, breached its Loan Agreements and Commitments, breached the duty of good faith and fair dealing, received fraudulent transfers, and deprived the Debtors of working capital, all of which combined to cause a cessation of the Debtors' businesses.

3.    Further, through the Davoodis and Title, the Defendants, and each of them, engaged in RICO activities in the nature of duplicative or otherwise unnecessary closings, and excessive and unlawful title fees that drove up the cost of closings.  These excessive charges benefitted the Davoodis and Title by charging excessive and outrageous Title policy premiums, at rates in excess of Pennsylvania law, charging moneys for "due diligence" after waiving them, and engaged in a pattern of racketeering activities that injured the Debtors and each of them in their finances.Sharestates was now attempting to lend far beyond its means, and did not have the liquidity to fund the Projects.  Instead, Sharestates delayed funding, demanded payments under its

OMC\4834-7168-7935.v2-10/18/21

cross default provisions, from entities not liable on the loans, manufactured defaults and loaded Project financing with fees and charges to meet its obligations to investors.

4.    Sharestates intentionally delayed disbursements it was unable to make by falsely claiming defaults or lack of documentation.  When even this strategy failed, Sharestates demanded that the Debtors take loan disbursements to pay interest on other Debtors' loans, or all loans would be defaulted and all projects would fail.

5.    Even this was insufficient for Sharestates' investor-driven needs.  Sharestates then used its position of complete dominance over the Debtors' finances to change the draw process for the loans, in violation of the contract.  Sharestates forced the Debtors into a forbearance and modification of some existing debt in order to obtain protective releases for their past misconduct. These modifications and forbearances were illusory, as they were structured to favor only Sharestates, release Sharestates from existing liability and still inevitably cause the complete failure of the Debtors' projects.

6.    The Debtors' projects stalled, and necessitated the instant bankruptcy.  The Debtors now seek recovery of the damages caused by the Defendants' fraud and breaches of contract, as well as avoidance of releases extracted without reasonably equivalent value.

4.

## II.    PROCEDURAL BACKGROUND

5.7.    On May 23, 2021 (the "Petition Date"), the Debtors, and each of them filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Code") in this Court, as above captioned.  An application for joint administration is pending.  These cases are jointly administered.

6.8.    Since the Petition Date, the Debtors have been operating as Debtors in possession, in custody and control of their respective assets and businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

III.    **JURISDICTION AND VENUE**

7.9.    The Debtors, and each of them are "debtors in possession".

8.10.    The Debtors Penn Treaty, Pier and Frankford have their principal assets located in or within the jurisdiction of this court.  The cases of Kingsland, 123rd and Hancock, are affiliate Debtor cases, with principal assets in the City of New York.

9.11.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334, and Sections 510, 544, 547 and 548 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), as well pursuant to the Pennsylvania Uniform Voidable Transfer Act, 12 Pa.C.S. §5101, et seq. ("PUVTA"), and this court's "related to" jurisdiction.

10.12.    This suit contains both core matters under 28 U.S.C. §157(b)(2)(F),(H) and (K), and non-core matters, properly before this court under its "related to" jurisdiction under 28 U.S.C. §157(b)(1).

11.13.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

12.14.    The Debtors consent to final orders by this court.

13.15.    Defendant Sharestates is upon information and belief, a New York Limited liability company, owned and controlled by Raymond Davoodi ("Ray"), and Radni Davoodi ("Radni" with Ray, the "Davoodis"), as well as Allen Shayanfekr ("Shayanfekr").  Upon information and belief, Shayanfekr is an attorney licensed to practice in the State of New York.

14.16.    Defendants the Davoodis and Shayanfekr are, upon information and belief, residents of the State of New York.

OMC\4834-7168-7935.v2-10/18/21

15.    Upon information and belief, the Davoodis and Shayanfekr are the individuals in control of operations and finances the Defendants Sharestates, and Title.

16.    At all relevant times, the actions taken by Sharestates and Title were taken at the behest of and direction of the Davoodis and Shayanfekr.

17.    Defendants, and each of them, regularly and systematically availed themselves to the jurisdiction of the Pennsylvania courts by virtue of tortious acts committed against the Debtors within the Commonwealth of Pennsylvania.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

## IV.    FACTUAL BACKGROUND

### A.  The Debtors' Business and Projects

18.17.  The Debtors are single-purpose limited liability companies engaged in the development of residential real estate for rental and sale.

18.    Alex Halimi ("Halimi") and Saul Mazor ("Mazor" with Halimi the "Principals") are the principals of the Debtors' members, and the managers of the Debtors' day-to-day operations.

19.    Debtors Hancock, 123 and Kingsland and non-debtor affiliates obtained secured construction financing from Sharestates starting in 2015 for several projects located in New York. These projects were smaller multi-unit properties of less than 12 units.

20.    While engaged in these small-scale projects with Sharestates, the Debtors had opportunity to develop much larger projects: the Penn Treaty Project and Pier Village Project.

19.21.  The Penn Treaty Project, and the Pier Village Project are located on Delaware Avenue, on the Delaware River, near the Rivers (formerly the Sugar House) Casino. The developments were purchased at different times with the Penn Treaty Project being acquired first.

20.22.  The Pier Village Project is a residential project, and originally consisted of fifty-seven (57) high-end residential units with prices starting at $1,500,000.00, with the potential for more.

21.23.  The Penn Treaty Project is directly next door, and consists of nineteen (19) high-end residential units overlooking Penn Treaty Park and the Delaware River.  Prices for these units start at $1,500,000.00.

OMC\4834-7168-7935.v2-10/18/21

22.    The Debtors' principals Alex Halimi ("Halimi") and Saul Mazor ("Mazor" together with Halimi the "Principals") are the principals of the Debtors, and the managers of the Debtors' day to day operations.

23.    The Principals attempted to obtain financing for the Penn Treaty Project, the first of the two Projects.

24.    In 2015, the Debtors' principals used Sharestates to finance another project. At the time of acquiring Penn in 2017, the Debtors' principals had been in contact with a number of potential lenders.

24.    The Principals had familiarity with Sharestates from prior, much smaller projects where Sharestates was the lender. WhenBecause of their prior relationship, the Debtors approached Sharestates about funding the Penn Treaty Project, Sharestates expressed interest and assured the Principals that it had the present ability to fund *in toto*, the Debtors' cash needs to complete the Projects.

25.    Sharestates provided acquisition funding for the Projects via loans secured by a mortgages, with the intent to refinance these loans into open-ended construction loans to fund development.

26.    The Penn Treaty Project is the most significant of the Principals' developments. Accordingly, Sharestates' representations and assurances that it was able and properly suited to fund the Penn Treaty Project were critical to the Principals and ultimately relied upon by the Principals in their decision to use Sharestates first to fund the Penn Treaty Project, and then eventually the Pier Village Project.

OMC\4834-7168-7935.v2-10/18/21

**Formatted:** Font: 11 pt

27.    ~~Because the Projects are on the Delaware River waterfront, extensive site development expenses, including the building of a sea wall, were required before vertical construction could begin.~~

28.    ~~Because the Delaware River riverbed extends onto the shore, a lease for the right for Penn Treaty to build on top of the Delaware River riverbed was required. Pier has yet to acquire the lease rights for its portion of the Project.~~

29.    ~~In order to obtain the riverbed lease, the Debtors hired Ballard Spahr, LLP and expended hundreds of thousands of dollars in legal fees and expenses in order to obtain two (2) consecutive 99-year leases (the "Lease") from the Commonwealth of Pennsylvania, and in order to begin construction on Penn Treaty.~~

30.    ~~At the time of the Sharestates financing, Pier had yet to obtain the riverbed lease.~~

26.    ~~Because of~~The Debtors would not have borrowed the acquisition funding from Sharestates without the commitment from Sharestates to provide future construction funding.

27.    The Debtors did not have sufficient cash flow for construction apart from loan proceeds.

~~31.~~28. Due to the complex nature of the Projects, and the Debtors' working capital needs, it was important that the moneys to finance the Projects were available and ready for use, as delays in the developments would be catastrophic.

32.    ~~The Debtors made clear the importance of having a facility that encompassed and financed both of the Projects.~~

~~33.~~29.  Sharestates ~~represented~~expressed interest and assured the Principals that it had the present ability to fund the ~~Pier~~Debtors' cash needs to complete the Projects and ~~Penn Treaty~~

OMC\4834-7168-7935.v2-10/18/21

Formatted: Font: 11 pt

~~Projects,~~ finish funding the Hancock, 123 and ~~to do so in a quick and efficient manner, so as not to cause delays in the Projects~~ Kingsland projects.

~~34.~~ 30. ~~From the onset,~~ Sharestates, through ~~Ray~~ the Davoodis and others, including Shayanfekr, represented that they had the capacity and ability to timely and fully fund ~~the Debtors' developments~~ disbursements under the proposed loans for the Projects.

~~35.~~ 31. The Debtors justifiably relied upon the representations by Sharestates, the Davoodis and Shayanfekr, as to the ability to fund fully and timely, the Debtors' obligations at the Projects.

~~36.    The process for obtaining loans from Sharestates with respect to both Projects was virtually identical and began with the Principals negotiating with Sharestates to finance each of the Projects.~~

~~37.    The Debtors provided all requested documents to Sharestates during their due diligence, and explained the extensive site improvement and other obligations necessary to complete each of the Projects.~~

~~38.    At all relevant times, Sharestates was fully aware of the Debtors' finances and operations.~~

~~39.    At all relevant times, Sharestates was aware that the Principals had not previously engaged in construction activities as extensive or complex as the Projects, but Sharestates was satisfied that the Principals could complete both of the Projects.~~

~~40.    At all relevant times, Sharestates represented that it had the ability to fund, in full, the development of each of the Projects, and the other of the Debtors' projects, and that funds would be immediately available at materials times.~~

OMC\4834-7168-7935.v2-10/18/21

**Formatted:** Font: 11 pt

41.    The Principals made clear that it was vitally important that the financing be available for each of the Projects.  Because of the extensive cash needs of the Debtors, Halimi made it clear that delays in funding would derail the Debtors' projects, including the Projects, and the projects at Frankford and Kingsland.

42.    Sharestates committed to fund the entire cash needs at each of the Projects, as well as the ongoing construction projects of Frankford and Kingsland.

43.    Because of the substantial financial risks, and the obligations being undertaken by the Debtors, as well as the potential catastrophic effect of slow-downs in each of the Projects, particularly with respect to obtaining the right to build on the Delaware River bed from the Commonwealth of Pennsylvania, the Debtors did not have the wherewithal to fund extensive losses, sure to occur, in the event of failures by Sharestates to timely loan under its Loan Agreement and Commitment.

44.    At the onset, Sharestates agreed to fund not just the acquisition and improvements to each of the Projects, but also to provide working capital to the Debtors.  Though the Principals had made substantial capital contributions, and continued to do so though the development of the Projects, their resources were not unlimited.

45.    At the very onset of the lending relationship, Sharestates agreed, assured and represented that it indeed had the ability to fully and timely lend the moneys needed by the Debtors to complete each of the Projects, as well as the other Debtor's projects.

46.    Developments like each of the Projects are very high risk, and require a large amount of working capital.  Unbeknownst to the Debtors, Loans of the type proposed by Sharestates were atypical, and inappropriate for the Projects.  In fact, entering into the loans sounded the Debtors' collective death knell.

**Formatted:** Font: 11 pt

11

47.    Working capital is essential to any person or entity entering into a development project, the size of the each of the Projects.  This fact, coupled with the additional undertakings by the Principals for the Frankford, Kingsland, 123rd, and Hancock projects, and the continuing demands and delays occasioned by Sharestates' administration of the Loans, made the Debtors' collective finances unstable from a working capital standpoint, should Sharestates fail to fund in the amounts, and in the time that it had contractually committed.

48.    Because of the insistence of cross default provisions imposed by Sharestates, in the various loan documents for each of the Projects, as well as the Principals' other projects, Sharestates was able to pressure the Principals to fund each project through whatever means they could, even if that meant weakening the finances of other projects and causing the various projects to become tentative in trying to advance construction, for fear that the project would be underfunded and, thus, not capable of being completed.  Sharestates administered the Loans for the Projects in such a way that it robbed the Debtors of cash flow and working capital and maximized return to Sharestates by delays and charges, which were occasioned solely by Sharestates's continuous breach of the Loan Agreements.

49.    Although Sharestates caused and encouraged the funding of one project at the expense of others, Sharestates ignored the Debtors' obviously undercapitalized state, as well as warnings by Principals that the Debtors needed timely release of moneys to fund the Debtor projects, and proceeded anyway, loaning in total, over $70,000,000.00 to the Debtors, collectively, knowing that their lending platform was one which was rife with burdensome, unnecessary, and damaging delays.

OMC\4834-7168-7935.v2-10/18/21

50. Sharestates' continuous delays and changes in the loan arrangement caused months and months of delays and cost the Debtors millions of dollars in wasted working capital that could have been used to fund the projects, but instead went to Sharestates.

51. Upon information and belief, at all material times the Davoodis, Shayanfekr, and Sharestates knew Sharestates did not have the present capacity to loan the moneys needed by the Debtors to complete each of the Projects, or for the undertakings by the other Debtors for the Frankford, Kingsland, 123rd and Hancock projects.

52. Unbeknownst to the Debtors, and each of them, the Davoodis, Shayanfekr and Sharestates presumably expected to raise the funds as the projects advanced, thereby fraudulently placing the Debtors in the very precarious positon of being at the whim of Sharestates' ability to raise money it had already committed to lend.

53. The Loan Commitment was false and illusory, as the Davoodis, Shayanfekr and Sharestates knew that it lacked the financial wherewithal to fund the Debtors' committed obligations, and never intended, or otherwise had the inability to perform as committed. Though Sharestates charged its full fees for the entire budgeted loan amount, it did not have the ability to fully fund the loans committed to.

54. In order to conceal these known facts from the Debtors, the Davoodis, Shayanfekr and Sharestates began backing away from their Commitments and delaying the funding of loans. Sharestates threw up roadblock after roadblock to construction loan advances, asking for incomprehensible and unnecessary information, and requiring the Debtors to refinance the Penn Treaty loans in order to free up money to fund its promised Commitments.

55. The Debtors had no choice but to refinance Penn Treaty and did it a number of times in order to get Sharestates investors a first lien position.

13

**Formatted:** Font: 11 pt

56.    Sharestates' behavior became even more concerning when it was time to fund the acquisition of the Pier Village Project in the latter part of 2019.  Almost immediately, Sharestates began to back away from its commitment to finance the entire Pier Village Project, resulting first in an unexpected dry closing and then ultimately requiring the seller of that property to take back a note because Sharestates would not fund the entire 57-lot acquisition of the property on which the Pier Village Project was situated.  Instead, Sharestates's erratic and improper behavior ultimately caused the seller of that property to take back a note secured by twenty (20) of the original fifty-seven (57) lots.

57.    Upon information and belief, Sharestates imposed obstacles to funding because it lacked the current ability to honor its commitments and the loan requests being made by the Debtors.

58.1.    Upon information and belief, Sharestates intentionally delayed funding in order to delay the Debtors' projects, knowing the delays ultimately would provide Sharestates' investors more lucrative returns through the added accrual of charges, interest and fees.

59.    Rather than fund the total loans promised, Sharestates began engaging in the unconventional practice of funding loans on individual units/lots that together comprised the Penn Treaty Project, rather than what they had promised to the Debtors, and began imposing ever-increasing demands on the Debtors' cash flows.  Furthermore, because Sharestates had reneged on its agreement to finance the entire Pier Village Project, the Principals had to fund work at the site, without the promised loans.

60.    With respect to the Penn Treaty Project, rather than financing the entire acquisition and construction of the project as one loan, Sharestates, through Shayanfekr and the Davoodis insisted upon the unconventional approach of nineteen (19) mini acquisition loans followed by

14

Formatted: Font: 11 pt

nineteen (19) mini-construction loans, each of which was secured by a mortgage on one of the nineteen (19) lots at the Penn Treaty Project. Sharestates took the separate individual Mortgages, rather than a typical blanket "open-ended mortgage" which is the traditional and straightforward way most lenders make construction funds available and protect their first lien position.

61.    The Sharestates loan process was unorthodox, unnecessarily time-consuming, difficult, cumbersome, delay-causing, costly, and intended to benefit only Sharestates in its dealings with its existing investors or otherwise to enable Sharestates to more easily sell individual loans, all to the detriment of Penn Treaty and the Principals.

62.    Upon information and belief the Debtors believe and therefore aver that Sharestates knowingly and intentionally deviated from the traditional open-ended mortgage, in order to cater to individual purchasers of loans from Sharestates, and at the same time lining the pockets of the Davoodis who retained the benefits of the excessive title charges being imposed at the repetitive and unnecessary closing by Sharestates and Title.

63.    Sharestates would reimburse dollars on the Project, but in order to fund the next tranche, and to assure all of its investors had first liens, Sharestates in each subsequent funding, refinanced the prior funding. The way Sharestates funded its loans cost the Debtors excessive and unnecessary lender fees, and unneeded title and other costs and fees. Title was the principal beneficiary of these unlawful and excessive title charges.

64.    In all, more than seventy (70) mortgages were placed on the Projects, some of which were refinanced a number of times because of the way Sharestates funded. Presently, there are thirty-seven (37) separate mortgages on Pier and nineteen (19) on Penn Treaty, instead of a preferred single mortgage on the Pier Village Project and a single mortgage on the Pier Village Project.

15

Formatted: Font: 11 pt

65.    Driven by a desire to originate loans with credit card-like interest rates, Sharestates loaned money without any true lender discipline or appropriate underwriting for the risks involved.

66.    Because Sharestates did not always have funds available, Sharestates routinely put up unnecessary hurdles and manufactured delays, solely in order to give Sharestates time to raise money it had previously committed.

67.    Upon information and belief, the demands and delays were intended to maximize the interest, fees and charges being charged the Debtors, and to increase financial pressures that would place the Debtors under the duress needed to force additional concessions, including the later discussed Modification and Forbearance Agreement.

68.    Sharestates' manner of financing caused innumerable and inexplicable delays in funding, which, in turn, caused substantial delays in all of the Debtors' projects, including the Projects.

69.    Because of the high interest rates, charges, fees and expenses on the outstanding mortgages, and lack of working capital, delays in funding by Sharestates, caused the Debtors to incur as much as $250,000.00 per week in charges.

70.    Sharestates unnecessarily and fraudulently delayed funding to maximize interest payments due from the Debtors.  By manufacturing delay, and maximizing the financial pressure these delays created, Sharestates exerted excessive lender control over the Debtors.

71.1.    Delays in funding caused by Sharestates damaged the Debtors in that they were obtaining engineered construction materials, for which prepayment was required.   On many occasions, Sharestates' unreasonable delay caused the Debtors to lose its spot in the fabrication process, with each week delay causing the Debtor to incur over $250,000.00 in charges.

OMC\4834-7168-7935.v2-10/18/21

**Formatted:** Font: 11 pt

32.    ~~Concerned with the behavior of Sharestates~~In reliance on these representations, the Debtors ~~began~~entered into construction financing for each Project.

~~72.~~33.  Pursuant to ~~more fully investigate~~ the promissory note executed by each Debtor, each Debtor's construction financing (~~the~~ ~~finances and operations of Sharestates~~"Loans") was cross-defaulted with all other loans to any entity owned by the Principals.

~~73.    The Debtors later learned that Sharestates' statements that it was "syndicating" its loans, by laying off funding portions to different institutional investors, was false.  Not all loans were sold to institutional investors.~~

~~74.    From Sharestates' web site, Halimi realized that Sharestates was misrepresenting not only to the Debtors, but to its individual investors and funders, the nature and quality of the loans they were making, or the instability being caused by Sharestates misuse of its power as lender.~~

34.    ~~In fact.~~Each of the Loans was secured by an open-ended construction mortgage on each Debtor's property or on the units thereof (the "Mortgages").

B.  Sharestates' Crowdfunding Model

~~75.~~35.  Sharestates is not a traditional construction lender; Sharestates is a "crowdfunding" platform~~, and not a formal lending institution, a fact that if known to the Debtors would have prompted the Debtors to immediately seek an alternative funder~~.

~~76.    Unbeknownst to the Debtors, Sharestates did not have sufficient capacity to fund from a "warehouse line", or a sufficient line of credit to finance the entirety of the Projects.  It used predominately investor money.   Consequently, if Sharestates could not place a particular loan, it could not fund.~~

**Formatted:** Font: 11 pt

77.   The major difference between what Sharestates does and a true "crowdfunding" platform is that in a true crowdfunding, if a goal for raising money is not met, the crowdfunding fails, and the money is not advanced.

78.1.   In this instance, Sharestates was piecemealing the funding to the Debtors, and pedaling the loans "a la carte", to individual investors, instead of seeking a project-funding package in the amount needed to fund the Projects.

79.36.  Sharestates' website, relevant portions of which are attached as **Exhibit "A"**, represents the following to its "syndicate partners"" – its crowdfunding investors:

- "Start with as little as $5,000*.  Register today to gain access to **institutional quality investments earning 8-12% annually with immediate cash flow."**
- "Individual accredited investors can access a large marketplace of institutional quality mortgage loans that have been sourced and underwritten by industry leaders.  **As an individual investor, you'll be participating side-by-side with large institutions in the same quality product.  You can even set up auto-invest to manage your investment strategy - delivering you peace of mind that you're never missing an opportunity.  Our investors earned over a 10% annualized return last year - get started today!"**
- "We offer investors direct access to real estate investments through our online marketplace – with net annualized returns between 8-12%...Crowdfunding make it easy for anyone to build a real estate portfolio and to fund a project."

37.   Unbeknownst to the Debtors, Sharestates did not have sufficient capacity to fund from a "warehouse line", or a sufficient line of credit to finance the entirety of the Projects.  It used predominately investor money.  Consequently, if Sharestates could not find investors for a particular loan, it could not fund draws upon that loan.

38.   The Defendants were misrepresenting – not only to the Debtors, but to individual investors and funders – the nature and quality of the loans they were making.

39.   In this instance, Sharestates was piecemealing the funding to the Debtors, and pedaling the loans "a la carte", to individual investors, instead of seeking a project-funding package in the amount needed to fund the Projects.

80.    In fact, the Project is now more than 100% encumbered and upon information and belief, no major institutional investor is participating in or along the "crowd funding" portions of the loans from individual investors.

81.40.  The Debtors believe and therefore aver that at the time of committing to the Projects, and in fact all of the other Debtors' projects at Frankford, Kingsland, 123rd, and Hancockthey executed the Loans for each Debtor, Sharestates did not have institutional investors in place to commit *in toto* to the Loans to the Debtors, or alternatively that the institutional investors constituted a *de minimus* amount of dollars available for funding.

82.41.  Sharestates' sale of its individual loans or otherwise securing investors for certain loans placesBy committing to lend more than it was able to fund, Sharestates was placed in a self-createdan irreconcilable, unwaivable, and untenable conflict of interest between theits legal and contractual duties owedto disburse funds to the Debtors and each of them, as borrowers, to fulfil the obligations under the loan documents, on the one hand, and the actions needed to fulfil the unknown promises made to investors.  Sharestates repeatedly refused to disclose who to return money to its investors were.

The representation about
C.  Sharestates' ability to fundLending Misconduct

42.    Following the Debtors' projects, including commitment to loan construction funds for the Projects, were known by Sharestates, the Davoodis began to stall underwriting and Shayanfekr to be false and materially false when made, because disbursements.

43.    Upon information and belief, Sharestates knew it finally had insufficient funds on hand to meetimposed obstacles to funding because it lacked the current ability to honor its lending commitment to commitments and the loan requests made by the Debtors, and .

OMC\4834-7168-7935.v2-10/18/21

Formatted: Font: 11 pt

44.    Sharestates utilized several methods to improperly extract money from the Debtors.

83.45.  Sharestates demanded that the mortgages on the Projects be recorded on a unit-by-unit basis, and that a new title search and distinct loan closing costs were imposed for each of them the 19 units at the Penn Treaty Project and the 37 units mortgaged for the Pier Village Project. As part of its agreement to refinance the Stewart parcel, Sharestates insisted that those units be separately identified in connection with its promise to refinance the Stewart parcel.

84.    The misrepresentations about the ability to fund were made by the Davoodis, Shayanfekr and Sharestates, in order to induce the Debtors to take on the Sharestates financing, and to get their investors the 8-12% return they promised on their web site.

85.    When the Debtors complained about the timing and delays of funding, Sharestates the Davoodis and Shayanfekr continued to misrepresent that it had the funding in place to finance the Projects, and the other affiliated Debtor projects at Frankford, Kingsland, 123rd and Hancock.

86.    The Debtors believe and further aver that none of the institutional investors listed by Sharestates as "approving their platform" are actual participants in the loans to the Debtors.

87.    The Debtors believe and further therefore aver investors were not fully informed about material facts relating to the Debtors' loans at the time of the loans being placed including:

a.    That Sharestates had cross default provisions with other loans to the Principals, that encouraged, and in fact required, the Debtors to fund cash flow deficiencies for their affiliates;

b.    that the Debtors had become thinly capitalized;

c.    that the Debtors' Principals had no credit;

d.    that there was insufficient equity in the Debtors' properties;

OMC\4834-7168-7935.v2-10/18/21

Formatted: Font: 11 pt

e. that the Pier Village Debtor needed to obtain a lease for the right to build on the State owned Delaware riverbed.

88. Finally revealing that the representations about funding were false, Sharestates began to assert pressure and control, by delaying and controlling the funding of the Projects, as well as the other affiliated Debtor projects.

89. Once the lending relationship started, Sharestates would threaten to cut off funding without basis in order to create a duress situation. Any question raised by the Principals about delays and timing with Sharestates would result in Sharestates threatening that the Debtors' pushback would result in the Debtors "being Blackballed for future fundings"; threatening to cut off funding that Sharestates had already committed to, in order to force concessions without legal right, and using the leverage and control from their commitment to do so.

90. The statement about "blackballing" was constantly used to pressure payments from the Debtors. Sharestates asserted this unlawful pressure, even though it was routinely missing its funding obligations to the Debtors.

91. Halimi questioned what Sharestates meant by the "blackball" comments, and was told investors would not buy new loans if the Debtors began to question how money was flowing.

92. Sharestates repeatedly refused to disclose the investors on the Loans.

93. In fact, Sharestates had committed to fund the Projects, so the "blackballing" threat was fraudulent, illegal and violated Sharestates' commitment to fund the Projects, as well as the other Debtor projects at Frankford, Kingsland, 123rd, and Hancock.

94. Though Sharestates was well aware of the Debtor's finances, the lack of creditworthiness of the Debtors' Principals, and the daunting nature of the Projects, Sharestates made the individual Loans to the Debtors. However, in so doing, fundings were delayed

21

**Formatted:** Font: 11 pt

materially to the great financial harm and detriment of the Debtors, as Sharestates scrambled to get Loan participants.

95.    As~~use~~ a ~~consequence of its inability to currently fund the completion of the Projects through one or two loans, Sharestates entered into numerous of the separate Mortgages for each participant, improperly charging the Debtors, through Title, title charges well in excess of those permitted under Pennsylvania law.~~

96.    ~~In all, Sharestates' choice to eschew traditional financing mechanism of an open-ended mortgage resulted in over seventy (70) Mortgages on the Projects, each securing a different loan or portion of a loan (the "Loan" or collectively, the "Loans").  Just the administration of the interest obligations on this confusing lending platform was unmanageable.~~

97.    ~~Each Mortgage was recorded against the Projects' units for a *pro rata* share of the full amount Sharestates was bound to distribute pursuant to the Loans, regardless of how much had actually been distributed.  In effect, Sharestates received a Mortgage for the maximum amount it was committed to lend, including all of its fees and charges, whether or not it actually loaned that amount.~~

~~98.~~46.  ~~Upon each request for construction reimbursement, Sharestates required Penn Treaty to refinance the original purchase, and obtain a new~~ title ~~policy from Title at a cost above the legal rate.~~company called Atlantis National Services, Inc. ("Title").

99.    ~~Upon information and belief, Title is an affiliate of Sharestates and the owners thereof.~~

47.    Upon information and belief, ~~payments to Title directly benefited the individual Defendants, the~~the Davoodis and~~/~~or Shayanfekr are the owners, investors or otherwise the direct beneficiaries of Title.

100.48.    For the title searches and policies demanded by Sharestates, Title charged costs above the legal rate and charged improper disbursement fees.

101.49.    By requiring a separate Mortgage on each unit, a new Mortgage upon each alteration of the lending relationship, and a new title search for each new Mortgage, Sharestates churned excessive and illegal fees for itself and its affiliate Title.

50.    Sharestates also delayed closing and funding on these construction loans by performing extensive, unnecessary "due diligence".

51.    This alleged due diligence consisted of repeatedly requesting the same documents and financial information from the Debtors after it had already been provided.

52.    Sharestates has not alleged whether it even performed its own independent due diligence.

53.    This due diligence was illusory; Sharestates admits that it relied entirely on the disclosures made by the Debtors.

54.    By extending the alleged due diligence period, Sharestates permitted itself to run interest upon the Loans before refinancing them.

55.    Because of the high interest rates, charges, fees and expenses on the outstanding mortgages, and lack of working capital, these delays in funding by Sharestates caused the Debtors to incur as much as $250,000.00 per week in charges.

102.    At each alteration of the lending relationship, Sharestates represented that some of the institutional investors could not agree to the terms proposed, and required terms more favorable to Sharestates.

103.    The alteration of the committed obligations breached Sharestates's contractual obligations.

23

OMC\4834-7168-7935.v2-10/18/21

**Formatted:** Font: 11 pt

104.    Upon information and belief, Sharestates did not actually negotiate the terms of loan alterations with each underlying investor, and the representations were false and knowingly false.

105.    Instead, Sharestates falsely represented that some investors were holdouts, in order to improperly extract additional concessions  As a consequence, Sharestates had ever-shifting requirements for its loans, beyond those already bargained for.

106.56.       In the alternative, if Sharestates did not have authority to renegotiate terms without the approval of the investors, it nevertheless did renegotiate terms without investor approval, and purported to bind the Debtors to those terms without authority to do sothe original commitment.

107.57.       At one juncture during the financing, Sharestates lacked the liquidity to make committed-to advances, and forced the Debtor to refinance the Penn Treaty loan again, at great expense to the Debtors, including costs and title charges, in order to create a liquidity event for Sharestates, i.e., to free up capital to be loaned again.

108.58.       The alleged refinance was not of any benefit to the Debtor, but rather was a manipulation intended to garner further investors' interest in investing in the Sharestates loans to the Debtors.

59.    Upon information and belief, Sharestates intentionally delayed funding in order to delay the Debtors' projects, knowing the delays ultimately would provide Sharestates' investors more lucrative returns through the added accrual of charges, interest and fees.

109.    Sharestates insisted the Debtors' loans be cross-defaulted with other loans made to other debtor and non-debtor entities. The Loans only permitted Sharestates later threatened that problems in those loans would affect funding for the Pier Villageto charge interest on amounts

OMC\4834-7168-7935.v2-10/18/21

Formatted: Font: 11 pt

actually loaned to the Debtors.  Sharestates charged Hancock, 123, and Penn Treaty ~~loans~~on the entire construction loan, even if ~~they were current.~~

~~110.~~60.    ~~Sharestates began demanding payments from the Debtors and their non-bankrupt affiliates knowing the Debtors had limited finances, but nevertheless knowing, if~~not ~~encouraging, the Debtors and their non-bankrupt affiliates to fund loan payments by using liquidity from one project to fund another.  Sharestates necessarily knew that this cross default requirement would weaken or jeopardize healthier projects to effectively act as a de facto, albeit improper, guarantor of other projects, all of which would do nothing more than increase the likelihood of an overall collapse of the projects, including the Projects, and ultimately permitting Sharestates to foreclose~~drawn, in violation of the Loans~~.~~

~~111.    This *modus operandi* used by Sharestates creates yet another undisclosed and unwaivable conflict of interest, if not a type of Ponzi Scheme, whereby Sharestates effectively forces the Debtors and their non-debtor affiliates to use liquidity from one project to fund another project to enable Sharestates to better ensure its promised return to investors of a financially troubled project.~~

~~112.    This multi-level conflict of interest redounds to the distinct detriment of the Debtors, their principals and non-debtor affiliates, and strengthens the return to investors on certain projects on the backs of other projects, thereby potentially jeopardizing the future success of all projects, including the Projects, and knowing further that doing so would cause the Debtors' collapse and permit it to foreclose.  However, in each such instance, Sharestates picks the investor to favor and which to prejudice.~~

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

113.    In each of the Debtors' Projects, investors are different.  Accordingly, using a cross default provision in any such instance creates an unwaivable conflict of interest between Sharestates investors.

114.    In each closing, Sharestates required the Debtors to refinance earlier loans in order to "wrap" the loans with other current loans.  Each time, Sharestates forced the Debtors to buy title insurance from Title.

61.    Whenever one Debtor was unable to make an interest payment on its Loan, Sharestates demanded that the Principals cause some other Debtor to make a draw on its Loan and use those proceeds to pay the interest payment for a different Debtor.

62.    By requiring the Debtors to draw on the Loans to pay interest on other Loans, Sharestates ensured it was paid but that there would not be funds available for construction on the Debtors' projects.

63.    In effect, Sharestates administered the Loans as though they were both one Loan and separate Loans, depending on which posture benefited it most in the short term.

D.  Sharestates Violates the Draw Process to Extract Releases

115.64.    The Loan documents did not explicitly lay out the draw process by which the Debtors could demand incremental disbursements under the Loans, but clearly provided for the advance of construction moneys by Sharestates, and not for the reimbursement of expenditures.

116.65.    The Loan Agreement(s) initially provided, asAs a condition tofor funding draws on the construction releases, for Penn TreatyProjects, the Debtors were originally required to submit the unpaid invoiceinvoices and proof of release of liens for prior work, followed by a

OMC\4834-7168-7935.v2-10/18/21

**Formatted:** Font: 11 pt

certification of completion by a construction professional.   Once the professional verified completed work, Sharestates was required to fund.

117.66._____The Debtors and Sharestates agreed upon this particular draw process (the "Original Draw Process"), and it became the binding process for claiming draws under the Loans.

67._____Sharestates immediately breached the Loan Agreement by insisting that only paid invoices would be reimbursed, in complete contravention of the Loan Agreement and understanding.  Penn Treaty was.

118.____The Debtors were now forced to pay the hired contractors first.

119.   Upon review and approval by Sharestates' professional,; Sharestates would disburse an amount sufficient to reimburse for the paid invoices.

120.68._____The Loan Documents only permitted Sharestates to charge interest on amounts actually loaned to the Debtors.  Sharestates charged Hancock, 123rd, and Penn Treaty on the entire construction loan, even if not drawn, in violation of the Loan Agreementupon review and approval by Sharestates' professional.

69._____Delays in funding caused by Sharestates damaged the Debtors in that they were obtaining engineered construction materials, for which prepayment was required.

70._____On many occasions, Sharestates' unreasonable delay caused the Debtors to lose its spot in the fabrication process, with each week delay causing the Debtor to incur over $250,000.00 in charges.

71._____Without contractual authorization, Sharestates also required Penn Treaty to take Loan disbursements in $5 million tranches, even if that was more than necessary to fund present invoices.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

72.    Sharestates established an interest reserve of $5 million for Pier, which it purportedly held in an account under its own control.  Sharestates never provided proof of escrowed funds.  Sharestates charged for amounts in excess of those to which it was entitled, and charged interest on the entire $5,000,000.00 million loan tranche, even if it was not advanced.

121.73.    This interest reserve was allegedly funded by a portion of the Loans and was used by Sharestates to pay itself interest on the portions of the Loans that had been funded. Sharestates refused to provide evidence the money was actually escrowed, as opposed to not advanced.

122.    Upon information and belief, Sharestates never funded an escrow, even though it charged Pier for the moneys that were to be placed in escrow under the fiction that the funds had been fully advanced, all to the Debtors' financial detriment.  Further, Sharestates charged the Debtors points for money it did not have in its possession.

123.    In order to charge interest on a higher amount of loaned principal, Sharestates demanded that Penn Treaty take disbursements in tranches of approximately $5 million, even when it did not need such a large disbursement to reimburse paid invoices.

124.74.    Sharestates started charging interest on the entire loan commitment even though Penn Treatythe Debtors had not drawn on it.

125.75.    By requiring the Debtors – especially Pier and Penn Treaty – to take out more money than was due, and then charging interest on this over-borrowing, Sharestates depleted the remaining amount of credit the Debtors could draw on, and exacerbated the Debtors' cash flow and working capital issues, without a contractual basis, and for the sole benefit of Sharestates.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

126.    The Debtors began complaining that the Loans were inappropriate, that the Debtors had never seen loans made individually like these, with different underlying investors, and that Debtors were concerned that Sharestates could fully perform on its Loan Agreement and Commitment.

76.    Sharestates continually delayed reimbursement and funding, causing the Debtors operational issues through, among other things, the inability to promptly schedule specialized suppliers and materialmen, contractors and other construction professionals at the Projects.

127.77.    The Debtors complained bitterly that they were going to fail, because of the delays caused by Sharestates' violation of the Original Draw Procedures.  The Debtors warned of a financial failure, if funding was not timely and completely made under the Original Draw Process.

128.78.    Aware of the issues raised by the Debtors, Sharestates began to refuse funding for Project related expenses, in violation of the Original Draw Process.  As noted above, Sharestates informed the Debtors that it would no longer abide by the Original Draw Process, insisting that the Debtors show evidence of payment of the vendors and contractors BEFORE Sharestates would fund.

129.79.    Sharestates began insisting that the Debtors fund payment of all vendors first, show wire receipts, and then submit invoices showing the vendor was paid before Sharestates would reimburse the Debtors (the "Modified Draw Process").  Sharestates' demands exacerbated the Debtor's working capital shortages by insisting on the Modified Draw Process.  Moreover, under these modified procedures, Sharestates began interfering with the Debtors' contractors by questioning payments made by the Debtor.

Formatted: Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

130.   Further, Sharestates interfered with vendors by making direct and unauthorized contacts to the vendors, questioning whether management had appropriately paid vendors, and raising issues about management with vendors.

131.80.       The Modified Draw Process breached the Loan AgreementLoans, and forced the DebtorDebtors to fund all expenses and then wait for the vagaries of Sharestates' newly created draw process for reimbursement.

132.   Though Sharestates claimed it could manage a construction loan like the ones made to the Pier and Penn Treaty Debtors, it demonstrated repeatedly its inability to manage the construction loan.   Sharestates retained CFSI, with the stated intention of monitoring and streamlining the draw process.  In reality, Sharestates engaged CFSI with the intention of delaying further the Projects and forcing a default.

133.   Instead of streamlining and expediting the process, CFSI added delay, requested unneeded, burdensome information, and interfered with Debtor's contractual relationships with its vendors, asking for invoices from the Debtors' vendors for their invoices for raw materials being used in finished products being used on the Projects.   The Debtors' vendors refused to provide their raw material and profit margin information to Sharestates and CFSI and complained bitterly to the Debtors.  Sharestates too began to harass Debtors' vendors, burdening them with unneeded hurdles to payment, and defaming management. As a result, the Debtors received calls from concerned vendors who were then resistant to additional advances of credit.

134.81.       Intentionally disregarding the Original Draw Process, Sharestates forced the Debtors in a "Catch-22" situation: they were now required to incur debts that had to be paid from cash flows that did not exist, in order to obtain the contractually-due advances.  Sharestates demanded interest payment from any party obligated to Sharestates including non-debtors.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

82.    The In the summer of 2020, when Sharestates demanded the Loans now use the Modified Draw Process, the Debtors were owed over $2,000,000.00 in construction cost reimbursement in the Summer of 2020, and at that time, Sharestates imposed modifications to how moneys would be received by reimbursements.

83.    At this point, the amounts owed on each Loan exceeded the as-built value of each Debtor property.

135. 84.    Without present equity or any hope for alternative financing for underwater projects, the Debtors had no alternative but to accede to Sharestates' demands.

136. 85.    On August 14, 2020, the Debtor Pier entered into a Confirmation, Modification and Ratification of Loan documents agreement ("Modification").  A true and correct copy of the Modification is attached hereto as **Exhibit "B"**.

137. 86.    On August 14, 2020, the Debtor Penn Treaty also entered into a forbearance agreement (the "Forbearance Agreement"). A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit "C"**.

138. 87.    The stated consideration for the Modification is ten ($10.00) dollars.

139. 88.    Sharestates coerced Pier into entering into the Modification, and agreeing to the Modified Draw Process in order to obtain the overdue moneys to which Debtors were entitled to under the Loan Agreement.

89.    At the same time that the Debtors were coerced into entering into the Modification, the Debtors were Penn Treaty was coerced to enter into a separate Forbearance Agreement with Sharestates, the.

140. 90.    The combined effect of Modification and Forbearance Agreement was the waiving the right to reimbursement of the $2,000,000.00 owed to the Debtors under the original

**Formatted:** Font: 11 pt

Loan Agreement and CommitmentLoans, and the granting of a Lender Release, knowing that the Debtors had no other funding alternative.  broad release to Sharestates.

141.91.    Under the Modification and Forbearance Agreement:

a.    The Debtors and Sharestates formally adopted the Modified Draw Process;

b.    Pier waived the right to be reimbursed for $2,061,801.70 pursuant to a draw request made on May 3, 2020;

c.    The DebtorsPier and Penn Treaty waived all of their respective claims against Sharestates, and granted a lender release to Sharestates (the "Lender Release").

142.92.    The Modification and Forbearance Agreement further modified draws by a formula imposed by Sharestates where it would recalculate advances, subtract certain "equity" contributions it expected from the Debtors, and recalculate moneys due, based upon a 75%/25% split between Sharestates and the Debtors.

143.    As a result of the new formula, the Modification, and the Forbearance Agreement, and with Sharestates having advanced $8,000,000.00, the Debtors were entitled to no reimbursement of the $2,000,000.00 advanced and due to them under the Loan and Commitment.

144.    The refusal of Sharestates to reimburse, as legally required, damaged the Debtors and deprived them of working capital.

145.    Each time a Debtor sought financing from Sharestates, and each time Sharestates required a refinance, modification or forebearance on an existing loan, Sharestates required the Debtors to obtain a new appraisal.

146.    Each time, Sharestates required the Debtors to use Republic Valuations ("Republic").

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

147.   The Debtors shopped around and discovered that other qualified appraisers would charge approximately $24,000.00 for appraisal work where Republic charged $60,000.00.

148.   The Debtors attempted to swap appraisers in order to save money, but Sharestates vetoed this attempt and required the use of Republic for all appraisals on all projects.

149.   Upon information and belief, Sharestates required the use of Republic because Republic was willing to appraise the properties at whatever amount Sharestates required to meet is loan-to-value ratios in order to enable Sharestates to continue its revolving door process of semi-crowdfunded lending.

150.   Upon information and belief, Republic charged exorbitant prices because that was its condition for issuing appraisals compliant with Sharestates' wishes and needs.

151.   Upon information and belief, Sharestates knew Republic's prices were exorbitant but required their employment at the expense of the Debtors in order to continue with its risky, unsupported and improper lending practices.

152.   Upon information and belief, Sharestates or an affiliate thereof specifically recommended or required that the borrower employ Republic for the appraisal in the Republic Suit.

153.   Upon information and belief, Sharestates utilized a similar rationale in the transactions underlying the Republic Suit and the instant loans to the Debtors: to require borrowers to use Republic, which would spit out desired valuations.

154.   This setup insulated Sharestates, as they did not hire Republic directly and could blame a borrower and/or Republic for the inflated valuation if Sharestates incurred a loss.

155.   The Modification, Forbearance Agreement and Lender Release were not supported by sufficient consideration, or a reasonably equivalent exchange, for the release of the numerous

33

**Formatted:** Font: 11 pt

and valid claims of the Debtors and each of them, against Sharestates, or the waiver of millions of dollars to be drawn to finance the Projects, as well as the other Debtor projects.

156.    At all relevant times to this matter, including at the original loan, all subsequent loan modifications and at the time of execution of the Modification, Forbearance Agreement and Lender Release, the Debtors were insolvent or otherwise rendered insolvent by virtue of the specific transaction(s) entered into with Sharestates.

157.    At the time of execution of the Modification, Forbearance Agreement and Lender Release, the Debtors were unable to pay their debts as they came due.

158.    At all relevant times, including at the time of each Loan, the placing of each Mortgage and the granting of the Lender Release, the Debtors had insufficient working capital.

159.    By the time of the execution of the Modification and Forbearance Agreement, the Debtors' operations had ceased, their finances were destroyed, and their ability to continue as a going concern was so impaired, such that the Debtors could not restart operations.

160.93.        The actions of Sharestates effectively wrested control of the Debtors' finances from the Debtors and left Sharestates in a position to control and dominate the Debtors' finances, and because of the cross-defaults, foreclose on the Debtors' projects.

94.    The Debtors were predictably unable to pay contractors prior to reimbursement.

161.    Due to the purported defaults, and its indiscriminate collection of interest from whichever Debtor could pay, Sharestates was so committed to its improper use of the cross-default provisions that would allow it to foreclose on valuable properties owned by Debtor affiliates, that it began to manufacture defaults byimpaired the Debtors.

OMC\4834-7168-7935.v2-10/18/21

**Formatted:** Font: 11 pt

162. In one instance, Sharestates threatened~~ability~~ to ~~foreclose upon the Pier and Penn Treaty Debtors because~~complete the New York ~~affiliate had purportedly defaulted on a loan by failing to pay interest.~~

163. ~~However, Sharestates had an interest reserve on Pier~~projects, which were at or near completion and ~~it was not in default.~~

164.95. Sharestates threatened almost ready to rent to ~~default the Debtors and the affiliates, and ruin both the affiliates and the Debtors even though it had agreed to waive any cross default as to Pier as long as its payments were current.  Though Pier had an interest reserve and was at all times current on its interest obligations, Sharestates nonetheless declared a default as to Pier~~tenants.

165. ~~Sharestates' positions were without contractual justification.~~

166. ~~When the Principals complained about the improper use of the cross default provision, Sharestates agreed it would not use the cross default to default any debtor current on its own loans.~~

96. Construction on all Debtor projects ceased after the summer of 2020, and has not resumed.

167.97. The entire Sharestates funding scheme, and each of the Loans made to the Debtors, and the Mortgages granted thereunder, was fraudulent as to the Debtors, and their creditors, and placed the Debtors in a position where financial failure was a foregone conclusion.

168. ~~The execution of the Modification and Forbearance Agreement and the grant of the Lender Release was fraudulent as to as to the Debtors, and their creditors, both existing and future.~~

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

98.    As a result of Sharestates' need to manufacture defaults, generate liquidity events and pay investors, all of the Debtors' projects became impossible to complete and necessitated the filing of these bankruptcy cases.

99.    Rather than fund 100% of construction Sharestates insisted that the Debtors pay 25% of any request for funding, further exacerbating the Debtors' cash flow issues.

100.    As of the filing of the bankruptcy cases, Sharestates alleged it was owed far more that the fair market value of each property.

## COUNT I
## : AVOIDANCE OF PIER VILLAGE MORTGAGES UNDER 11 U.S.C. §544
### Debtors v. Sharestates

~~169.~~101.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

~~170.~~102.    Sharestates ~~recorded individual mortgages against~~encumbered each of units 18 through 54 of the Pier Village Project with individual mortgages (the "Pier Village Mortgages~~").~~"), which encumbrance is a transfer.

~~171.~~103.    Pursuant to their written terms, the Pier Village Mortgages each encumber the "Mortgaged Property," which is defined in each mortgage as a specific individual unit at the Pier Village Project.

~~172.~~104.    Sharestates does not have any recorded, unsatisfied mortgage against the entire Pier Village Project "in gross."

~~173.~~105.    Vertical construction has not begun on the Pier Village Project, which is currently a lot of land ready for construction.

~~174.    No units actually exist at the Pier Village Project.~~

OMC\4834-7168-7935.v2-10/18/21

175.106.      The collateral securing the Pier Village Mortgage – the individual units – does not yet exist.

176.107.      The Pier Village Mortgages are inchoate, and have not attached to any extant collateral.

177.108.      A creditor that extended credit to the Debtors on the petition date could have obtained a judicial lien or an execution on the Pier Village Project "in gross" with rights superior to the Pier Village Mortgages.

109.    Following the recording of the Pier Village Mortgages, Pier entered into the Modification with Sharestates.

110.    Sharestates did not record new mortgages consistent with the Modification.

111.    The Modification of the underlying loan obligations rendered the Pier Villages Mortgages unperfected as against a future purchaser.

178.112.      A bona fide purchaser of the entire Pier Village Project in gross would take title free and clear of the Pier Village Mortgages.

113.    A perfected lien or execution creditor would obtain superior priority to the Pier Village Mortgages.

179.114.      Pursuant to 11 U.S.C. §544(a)(1), (2), (3), the Debtors may avoid the Pier Village Mortgages.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates avoiding the Pier Village Mortgages and providing such other and further relief as the court deems just and equitable.

COUNT II

37

Formatted: Auto Numbered Single Spaced, Right: 0", Font Alignment: Auto

Formatted: Font: 11 pt, Not Bold, No underline

Formatted: Font: 11 pt

## : AVOIDANCE OF ~~LOANS, MORTGAGE~~MORTGAGES, MODIFICATION, FORBEARANCE AGREEMENT AND LENDER RELEASE AS A FRAUDULENT CONVEYANCE UNDER 11 U.S.C. §548 OF THE BANKRUPTCY CODE
### Debtors v. Sharestates

~~180.~~115.        Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

~~181.~~116.        At the time ~~of taking the Loans and granting of each of the~~they entered into the Mortgages, ~~and at the time of entering into the~~ Modification, Forbearance Agreement, and granting the Lender Release, the Debtors were insolvent or became insolvent as the result of the transaction as the fair market value of their assets exceeded their debts.

~~182.~~117.        At the time ~~of taking the Loans and granting of each of the~~they entered into the Mortgages, ~~and at the time of entering into the~~ Modification, Forbearance Agreement, and the granting of the Lender Release, the Debtors were unable to pay their debts as they came due.

~~183.~~        At ~~all relevant times, including at~~ the time ~~of each Loan, and granting of each of~~ they entered into the Mortgages, ~~and at the time of entering into the~~ Modification, Forbearance Agreement, and the granting of the Lender Release~~, the Debtors had insufficient working capital.~~

~~184.    Under 548(b), the Debtors may avoid any transfer of property to or for the benefit of a creditor where: (1) the Debtor received less than reasonably equivalent value in exchange for such transfer or obligation; and (a) was insolvent; (b) was engaged in business or about to engage in business for which the property remaining with the Debtor was unreasonably small capital; (c) intended or believed that the Debtor would incur debts beyond its ability to pay.~~

~~185.    The Loans, Mortgages, Modification, Forbearance Agreement and Lender Releases were entered into at a time when the Debtors were insolvent. The fair saleable value of the Debtors' assets after closing was less than the amount of the debt to Sharestates.~~

OMC\4834-7168-7935.v2-10/18/21

186.118.     At the time the Loans, Mortgages, Modification, Forbearance Agreement, and the Lender Releases were entered into, the Debtors were engaged in business or about to engage in business for which the Debtors had unreasonably small capital.

187.   The Loans, Mortgages, Modification, Forbearance, and Lender Releases were entered into at a time when the Debtors intended to or believed that they were incurring debts beyond the Debtors' present ability to repay as they came due.

188.   Sharestates was fully aware of the Debtors' precarious financial position at each material time.

189.   At the time of the Loans, and at each of them, it was or should have been apparent that the Debtors would fail.

119.   The Loan, the Mortgages,The Mortgages created encumbrances on the Debtors' property, which constitutes a transfer.

120.   The Debtors received fraudulent promises of construction financing in exchange, which illusory promises are not reasonably equivalent value.

190.121.     The Modification, Forbearance Agreement, and the Lender Release constitute transfers of property because with respect to each, the Debtors gave up valuable rights in exchange for less than equivalent value. under the applicable contracts and released valuable causes of action.

191.   Sharestates did not disburse all loan proceeds that it was committed to lend. For each of these transfers, the Debtors did not draw down the entirety of the Loans.

192.   For each grant of a Mortgage, Sharestates received a purported lien in the full amount.technical months-long cessation of foreclosure activity which lien was not reasonably equivalent to the amount due to Sharestates.

OMC\4834-7168-7935.v2-10/18/21

Formatted: Font: 11 pt

193.122.    In particular, with respect to the Modification, Forbearance Agreement, valuable rights and Lender Release, the Debtors received no consideration and waived over $2 million in valid, reimbursable construction costs plus all extant causes of action for Sharestates' misconduct transferred away.

194.    Upon information and belief, affirmative claims for Sharestates' lender liability and avoidance claims are the largest non-operating assets of the Debtors.

123.    The Loans. Even this temporary cessation was illusory, as the Debtors had no means to restart construction.  The cessation provided the Debtors no value because Sharestates knew it could immediately resume collections activity once it was over.

195.124.    The Mortgages, Modification, Forbearance Agreement, and Lender Release are avoidable transfers under Section 548 (b) of the Bankruptcy Code.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates, as well as: (a) avoidance of avoiding the Loans, Mortgages, Modification, Forbearance Agreement, including the issuance of an Order voiding and nullifying the Mortgages and striking them from the records maintained by the Recorder of Deeds of Philadelphia County, Pennsylvania and New York, New York; (b) avoidance of the Modification, Forbearance Agreement and Lender Release; (c) damages in the amount necessary to satisfy the Mortgages; and (d) and providing such other and further relief as the court deems just and equitable.

COUNT III
## : AVOIDANCE OF LOANS, MORTGAGES, MODIFICATION, FORBEARANCE AGREEMENT AND LENDER RELEASE AS A FRAUDULENT CONVEYANCE UNDER 11 U.S.C. SECTION 544 OF THE BANKRUPTCY CODE AND PUVTA
### Debtors v. Sharestates

196.125.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

OMC\4834-7168-7935.v2-10/18/21

197.    Section 544 of the Code is the Debtors' "strong arm" powers and permits the Debtors to avoid any transfer that would be avoidable under state law.

198.126.    Sharestates' claim, or right to payment by the Debtors, arose after the Debtors granted Sharestates Mortgages on the Project property.  12 Pa.C.S. §5104(a).

199.    The Debtors granted Sharestatesentered into the Mortgages on the property without receiving reasonably equivalent value in exchange for same.  12 Pa.C.S. §5104(a)(2).

200.    The Debtors gave Sharestates a, Modification, Forbearance Agreement, and entered the Lender Release without receiving equivalent value in exchange for same.

201.127.    The consideration for the waiver of over $2,000,000.00 in owed reimbursements and waiver and release of valid claims against Sharestates was not a reasonably equivalent exchange, and was the result of improper lender pressure and controlreasonably equivalent value in exchange.

202.128.    In entering into the Loans, and in granting the Mortgages, the Debtors engaged in or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.  12 Pa.C.S. §5104(a)(2).

203.129.    At all relevant times, Sharestates was aware of the Debtors' precarious financial condition, and insolvency.

204.130.    In entering into the Mortgages, Modification and Forbearance Agreement, and granting the Lender Release under the Forbearance Agreement, the Debtors engaged in or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.  12 Pa.C.S. §5104(a)(2).

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

205.131.    In entering into the Modification and Forbearance Agreement, and granting the Lender Release under the Forbearance Agreement the Debtors gave up valuable claims against Sharestates, without supporting consideration, or equivalent exchange.

206.132.    In granting the Mortgages on the Debtor project properties, the Debtors intended to incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.  12 Pa.C.S. §5104(a)(2).

207.    The Debtors have other existing creditors, including a creditor secured by real estate property.

208.133.    The Mortgages, Modification, Forbearance Agreement and Lender Release are voidable as to existing and future creditors.  12 Pa.C.S. §5104(a).  ); 11 U.S.C. §544.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates, as well as: (a) avoidance of avoiding the Loans, Mortgages, Modification, and Forbearance Agreement, including the issuance of an Order voiding and nullifying the Mortgages and striking them from the records maintained by the Recorder of Deeds of Philadelphia County, Pennsylvania and New York, New York; (b) avoidance of the Forbearance Agreement and Lender Release; (c) damages in the amount necessary to satisfy the Mortgages; and (d) and providing such other and further relief as the court deems just and equitable.

COUNT IV
**AVOIDANCE OF MORTGAGES, MODIFICATION, FORBEARANCE AND LENDER RELEASE AS A PREFERENCE: RECOVERY UNDER 11 U.S.C. §547 OF THE BANKRUPTCY CODE550 AND PRESERVATION OF AVOIDED TRANSFER UNDER 11 U.S.C. §551**
**Debtors v. Sharestates**

209.134.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

OMC\4834-7168-7935.v2-10/18/21

210.    Sharestates, as the Debtors' main funding source for the Project, improperly dictated when and how the Debtors could pay contractors, unilaterally changed the draw process, demanded a renegotiation of the Loans under duress, and otherwise exercised control and domination over the operations of the Debtors.

211.    At all times, Sharestates exercised its dominant position to force the Debtors into modifications of existing rights on terms that were negotiated at less than arm's length, and waiving valuable claims against Sharestates.

212.    Sharestates is a non-statutory insider of the Debtors.

213.    Certain Mortgages (the "Recent Mortgages") were granted within a year of the petition date.

214.    These Mortgages purportedly secured claims for the full amount due to be disbursed, even if that amount was never disbursed.

215.    The Modification and Forbearance Agreement and Lender Releases were granted on August 14, 2020.

216.    The Modification and Forbearance Agreement was made on account of the Debtors' antecedent debt to Sharestates.

217.    Pursuant to the Modification and Forbearance Agreement and Lender Releases, Sharestates obtained a modification of the Original Draw Process into the Modified Draw Process, which only benefitted Sharestates.

218.    Pursuant to the Modification and Forbearance Agreement and Lender Releases, Sharestates obtained waiver of a valid reimbursement claim due to the Debtors of over $2,000,000.00, transferring value from the Debtors to Sharestates, and enhancing its collateral.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

219. Pursuant to the Modification and Forbearance Agreement and Lender Releases, Sharestates obtained releases of all existing claims against it, including claims for lender misconduct, transferring away these valuable causes of action.

220. By executing the Recent Mortgages, Sharestates purportedly obtained a lien for far more value than the amount due on account of each Recent Mortgage.

221. Sharestates would not have obtained any of these benefits if the Recent Mortgages, Modification, and Forbearance Agreement had not been made and the Debtors were liquidated in chapter 7.

222. The Recent Mortgages and Forbearance Agreement allowed Sharestates, a creditor, to receive far more value than it would have absent these transfers.

223. The Recent Mortgages, Modification and the Forbearance Agreement and the transfers of value that it effectuated are avoidable as preferences to an insider pursuant to 11 U.S.C. §547(b).

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates, as well as: (a) avoidance of the Loans, Mortgages, Modification and Forbearance Agreement, including the issuance of an Order voiding and nullifying the Mortgages and striking them from the records maintained by the Recorder of Deeds of Philadelphia County, Pennsylvania and New York, New York; (b) avoidance of the Forbearance Agreement and Lender Release; (c) damages in the amount necessary to satisfy the Mortgages; and (d) providing such other and further relief as the court deems just and equitable.

**COUNT V**
**RECOVERY UNDER 11 U.S.C. §550**
Debtors v. Sharestates

| Formatted: Font: 12 pt |
| Formatted: Indent: Left: 0", First line: 0.5" |
| Formatted: Font: 11 pt |

44

224.1.   Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

225.135.    The transfers described in Counts I, II and III and IV (the "Transfers") above are avoidable.

226.136.    Intercap and Investments are the initial, immediate or mediate transferees of the Transfers.

227.137.    Intercap and Investments had intimate knowledge of the substance of the Transfers before they occurred because they dictated the substance of those Transfers.

228.138.    Intercap and Investments received the Transfers in bad faith, for no value, with knowledge of the voidability of the Transfers.

229.139.    Debtors may recover the property transferred in the Transfers, or the value thereof, from Intercap and Investments.

140.    The Transfers avoided in Counts I, II and III must be preserved for the benefit of the estate.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates in the amount of or the value of the property transferred in the avoided Transfers, preserving such Transfers for the benefit of the estate and providing such other and further relief as the court deems just and equitable.

COUNT VI
## V: EQUITABLE SUBORDINATION
Debtors v. Sharestates

230.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

45

~~The Debtors aver that~~ **Debtors v. Sharestates**

141.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

~~231.~~142.    Sharestates engaged in inequitable conduct as more fully set forth in this Complaint.

~~232.~~143.    Sharestates engaged in misrepresentations about its ability and willingness to fund loans to the Project, including that Sharestates had the ability to fully fund the Loans.

~~233.~~144.    Sharestates engaged in fraud in the inducement of the Loan.

~~234.~~145.    Sharestates engaged in unconscionable acts including unilaterally changing ~~agreed~~the draw process and using that change to ~~terms of~~force the ~~Loan Agreements~~Debors to grant ~~Sharestates~~ the Lender Release.

~~235.~~146.    Sharestates overcharged routinely for title insurance obtained through Title, an affiliate.

~~236.~~147.    Sharestates made loans without any lender discipline, i.e., without an understanding of how the loans would be repaid.

~~237.~~148.    Sharestates created inadequacies in the Debtor's capital structure that showed an inability to repay the Loans.

~~238.~~149.    Sharestates made the loans in the face of ~~obvious~~ information that should have led Sharestates to conclude the loans were not reasonable.

~~239.~~150.    Sharestates took Mortgages for the full amount of the Loans before disbursing any Loan proceeds.

240.151.    Sharestates' only concern was originating more loans to entice more individual investors for their crowd-funded or syndicated lending business, regardless of the actual risks and supporting collateral for those loans.

241.152.    In massively over-encumbering the Project with undersecured loans, Sharestates prevented the Debtors from qualifying for loans with any other lender.

153.    Sharestates then required the Debtors to draw on Loans for one project in order to pay Sharestates for another.

242.154.    By encumbering all of the Debtors' equity in their assets, including the Projects, Sharestates set the Debtors on a disastrous downward spiral from which they could not recover.

243.155.    Sharestates' overreaching during the lending relationship gave it an improper advantage over the Debtors and all other creditors of the Debtors.

244.    Sharestates dominated and controlled the Debtors' finances.

245.156.    Sharestates breached fiduciary duties owed to the Debtor, and was able to succeed because of its dominance and control of all of the Debtors' finances.

246.157.    Sharestates' actions ensured that no other creditors could be paid out of the Debtors' assets by encumbering them so fully that all equity was removed.

247.158.    Equitable subordination of Sharestates' claims is not inconsistent with any provision of the Bankruptcy Code.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates pursuant to Section 510 of the Bankruptcy Code, subordinating any claim made by Sharestates or on behalf of the Loans or Mortgages, to all other claims against the Debtors, and providing such other and further relief as the court deems just and equitable.

Formatted: Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

COUNT ~~VII~~

**VI:** LENDER LIABILITY – BREACH OF CONTRACT/BREACH OF ~~FIDUCIARY DUTY~~

~~Debtors v. Sharestates~~

~~248.   Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.~~

~~249.1.   As set forth more fully above, Sharestates and the Debtors entered the Loan contract without specifying how draws from Loan proceeds would be authorized and disbursed to the Debtors.~~

~~250.1.   After entering the Loan, Sharestates and the Debtors agreed to the authorization and disbursement mechanism of the Original Draw Process.~~

~~251.1.   By their agreement and course of performance, the Original Draw Process became a binding term of their lending arrangement.~~

~~252.1.   The Debtor gained legally enforceable rights by virtue of its course of dealing with Sharestates and the Original Loan Agreement.~~

~~253.1.   In 2020, Sharestates ceased to comply with the Original Draw Process and unilaterally demanded that the draw process be altered in its favor of the Modified Draw Process, or else it would not disburse further funds.~~

~~254.1.   Through the draw process, Sharestates controlled and dominated the Debtors' finances.~~

~~255.1.   Under duress and without any other options aside from complete financial ruin, the Debtors executed the Modification, waived the right to recover contractually obligated payments from Sharestates under the Original and Modified Draw Processes.~~

OMC\4834-7168-7935.v2-10/18/21

256.   Under the Modification, at paragraph 1.1, the Debtors waived the right to a distribution they had validly demanded and that Sharestates was obligated to pay under the Original Draw Process. The Modification also provided a lender release.

257.1.   The Modification adopted a reimbursement-based Modified Draw Process that only favored Sharestates.

258.1.   Sharestates' refusal to disburse funds under the Original Draw Process was a breach of the duty of good faith and fair dealing.

259.1.   Sharestates' breach improperly forced the Debtors into the Modification and Forbearance Agreement, waiving valuable causes of action and their contractual right to the reimbursement of over $2,000,000.00 already used for the Projects.

260.1.   The waiver of the reimbursement of expenses under the Modification and Forbearance left the Debtors in an undercapitalized state.

261.1.   Sharestates' breach caused the Projects to stall, as the Debtor concluded no other or further advances would be made.

262.1.   Sharestates knew that the Debtors did not have capital aside from that reimbursed by Sharestates.

263.1.   Sharestates reasonably knew that a stall in the Projects would mean that construction could never be restarted, and ultimately would cause the financial collapse of all of the Debtors.

264.1.   Sharestates knew that by forcing a waiver, it could recover the Projects and the value of the Debtors' squandered working capital.

265.1.   By using their own breach of contract to exert improper pressure, and force concessions, Sharestates forced the Debtors into the Modified Draw Process in the Modification

OMC\4834-7168-7935.v2-10/18/21

Formatted: Font: 11 pt

and the Forbearance Agreement, requiring the Debtors to source millions of new dollars to pay contractors before construction could resume, and further, releasing Sharestates for its bad acts and breaches.

266.1.   The Debtors were predictably unable to do so.

267.   The Debtors were damaged by Sharestates' breaches, in an amount yet to be determined, including increased costs to restart the stalled Projects and the loss of the profits from the Projects, as well as the loss of the other Debtor projects.

268.   The Debtors had at the time of the Modification, already invested over $15,000,000.00 in the Projects.

269.   Because of its dominance and control of the Debtors' finances, Sharestates moved beyond being a mere lender.  Sharestates, through its control of the Debtor's finances, manipulated the Debtors in order to gain concessions from the Debtors and avoid its contractual obligations, and ultimately the Debtors' projects.

270.   Sharestates, because of its dominance and control of the Debtors' finances, and each of them, left the Debtors without any real control of their finances.

271.   Sharestates controlled all moneys for distributions to the Debtors, and failed to acknowledge its duties to the Debtors.

272.   Through fraud and artifice, Sharestates controlled the Debtors' finances beyond what a normal lender would under the circumstances.

273.   Sharestates breached its fiduciary duties to the Debtors by committing acts of fraud, nondisclosures, lender liability, self dealing and conspiracy.

Formatted: Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

~~WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates for (a) damages in the amount caused by Sharestates' breaches, (b) consequential damages; and (c) providing such other and further relief as the court deems just and equitable.~~

## COUNT VIII
~~LENDER LIABILITY – BREACH OF~~ THE DUTY OF GOOD FAITH
### AND FAIR DEALING
**Debtors v. Sharestates**

~~274.~~159. Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

~~275.~~160. Sharestates required the Debtors to refinance or modify the Loans at several points during their lending relationship~~, including the Forbearance Agreement~~.

~~276.~~161. Each time Sharestates required such a refinancing or modification, Sharestates delayed actually executing the refinancing or modification for several months, purportedly to perform "underwriting" of the refinanced loan.

~~277.~~162. Because of the Debtor's elephantine interest obligations to Sharestates, and its cash needs at the Project, every month of delay costs the Debtors nearly $500,000.00 in interest charges, and $250,000.00 in delay costs.

~~278.~~163. Further, with respect to the construction, the Debtors had contracts to build trusses and other architectural components for the Projects. Without the cash needed to procure the materials, orders at the manufacturer were taken out of rotation, causing further delays.

~~279.~~164. Sharestates did not actually perform underwriting for these modifications, and ~~has admitted~~admits that it relied entirely ~~of~~on the existing representations and financials provided by the Debtors.

OMC\4834-7168-7935.v2-10/18/21

280.165.    Because it was not actually evaluating any underwriting information, Sharestates would have been able to execute the modifications immediately.

281.166.    Instead, Sharestates placed the loans in purported underwriting for several months, and disbursed loan proceeds to itself to cover interest due on the loans during the underwriting period.

282.167.    In intentionally slowing down the refinancing process once it had already committed to refinance, Sharestates generated hundreds of thousands of dollars in interest, greatly reducing the Debtors' working capital.

283.    Performing a slow refinancing process by claiming false due diligence in order to extract interest payments is a fraud, and a breach of the duty of good faith and fair dealing.

284.    Sharestates also required the Debtors to take separate Mortgages on each Unit at Penn Treaty, and to re-execute those Mortgages on each extension or modification, even when a re-execution was not legally necessary.

285.    Sharestates rolled certain refinancing and recording costs into the balance of each refinanced Mortgage.

286.168.    Sharestates demanded a new title search by Title for each such re-execution of a Mortgage, even when a title search was not legally necessary.

287.169.    Sharestates' demands for re-execution and the attendant fees paid to Title were not actually required to safeguard Sharestates' position.

288.170.    Upon information and belief, Sharestates made these demands to churn fees for its affiliate and drag out the re-execution process to increase the interest it paid itself from Loan proceeds and increase the amount owed on the mortgages.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

289.171.    In demanding unnecessary re-executions and title searches, Sharestates breached its duty of good faith and fair dealing.

172.    Sharestates also demanded that certain Debtors take disbursements on their Loans, then lend this disbursements to other Debtors to allow the recipients to make interest payments to Sharestates.

173.    Sharestates later alleged that these Debtors had drawn too much of their loan without appropriate progress on the Projects and sought to withhold draws.

174.    Sharestates required the Debtors to take these actions, then alleged a default as a result.

175.    As set forth more fully above, Sharestates and the Debtors entered the Loan contract without specifying how draws from Loan proceeds would be authorized and disbursed to the Debtors.

176.    After entering the Loan, Sharestates and the Debtors agreed to the authorization and disbursement mechanism of the Original Draw Process.

177.    By their agreement and course of performance, the Original Draw Process became a binding term of their lending arrangement.

178.    The Debtor gained legally enforceable rights by virtue of its course of dealing with Sharestates and the Original Loan Agreement.

179.    In 2020, Sharestates ceased to comply with the Original Draw Process and unilaterally demanded that the draw process be altered in its favor of the Modified Draw Process, or else it would not disburse further funds.

180.    Through the draw process, Sharestates controlled and dominated the Debtors' finances.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

181.    Under duress and without any other options aside from complete financial ruin, the Debtors executed the Modification, waived the right to recover contractually obligated payments from Sharestates under the Original and Modified Draw Processes.

182.    Under the Modification, at paragraph 1.1, the Debtors waived the right to a distribution they had validly demanded and that Sharestates was obligated to pay under the Original Draw Process.  The Modification also provided a Lender Release.

183.    The Modification adopted a reimbursement-based Modified Draw Process that only favored Sharestates.

184.    Sharestates' refusal to disburse funds under the Original Draw Process was a breach of the duty of good faith and fair dealing.

185.    Sharestates' breach improperly forced the Debtors into the Modification and Forbearance Agreement, waiving valuable causes of action and their contractual right to the reimbursement of over $2,000,000.00 already used for the Projects.

186.    The waiver of the reimbursement of expenses under the Modification and Forbearance left the Debtors in an undercapitalized state.

187.    Sharestates' breach caused the Projects to stall, as the Debtor concluded no other or further advances would be made.

188.    Sharestates knew that the Debtors did not have capital aside from that reimbursed by Sharestates.

189.    Sharestates reasonably knew that a stall in the Projects would mean that construction could never be restarted, and ultimately would cause the financial collapse of all of the Debtors.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

190.   Sharestates knew that by forcing a waiver, it could recover the Projects and the value of the Debtors' squandered working capital.

191.   By using their own breach of contract to exert improper pressure, and force concessions, Sharestates forced the Debtors into the Modified Draw Process in the Modification and the Forbearance Agreement, requiring the Debtors to source millions of new dollars to pay contractors before construction could resume, and further, releasing Sharestates for its bad acts and breaches.

192.   The Debtors were predictably unable to do so.

290.193.    The Debtors were damaged by Sharestates' breaches of the contracts and the duty of good faith and fair dealing, in an amount yet to be fully determined, including the interest and charges paid during the refinancings, the increased costs paid to Title for the refinancings and all fees and costs rolled into the Loans during refinancings to restart the stalled Projects and the loss of the profits from the Projects, as well as the loss of the other Debtor projects.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates for (a) damages in the amount caused by Sharestates' breaches, (b) consequential damages; and (c) providing such other and further relief as the court deems just and equitable.

**WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates for (a) damages in the amount caused by Sharestates' breaches, (b) consequential damages; and (c) providing such other and further relief as the court deems just and equitable.**

COUNT IX
VII: FRAUD IN THE INDUCEMENT
Debtors v. Sharestates

55

OMC\4834-7168-7935.v2-10/18/21

### Debtors v. Sharestates

291.194.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully.

292.    At the time each Debtor entered into a Loan or a modification or refinance thereof, Sharestates misrepresentedrepresented that it had the extentability to which it couldtimely fund money needed for the Debtor projects.

293.    At all relevant times, Sharestates was aware of the Debtors' finances.

294.    Sharestates misrepresented that its loans were fundamentally backed by institutional investors.

295.195.    Sharestates lacked the liquidity to commit to the loans agreed todraws consistent with the Debtorscontract.

296.196.    Sharestates contractually agreed to fund construction requests and release moneys on two (2) to three (3) days' notice.  Sharestates never complied with its contractual obligations to fund in two to three days.

297.    These representations were material, as the timely funding of construction was a critical decision in the funding path chosen by the Debtors.

298.    The representations relating to the timely funding were false, in that each funding request required Sharestates to go out and find investors for the advances.

299.    At numerous points in time, Sharestates did not have the finances to make contractual advances, of which Sharestates was fully aware.

300.    Sharestates had an inherent conflict of interest in making a crowdfunding loan representing to investors that major financial institutions were participating in their crowdfunding activities, when in fact the loans were being placed with individual investors.

OMC\4834-7168-7935.v2-10/18/21

301. In order to keep the facade of lender participation alive for its investors, Sharestates misrepresented to the Debtors that Sharestates had the ability to fund from a warehoused line of credit that they then sold off to institutional investors.

302. The Debtors did not know that Sharestates was actually raising money to fund, knowing it could not actually fund as promised.

303. While misrepresenting its ability to fund to the Debtors, Sharestates was misrepresenting to its investors that they had made sound loans, that principal was safe, and returns of 10 to 24% should be expected.

304. As a further act of fraud, Sharestates ignored material weaknesses, all with the purpose of getting more money into the loan transactions with the Debtors.

305. The actions of Sharestates were intended to wrest control of the Debtor projects, including the Projects from the Debtors and obtain for their own benefit, the over $15,000,000.00 the Debtors and their principals had injected into the Projects.

306. The misrepresentations were intended to give the Debtors the impression of an existing ability to fund fully the Projects, as well as the other Debtor projects.

307. The misrepresentations were false, and knowingly false.

308. The misrepresentations were repeatedly made by Ray and Shayanfekr.

309. The Debtors were unaware the Debtors were dealing with a crowd funder.

310. Sharestates misrepresented its ability to fund the loans to the Debtors, by representing that it had the capacity to make the loans and not disclosing the crowdfunding nature of Sharestates' activities.

311. Sharestates misrepresented that the Loans would be participated in by institutional investors after funding.

Formatted: Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

312.    Sharestates intentionally delayed funding, creating cash flow issues, and burning off needed working capital, for the sole purpose of triggering defaults, and forcing the Project to fail, which it did.

313.    During the several renegotiations, Sharestates extracted additional favorable terms from the Debtors after already agreeing to refinance or extension terms.

314.197.    Sharestates did so by falsely representing that one or more underlying investors were holdouts that could veto the renegotiated terms.

315.198.    In the alternative, Sharestates negotiated and bound the Debtors to renegotiated terms without appropriate authority from all underlying investors.

316.199.    Sharestates' representations about its ability to fund and its authority or ability to renegotiate terms were material in that the Debtors would not have entered the original loan, or agreed to the additional terms in the renegotiation, if Sharestates had not made those representations.

200.    The misrepresentations were repeatedly made by Ray and Shayanfekr in order to induce the Debtors to enter into the Loans or renegotiate them on terms more favorable to Sharestates.

317.201.    The Debtors justifiably relied upon the misrepresentations of Sharestates through its principals.

318.    Sharestates' representations about its ability to fund and its authority or ability to renegotiate terms were false, and knowingly false.

319.    Sharestates lacked the liquidity necessary to perform on all of its commitments to the Debtors.

OMC\4834-7168-7935.v2-10/18/21

Formatted: Font: 11 pt

320.    Sharestates' representations were provably false in that during the relationship, Sharestates had to refinance performing indebtedness to create a "liquidity event" for funding.

321.    The Debtors had no understanding of the vagaries of Sharestates' lending platform.

202.    Sharestates intentionally delayed funding, creating cash flow issues, and burning off needed working capital, for the purpose of triggering defaults, and forcing the Project to fail, which it did.

322.203.    Due to Sharestates' false material representations, the original loan agreement and all subsequent modifications thereto are voidable.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates (a) avoiding voiding the original and subsequent lending contracts, (b) for damages in the amount caused by Sharestates' fraudulent inducement, attorney fees and costs; and (c) providing such other and further relief as the court deems just and equitable.

COUNT **X**

CIVIL RICO - 18 U.S.C. §1962(c)

Debtors v. All Defendants

323.    Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein and at length.

324.    18 U.S.C. §1962(c) provides a civil remedy to plaintiffs injured by an enterprise engaged in a pattern of racketeering activity.

325.    The Davoodis and Shayanfekr are "persons" within the meaning of the civil RICO statute.

326.    The Davoodis and Shayanfekr were at all relevant times, in control of the operations and finances of the Defendants Sharestates and Title.

OMC\4834-7168-7935.v2-10/18/21

327.   All of the activities complained of were for the express benefit of the Davoodis and Shayanfekr and their entities Sharestates and Title.

328.   Sharestates and Title qualify as a "person" for RICO purposes in that the Davoodis and Shayanfekr, have conducted an enterprise's affairs through a pattern of racketeering activity.

329.   The Davoodis and Shayanfekr were each intimately aware of the activities in Sharestates and Title.

330.   The Defendants, and each of them, have engaged in a pattern of RICO activities extending beyond the Debtors to the non-debtor affiliates, where the Defendants and each of them, engaged in identical conduct.

331.   Sharestates and Title continue to engage in the behaviors complained of with other borrowers.

332.   The repeated title policies were at a rate in excess of Pennsylvania law.

333.   Further, the Defendants, and each of them, were "churning" the refinancing of the Loans in order to maximize amounts paid to Sharestates and Title.

334.   In this case, the Defendants, and each of them, through the use of mails and by electronic transmission, engaged in acts of mail fraud. Specifically, Shayanfekr and the Davoodis sent HUD-1 statements, which charged in excess of the rates permitted to be charged in Pennsylvania.

335.   The fraudulent activity was engaged in with the specific intent to defraud the Debtors, as the Debtors had no choice in the transactions.

336.   As a direct and proximate cause of the RICO activities, as herein alleged, the Debtors suffered damages in their finances by a pattern of RICO activity engaged in by the Defendants Sharestates and Title, the full extent to which has yet to be determined.

**Formatted:** Font: 11 pt

60

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates and Title for (a) damages occasioned by their pattern of racketeering activity, (b) punitive damages; (c) enjoining future actions by the Defendants; and (d) providing such other and further relief as the court deems just and equitable.

### COUNT XI
### VIII: FRAUD
**Debtors v. All Defendants**

337.204.    The Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein and at length.

338.205.    At all material times the Davoodis and Shayanfekr were in control of the finances, loan origination, lending, administration, collection activities and operations of Sharestates and Title.

339.206.    As detailed herein, the Davoodis and Shayanfekr, made material misrepresentations about the suitability of the Debtors for their financing products.

340.207.    Those representations included: (a) that Sharestates had a ready source of funds warehoused, that they would advance and then syndicate to investors; (b) that money was in hand and did not need to be raised; (c) that the format was often used to fund and complete construction projects like the Debtors; (d) that money needed for construction could be released within (3) three days of the requests; (d) that Sharestates investors were institutional in nature, not individuals.

341.208.    What the Debtors did not know, that Sharestates and the Davoodis and Shayanfekr knew, was that Sharestates was obligated to provide a return to investors from the

OMC\4834-7168-7935.v2-10/18/21

moment Sharestates received the investors' money, so Sharestates had to continue to provide returns to investors even if the money sat with Sharestates.

342.209.    Driven by an overriding desire to get investor money on the streets and making the credit card returns promised, Sharestates ignored its Loan and Commitments, and conducted business in a way which maximized investor returns but doomed the Debtors to failure.

343.210.    Accordingly, no money was in fact "available" under Sharestates' model, so no money could be made "available" until requested in a draw or reimbursement request.

344.211.    Because of the Sharestates lending platform, money was never available when needed, and caused unnecessary and expensive delays on the projects.

345.212.    Sharestates also contractually agreed to release moneys on a one (1) to two (2) business days window.  Sharestates never timely advanced or reimbursed money on this schedule, and in fact, each request was followed by weeks of inexplicable and commercially unreasonable delays.  Sharestates later unilaterally changed the timeline to five (5) to seven (7) days.

346.213.    The representations that Sharestates could timely and efficiently fund the Debtors' projects, including the Project, on one (1) to two (2) days' notice, were false and knowingly false because Sharestates did not have an approved line of credit and its ability to loan was and is a function of its ability to raise money through crowdfunding.  The statements were made to cause the Debtors and their Principals to believe construction funding would be timely and seamless, and induce the loans.

347.214.    Sharestates failed to disclose that the process for Sharestates to acquire loans, and to get proceeds to the Debtors was not assured, and had to be reviewed at each advance,

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

making the process cumbersome, time consuming and expensive.  While Sharestates dallied with

each advance, the Debtors burned off working capital needed to complete the Debtor Projects.

348.215.    The Debtors justifiable relied on the misrepresentations of Sharestates,

only to be exposed to unjustified and inexplicable delays, excess charges, missed funding

deadlines, and losses.

349.216.    The misrepresentations were for the express purpose of inducing the

Debtors to tie up all of their assets with high interest rate obligations, in order to maximize the

returns to Sharestates' alleged investors.

350.217.    The misrepresentations allowed Sharestates, the Davoodis and Shayanfekr

to remove all of the equity from the Debtors' Projects, as well as the working capital, and poised

them for recovery by Sharestates through foreclosure.

351.218.    The Debtors believe and therefore aver that Sharestates, under control of

the Davoodis and Shayanfekr, had no regard for their actual contractual commitments, and simply

changed the deal as they saw fit along the way.

352.219.    Title, also controlled by the Davoodis and Shayanfekr, charged the Debtors

for unnecessary and unneeded title policies, which policies and payments inured to the benefit of

the Davoodis and Shayanfekr.

353.220.    The charges were illegal, fraudulent, excessive and violated Pennsylvania

law.

354.221.    Sharestates, thoughthrough the control of the Davoodis and Shayanfekr,

charged excessive and unwarranted "due diligence" fees it agreed it would not collect.

355.222.    The collection of the waived fees was fraudulent as to the Debtors.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

356.223.    Defendants required the Debtors to use Republic for certain appraisals at excessive cost because Republic and Sharestates had a tacit or explicit agreement to over-value properties as necessary to permit Sharestates to over-lend while pretending to fulfill their commitments to investors.

357.224.    Defendants always knew the appraisals produced by Republic were inflated, but required the Debtor to accept them as accurate and pay the excessive fees in order to continue generating unjustifiably-large loans to be sold to investors.

358.225.    If the Debtors had known of this rationale for the use of Republic, they would never have used Republic for appraisals.

359.226.    As a direct and proximate cause of the fraud of the Defendants, as herein alleged, the Debtors suffered damages, the full extent to which has yet to be determined.

360.227.    The Debtors were damaged in their operations and finances by the fraudulent activities of the Defendants, including the potential loss of the Debtors' entire investment in the projects.

361.228.    The actions of the Defendants, and each of them, are outrageous, wanton and without legal rustication, justifying the imposition of punitive damages.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates, the Davoodis and TitleShayanfekr for (a) damages occasioned by their fraudulent activities, (b) punitive damages; and (c) providing such other and further relief as the court deems just and equitable.

**COUNT IX: OBJECTION TO PROOFS OF CLAIM UNDER 11 U.S.C. §502(b)(1)**
**Debtors v. Sharestates**

**COUNT XII**

64

Formatted: Underline

Formatted: Font: Not Bold

Formatted: Normal, Don't add space between paragraphs of the same style

Formatted: Font: 11 pt

## ~~CIVIL CONSPIRACY~~
### ~~Debtors v. All Defendants~~

~~362.~~229.   ~~Debtors incorporate~~The Debtor incorporates by reference the ~~allegations in the~~ foregoing paragraphs as if set forth ~~full~~fully herein and at length.

~~363.   Defendants and each of them, engaged in an unlawful scheme and conspiracy, orchestrated by the Davoodis and Shayanfekr, and aided and abetted by one another, to unlawfully seize control of the Debtors' properties and operations by committing to loans it was not in a positon to currently make, or the Debtors in a position to repay.~~

~~364.   Defendants and each of them, engaged in an unlawful scheme and conspiracy, orchestrated by the Davoodis and Shayanfekr, and aided and abetted by one another, to remove all of the equity in the Debtors' companies, leave them in a state of undercapitalization, and without finances, in order to obtain the assets through foreclosure.~~

~~365.   The Defendants, and each of them, were aware of the frailty of the Debtors' capital structure, and knew that the loans being made could not be repaid.~~

~~366.   The Defendants, and each of them, had a secret and undisclosed agreement to take the Debtors' projects by burdening the Debtors' finances with high interest rate obligations, to violating the loan agreements, delay funding, and charge excessive interest and other charges to the Debtors for title insurance.~~

~~367.   As a direct and proximate cause of the civil conspiracy as herein alleged, the Debtors suffered damages, the full extent to which has yet to be determined.~~

230.   Sharestates filed proofs of claims in the Debtors' cases (the "POCs").

231.   The POCs alleged debts based upon a writing, but do not attach any writing evidencing the obligation.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

232.   The POCs allege certain amounts for interest, fees, charges and escrow advances without any supporting documentation.

233.   Upon information and belief, these additional amounts are not permitted by the applicable lending contracts, unreasonable or not actually incurred.

234.   The POCs are not self-supporting, and must be disallowed.

235.   In the alternative, the amounts attributable to uncollectable interest, fees and charges must be disallowed.

WHEREFORE, Debtors pray for all the above reasons contained in this court enter Count, the Debtors respectfully request the entry of a judgment in their favor and against Sharestates, the Davoodis, Shayanfekr and Title for (a) damages occasioned by their fraudulent activities, (b) punitive damages; and (c) providing disallowing the POCs, or in the alternative the portions of the POCs attributable to unenforceable fees and charges, and such other and further relief as the court deemsis just and equitable.

### COUNT XIII
### AIDING AND ABETTING
### COUNT X: DETERMINATION OF SECURED CLAIM AND BIFURCATION OF CLAIM UNDER (11 U.S.C. §506(a)(1))
### Debtors v. All DefendantsSharestates

368.236.   The Debtors incorporate by reference the allegations in the foregoing paragraphs as if set forth fullfully herein and at length.

369.   Defendants, and each of them, including the individual Defendants knew that the misconduct described of herein was unlawful, and in violation of the rights of the Debtors as contract parties.

370.   The Defendants gave substantial assistance and encouragements to each other, and to such unlawful activity by participating, inducing or benefitting from the unlawful behavior.

OMC\4834-7168-7935.v2-10/18/21

371.  As a direct and proximate cause of Defendants' knowledge, participation, assistance and encouragement, the Debtors have sustained damages, the full extent to which has yet to be determined.

WHEREFORE, Debtors pray this court enter judgment in their favor and against Sharestates and Title for (a) damages occasioned by their aiding and abetting, (b) punitive damages; and (c) providing such other and further relief as the court deems just and equitable.

## COUNT XIV

## RECHARACTERIZATION AS EQUITY PURSUANT TO 11 U.S.C. §105(a)

"An allowed claim of a creditor secured by a lien ~~Debtors v. Sharestates~~

237.  on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C §506(a)(1).

238.  A party in interest may make a request determine "the amount of a secured claim under §506(a) of the Code." Fed. R. Bankr. P. 3012(a)(1).

239.  To the extent that Sharestates has an Allowed Claim, the value of each Debtor's property securing the claim is far below the amount of the claim.

240.  Any allowed claim by Sharestates must be bifurcated into a secured claim in the amount of the value of that Debtor's liened property, and an unsecured claim for the remainder.

OMC\4834-7168-7935.v2-10/18/21

WHEREFORE for all the above reasons contained in this Count, the Debtors respectfully request the entry of a judgment determining that bifurcating the claim into secured and unsecured portions, and provide such other and further relief as is just.

**COUNT XII: LIEN STRIP OF UNSECURED CLAIM UNDER 11 U.S.C. §506(d)**
**Debtors v. Sharestates**

~~372.~~241.    The Debtors incorporate by reference the ~~allegations in the~~ foregoing paragraphs as if set forth ~~full~~fully herein and at length.

242.    Pursuant to 11 U.S.C. §506(d)(1), "to the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void."

243.    To the extent that Sharestates claims are unsecured, this Court must enter a judgment voiding the lien upon that Debtor's property.

WHEREFORE, the Debtors respectfully request the entry of a judgment voiding the liens on each Debtor's property to the extent that the lien exceeds the value of the Allowed Secured Claim and such other relief as is just.

**COUNT XIII: SURCHARGE LIEN FOR PRESERVATION AND DISPOSITION**
**COSTS UNDER 11 U.S.C. §506(c)**
**Debtors v. Sharestates**

244.    The Debtors ~~and especially the Pier~~incorporate by reference the foregoing paragraphs as if set forth fully herein and ~~Penn Treaty Debtors   were undercapitalized when they obtained financing~~at length.

~~373.~~245.    Pursuant to 11 U.S.C. §506(c), a debtor-in-possession "may recover from ~~Sharestates.~~property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

OMC\4834-7168-7935.v2-10/18/21

374.   As a result of this undercapitalization and the cross-default provisions, which Sharestates employed without any clear rationale to default entities it had previously promised not to default while they stayed current, Sharestates exercised excessive and overweening control of the specifics of Debtor operations.

246.   By knowingly over- To the extent that Sharestates has an allowed Secured Claim, that Claim is secured by the Debtor's real property and rents from tenants.

247.   Postpetition, the Debtors have rented certain properties to tenants and prepared to sell the real properties through an auction and sale process.

248.   As part of the sale process, the Debtors seek postpetition lending to each Debtor, complete construction on Hancock, Kingsland and 123, which construction will increase the value of those properties for Sharestates' benefit.

249.   Postpetition, the Debtors have paid for, and will pay for, insurance and repairs and real estate taxes.

250.   These improvements and payments have or will preserve or increase the value of the real properties securing Sharestates' claims to Sharestates' direct benefit.

251.   The costs incurred by the Debtors for attorney and professional fees and transaction costs in accomplishing the sales of real property are costs incurred in disposing of Sharestates' collateral.

252.   All these costs and expenses benefited Sharestates prevented each Debtor from seeking financing from any entity aside from by maintaining paying rentals, improving the collateral or preventing its depletion and preventing the imposition of priming liens that would have lessened Defendants' collateralized interest.

**Formatted:** Font: 11 pt

OMC\4834-7168-7935.v2-10/18/21

375.253.    These costs and expenses further allowed the Debtors to dispose of the collateral without the necessity of costly action by Sharestates.

376.    While each loan to each Debtor had a fixed maturity date, Sharestates demanded complete refinances so frequently that those maturity dates were effectively illusory and neither party actually relied upon them.

377.    The loan documents did not clearly set out schedules of draws, draw processes or repayment schedules.

378.    Even if the loan documents purported to do so, those terms were constantly modified upon each modification or refinance demanded by Sharestates.

379.    Sharestates intended the complex web of cross-defaulted loans to the Debtors to function like a trap: a minor default by any of them would set off a cascade of cross-defaults, fees and charges that would allow Sharestates to consume any additional equity generated on the projects by Debtor operations or construction.

380.    Sharestates could thus increase its upside almost at will, while its downside was limited by its interestare entitled to an equitable lien pursuant to Section 506(c) of the Bankruptcy Code in the projects.

381.    amount of these costs and expenses.  This ability to take all profits from a business endeavor is characteristic of equity, not debt.

382.    Sharestates thus intended to take an equity like interest in the overall Debtor affiliate group, not a debt-like interest.

383.254.    Pursuantlien must, pursuant to contracts with postpetition lenders, be subordinate to any debtor-in-possession priming lien pursuant to 11 U.S.C. §105, any purported

OMC\4834-7168-7935.v2-10/18/21

debt owed to Sharestates by the Debtors must be re-characterized as equity consistent with 365(d), but superior to Sharestates' chosen risk/reward profileliens.

WHEREFORE, Debtors pray for all the above reasons contained in this court enter Count, the Debtors respectfully request the entry of a judgment in their favor and against Sharestates determining that Sharestates holds an equity interest surcharging the Debtors' property securing Sharestates' liens via a lien subordinate only to any applicable debtor-in the Debtors and not claims against them and providing possession priming lien pursuant to 11 U.S.C. §365(d), and provide such other and further relief as the court deems is just and equitable.

Respectfully submitted,

Dated: 5/27/October 18, 2021                    By:    /s/ Edmond M. George

Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
PA Bar No. 45969 (EMG)
PA Bar No. 78374 (MDV)
OBERMAYER REBMANN MAXWELL
& HIPPEL LLP
Centre Square West, Suite 3400
1500 Market Street
Philadelphia, PA 19102
P: 215.665.3000
F: 215.665.3165
Email:  edmond.george@obermayer.com
Email:  michael.vagnoni@obermayer.com
AttorneysProposed Special Counsel for
Debtors

OMC\4834-7168-7935.v2-10/18/21