# I0N THE UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 1121 PIER VILLAGE, INC,<br>PENN TREATY HOMES, LLC,<br>2626 FRANKFORD LLC<br>285 KINGSLAND LLC,<br>231 E 123 LLC,<br>193 HANCOCK, LLC<br><br>Debtors | Chapter 11<br>Lead Case No. 21-11466 (ELF)<br><br>(Joint Administration Requested) |
| 1121 PIER VILLAGE, INC,<br>PENN TREATY HOMES, LLC,<br>2626 FRANKFORD LLC<br>285 KINGSLAND LLC,<br>231 E 123 LLC,<br>193 HANCOCK, LLC<br><br>Plaintiffs<br><br>Vs.<br><br>SHARESTATES INTERCAP LINE,<br>LLC, SHARESTATES INVESTMENTS<br>LLC, RAYMOND DAVOODI, RADNI<br>DAVOODI, ALLEN SHAYANFEKR<br><br>Defendants | CHAPTER 11<br><br><br><br>Adversary No. 21-A-00044 (ELF) |

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF
## THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

Defendants, Sharestates Intercap Line, LLC ("**Sharestates Intercap**"), Sharestates Investments, LLC ("**Sharestates Investments**"), Raymond Davoodi, Radni Davoodi and Allen Shayanfekr, in reply to the Debtors' Response in Opposition to Defendants' Motion to Dismiss [Dkt No. 30] (the "**Response")** and in further support of their motion to dismiss the First Amended Adversary Complaint [Dkt No. 24-1] (the "**Amended Complaint**") filed by Debtors 1121 Pier

Village LLC, Penn Treaty Homes LLC, 2626 Frankford LLC, 285 Kingsland LLC, 231 E 123 LLC and 193 Hancock LLC (collectively the "**Debtors**"), state as follows:

## INTRODUCTION

The Amended Complaint represents the second attempt by the Debtors to state viable claims against the Defendants. As with their original attempt, the Amended Complaint instead manages only to assemble a litany of contradictory and far-fetched claims arising under both the Bankruptcy Code and non-bankruptcy law, and under theories of contract and tort, which, if successful, would nullify and avoid millions of dollars of loans made over several years, by Sharestates Intercap and Sharestates Investments (collectively, the "**Sharestates Entities**") to the Debtors. These loans were evidenced by loans agreements that were undeniably executed by the Debtors, they were secured by mortgages granted contemporaneously with the extension of the loans, and were the product of contractual agreements by which tens of millions of dollars were advanced by the Sharestates Entities to the various Debtors over several years.

In the Amended Complaint, the Debtors fail to identify <u>any</u> provision of any specific loan document or other contract that has been breached by either of the Sharestates Entities, and further fail to identify any other deed or act of any Defendant that would entitle any Debtor to relief. Instead, they make conclusory allegations that lump together all the Debtors and many of the Defendants, while omitting specifics regarding the "who" "what" or "when" of any alleged bad acts required by the Federal Rules of Civil Procedure. For the reasons stated herein, in Defendants' Memorandum of Law in Support of Preanswer Motion to Dismiss [Dkt No. 18-1] (the "**Original Motion to Dismiss**"), and in Defendants' Objection to the Debtors' Motion for Leave to Amend Complaint [Dkt No. 26] (the "**Motion**"), these failures mean that the Amended Complaint should be dismissed.

# ARGUMENT

A. **The Legal Theory Advanced by Pier Village In Support of Count I is Contrary to Pennsylvania Law**

Even taking as true all the well-pled factual allegations assert in support thereof, the allegations of Count I of the Amended Complaint fail, as a matter of law, to state any claim upon which relief could be granted. Specifically, the authority relied upon by the Debtors in the Response in support of Count I is flawed, and reflects Debtors' misunderstanding of Pennsylvania law regarding loan modifications.

In their Response, Debtors abandon their original theory that the Pier Village Mortgages are somehow invalid because the units secured by the Pier Village Mortgages have not yet been constructed. Instead, Debtors set forth an entirely new theory for why the Pier Village Mortgages should be avoided.[1] In essence, Debtors now claim that, because the loans securing the Pier Village Mortgages were modified to change the manner in which future advances were made and that Modification was not recorded, junior lienors leap in front of the Pier Village Mortgages. Debtors' new theory once again ignores the fundamental legal principles of land titles and recording, and is simply wrong.

As an initial matter, the sole Pennsylvania authority relied upon by the Debtors is *Ter-Hoven v. Kerns*, 2 Pa. 96 (1845). Even *Ter-Hoven*, however, recognizes that, while future, discretionary advances under a loan may be subordinate to a later encumbrance, the original debt advanced prior to the later encumbrance still holds priority. *See* 2 Pa. at 100; *Farmers Nat. Bank of Pennsburg v. Kern*, 194 Pa. Super. 479, 483 (1961) (holding that additional funds that were advanced by first priority mortgage holder before second mortgage was recorded took priority over

---

[1] To the extent Debtors still maintain their original theory, that the Pier Village Mortgages are avoidable because improvements were not constructed, the same lacks all merit for the reasons set forth in Sharestates' papers in opposition to Debtors' motion to amend and in opposition to Debtors' motion to limit credit bidding.

second mortgage).

In that vein, here, the Pier Village Mortgages were properly recorded, and provide notice to any future encumbrancers. *See* 21 Pa.S. §357 ("The legal effect of the recording of such agreements shall be to give constructive notice to subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements of the fact of the granting of such rights or privileges and/or of the execution of said releases, and the rights of the subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements shall be limited thereby with the same force and effect as if said subsequent purchasers, mortgagees, and/or judgment creditors had actually joined in the execution of the agreement or agreements aforesaid."); *See also, McCannon v. Marston*, 679 F.2d 13, 15 (3d Cir. 1982) ("Record notice defeats claims of a subsequent purchaser.").

Nothing in the Modification discharged the Pier Village Mortgages, nor did Pier Village repay any funds advanced prior to the Modification. Thus, even under Debtors' own incorrect analysis, any future encumbrancers would be bound by and subordinate to any advances under the Pier Village Mortgage prior to the Modification. Those funds advanced before the Modification, as secured by the Pier Village Mortgages are unavoidable as they hold priority over any future, hypothetical future encumbrance.

More importantly, Debtors' claim that the subsequent encumbrancers would take priority over advances by Sharestates because the Modification altered the parties obligations, and the Debtors' reliance on Restatement (Third) of Property (Mortgages) §7.3 (1997) for that proposition, has no support in Pennsylvania law. Even *Fraction v. Jacklily, LLC*, cited by Debtors, declined to decide whether Restatement (Third) of Property (Mortgages) §7.3 (1997) applied in Pennsylvania. *See* 2021 U.S. Dist. LEXIS 167497, *7 (E.D. Pa. Sept. 2, 2021) ("both the Bankruptcy Court and

this Court decline to decide" whether it applies); *See also, Hamilton v. Pennsylvania Hous. Fin. Agency*, 614 B.R. 48, 58 (E.D. Pa. 2020) ("In declining to apply the equitable subordination doctrine or section 7.3 of the Restatement, the Bankruptcy Court applied Pennsylvania law. The Pennsylvania Supreme Court has not adopted either rule. When asked to adopt the equitable subordination doctrine, the Commonwealth Court declined. Significantly, it declared that it was not the law of Pennsylvania. Therefore, we conclude that the Bankruptcy Court, in applying Pennsylvania law and declining to adopt a new rule, did not commit legal error."). Indeed, Debtors cite no binding Pennsylvania authority supporting their claim.

In any event, the Modification did not materially alter the obligations, create new debt, increase the principal available under the loans at issue, or change the interest rate or the maturity date. Rather, as conceded by the Debtors, the Modification only changed the manner by which future advances would be made. *See* Modification; Opp. Brf. at p. 8. Any claim that a subsequent encumbrancer would be prejudiced by such a change strains credulity. *See Fraction*, U.S. Dist. LEXIS 167497 at *7 (even if Restatement applied, capitalizing interest to increase principal balance, reducing interest rate, lowering payments and extending maturity date was not prejudicial); *Hamilton*, 614 B.R. at 54 (affirming decision that modified mortgage, modified to capitalize interest, reduce rate, and extend maturity, retained priority, regardless of whether modification was material to the lower court's decision that original mortgage had priority because lender's material modifications of its Mortgage did not have a prejudicial effect on Appellant's junior mortgage).

Rather, even after the Modification, the Pier Village Mortgages remained mortgages securing loans for construction advances, the only difference being how those advances were to be disbursed. (*See* Modification; Opp. Brf. at p. 8). In this way, *Ter-Hoven* confirms that, for

future advances to lose priority over a subsequent encumbrance, the first lender must have "*actual notice* of a new intervening encumbrance]" and not be obligated to make the future advance. *See* 2 Pa. at 100. This Court has also confirmed as much. *See In re Johnson*, 124 B.R. 648, 650 (Bankr. E.D. Pa. 1991) ("'The law is definitely established that an advance made pursuant to a mortgage to secure future advances which the mortgagee was not obligated to make, is subordinate in lien to an encumbrance intervening between the giving of the mortgage and the making of the advance, if the advance was made with actual notice or knowledge of the intervening encumbrance'") (emphasis in original) (quoting *Housing Mortg. Corp. v. Allied Const., Inc.*, 374 Pa. 312, 320 (1953) (superseded in part by statute as stated in *United States v. Jacono*, 244 Fed. Appx. 416, 420 (3d Cir. 2007) ("42 Pa.C.S. § 8143, which concerns mortgages to secure future advances or 'open-ended mortgages,' such as the mortgage at issue in this case, supersedes the decision in Housing Mortgage Corp. to the extent that it requires the holder of the intervening lien or encumbrance to provide written notice of its claim to the property to the holder of the open-ended mortgage in order for the lien of the holder of the intervening mortgage to be given priority.'"))).

Over thirty-years ago, the Pennsylvania Legislature presciently eviscerated Debtors' reliance upon *Ter-Hoven* and the principle that intervening encumbrances may take priority over all future advances of a prior mortgage. Specifically, 42 Pa.C.S. § 8143 expressly provides that

> an-open end mortgage . . . may secure unpaid balances of advances made after such open-end mortgage is left for record. The validity and enforceability of the lien of an open-end mortgage shall not be affected by the fact that the first advance is made after the date of recording of the mortgage or that there may be no outstanding indebtedness for a period of time after an advance or advances may have been made and repaid. . . . An open-end mortgage securing unpaid balances of advances referred to in subsection (a) is a lien on the premises described therein from the time the mortgage is left for record for the full amount of the total unpaid indebtedness, including the unpaid balances of the advances that are made under the mortgage plus interest thereon, regardless of the time when the advances are made.

42 Pa.C.S. § 8143(b) (emphasis added). For any subsequent encumbrance to take priority over

future advances under an open-end mortgage, the advance(s) at issue must be <u>non-obligatory</u> and "made <u>after</u> the holder of the mortgage receives <u>written notice</u>" of the subsequent encumbrance complying with the statute. *See id.;* (emphasis added); *In re Johnson*, 124 B.R. at 653 ("in order to obtain priority over an outstanding 'open-end mortgage,' the intervening mortgagor must provide a very specific notice to the prior mortgagee. 42 Pa. C.S. §§ 8143(b), (d). The Act appears to be merely the final step in a march of Pennsylvania law away from the increasingly-isolated minority position which its courts articulated in the 19th century."). Additionally, regardless of whether any notice is received, the future advance(s) still retain priority over a subsequent encumbrance if the advances were made to provide funds for construction costs. *See* 42 Pa.C.S. § 8143(b).

Here, the loans secured by the Pier Village Mortgages are all open-ended construction mortgages. *See* Modification at 1st Whereas ("secured by a certain Open-End Mortgage and Security Agreement"); Am. Compl. at ¶34 ("Each of the Loans was secured by an open-ended construction mortgage on each Debtor's property or on the units thereof"). Tellingly, Debtors have made no claim that Sharestates received written notice pursuant to 42 Pa.C.S. § 8143 of an intervening encumbrance (or otherwise had <u>actual knowledge</u> of one, *see Ter-Hoven*, 2 Pa. at 100) prior to advancing monies to Debtors (whether before or after the Modification), because no such claim exists.

Rather, Debtors seek to avoid the Pier Village Mortgages as "hypothetical lien or execution creditor[s] or a bona fide purchaser[s] of real property" pursuant to the debtor's avoidance powers under section 544 of the Bankruptcy Code. Such a claim/right, however, exists only *as of "the commencement of" this matter*. *See* 11 U.S.C. §544 (a) (emphasis added). Moreover, a cardinal principle in the application of the avoidance power under section 544 is that "[a]lthough federal

bankruptcy law establishes the bona fide purchaser status of the trustee [or debtor-in-possession], the trustee's [or debtor-in-possession's] rights in that capacity are fixed by relevant state law." *See In re Best*, 417 B.R. 259, 281 (Bankr. E.D. Pa. 2009) (citing *McCannon v. Marston*, 679 F.2d 13, 15-16 (3d Circ. 1982)).   In other words, if a hypothetical encumbrancer obtaining an interest in the Pier Village Property as of the Petition Date could take priority over advances by Sharestates, those advances are avoidable by the Debtor.  That scenario could not and does not exist here for the simple reason that the hypothetical encumbrancer here (*i.e.,* Debtors/a Trustee) took its alleged interest on May 23, 2021 pursuant to 11 U.S.C. §544 (a).  At that time, no written notice (or other <u>actual knowledge</u>) was provided to Sharestates before it made any further advances and, indeed, no further monies were or could have been advanced by Sharestates to the Debtors.  Thus, pursuant to 42 Pa.C.S. § 8143, all advances made by Sharestates prior to the Petition Date retain their first lien priority and cannot be avoided.

Additionally, any advances under the loans could only be used for construction costs. *See* Modification at §1.2.  Accordingly, regardless of whether any notice was provided to Sharestates, under no circumstance could any subsequent encumbrance ever take priority over advances by Sharestates secured by the Pier Village Mortgages. *See* 42 Pa.C.S. § 8143(b) (non-obligatory advances made after notice are subordinate to a subsequent encumbrance, "<u>unless the advance so made is in order to pay toward, or to provide funds to the mortgagor to pay toward, all or part of the cost of completing any erection, construction, alteration or repair of any part of the mortgaged premises, the financing of which, in whole or in part, the mortgage was given to secure</u>") (emphasis added).  That would obviously include a hypothetical encumbrancer taking its interest the Petition Date. *See* 11 U.S.C. §544 (a).

Finally, as construction loans and subject to Debtors' compliance with the terms thereof,

any future advances by Sharestates were obligatory. (*See* Modification at §1.2(b) ("Not more than four (4) business days' after confirmation that Borrower has deposited its Twenty Five Percent (25%), Lender shall fund Seventy-Five Percent (75%) of the advance request to Escrow Agent."). Thus, again, even if Sharestates was provided with notice of a hypothetical encumbrance on the Petition Date (and leaving aside that there were no advances after that date for which the hypothetical encumbrance could take priority), any advances by Sharestates would still be entitled to priority. *See Central Pennsylvania Sav. Asso. v. Carpenters of Pennsylvania, Inc.*, 502 Pa. 17, 22 (1983) ("when the senior mortgagee is required under the loan agreement to make the further advances, such advances relate back to the date of the original mortgage and take priority over the junior lien"); *In re Cole*, 60 B.R. 325, 328 (E.D. Pa. Bankr. 1986) ("When an encumbrance in a parcel of realty arises after the creation of a mortgage but before the disbursement of funds under a future advance clause, the issue of priority between the mortgagee and the intervening encumbrancer is based on whether the future advances were obligatory.").

Simply put, under 11 U.S.C. §544 (a), Sharestates' liens are only avoidable if a hypothetical subsequent encumbrancer taking its interest as of the Petition Date would be entitled to priority over Sharestates. As set forth above, there are simply no set of facts under which that can occur here. For that reason, Count I of the Amended Complaint must be dismissed with prejudice.

**B. The Amended Complaint Still Fails to Plead Any Allegations in Support of the Fraudulent Conveyance Claims With the Requisite Particularity**

In the Motion, Defendants asserted that the Amended Complaint failed to satisfy the obligations set forth in FRCP 9(b) that fraudulent transfer claims be pled with particularity. *Motion,* pp. 13-18. This included, but was not limited to the fact that the Amended Complaint failed to identify any "transfer" for the Debtors' fraudulent conveyance claims. *Id.*

In the Response, the Debtors cite authority for the general proposition that "mortgages" and "releases" may, in certain circumstances, constitute transfers eligible for avoidance. *Response,* pp 10-11.  The Debtors then assert that:

> The [Amended] Complaint and its exhibits identify several transfers within the applicable lookback window.  All the Pier Village Mortgages were recorded within 2 years of the Petition Date.  The Forbearance demonstrates that the unit mortgages against units 1-9 owned by Penn Treaty Homes LLC were modified and re-recorded on February 21, 2020.  As discussed above, the Releases effected a transfer on August 14, 2020.  Each of these transfers is sufficiently identifiable from the Complaint.

*Id.,* p. 11.   Defendants' general references to the Amended Complaint and its exhibits, however, are insufficient to survive a motion to dismiss.

Rule 9(b) puts the onus squarely on the Debtors to identify the "who, what, when, where or how" of the alleged fraudulent transfers in the allegations of the complaint.  *See Girerum v. Glick et al. (In re Glick),* 568 B.R. 634, 670 (Bankr. N.D. Ill 2017) (holding that the pleading standards of Rule 9(b) applies to fraudulent transfer claims, regardless of whether the claim is based on actual or constructive fraud), *citing General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1079 (7th Cir. 1997); *Pricaspian Dev. Corp. v. Martucci,* 759 Fed. App. 131, 135 (3rd Cir. 2019) ("Federal Rule of Civil Procedure 9(b)'s particularity requirement applies to plaintiffs' claims under the Uniform Fraudulent Transfer Act.").  The Response <u>does not dispute</u> that the fraudulent conveyance claims are governed by Rule 9(b).  Requiring Defendants to dig through the exhibits to the Amended Complaint to identify potential transfers that might be eligible for avoidance is not required.  Nevertheless, even were Defendants in a position to identify an asset of value that was transferred to one of the Sharestates Entities, the Amended Complaint still fails to state a claim for fraudulent conveyance with respect to those transfers.

**1. Neither the Amended Complaint Nor the Response Identifies Any**

**Fraudulent Transfer Made by Any Debtor Other Than Pier Village or Penn Treaty**

Even assuming, *arguendo,* that passing references to mortgages in the exhibits to the Amended Complaint could satisfy the requirements of Rule 9(b), each of the "transfers" identified by the Debtors in their Response relate to only two of the Debtors – Pier Village and Penn Treaty. There is no allegation that any avoidable "transfers" were made by 123 E 123 LLC, 295 Kingsland, LLC, 193 Hancock, LLC (collectively, the "**NY Debtors**") or 2626 Frankford LLC ("**Frankford**"). It appears, therefore, that neither the NY Debtors nor Frankford can assert any claims under Counts II and III of the Amended Complaint.

   **2. The Amended Complaint Fails to Allege Any Fact That Would Support a Claim that the Mortgages Granted by Pier Village or Penn Treaty Were Fraudulent Transfers**

From the Response, it appears that the Debtors contend that the mortgages granted by Pier Village and Penn Treaty are eligible for avoidance as fraudulent transfers. Each of those mortgages were granted by a Debtor in exchange for contemporaneous loans, and the Amended Complaint does not suggest otherwise. *See, Forbearance Agreement,* a copy of which is attached to the Amended Complaint as Exhibit C, pp. 1-8 (referencing nineteen loans and the mortgages granted to secure them); *Modification,* a copy of which is attached to the Amended Complaint as Exhibit B, p. 1 (referencing loan agreements dated as of January 27, 2020 secured by open-end mortgages and security agreements).

While the Debtors allege that "fraudulent promises of construction financing" did not constitute reasonably equivalent value for the mortgages, the Debtors do not allege that the loans, themselves, extended as part of the same transaction in which Penn Treaty and Pier Village granted the mortgages, did not amount to reasonably equivalent value. *Amended Complaint,* ¶ 120;

*compare Amended Complaint,* ¶ 127 (alleging, albeit insufficiently, that the Debtors did not obtain reasonably equivalent value for the releases). Further, to the extent that the Debtors contend that these "fraudulent promises of construction financing" rendered the consideration for the mortgages inadequate, they fail to identify those fraudulent promises with the requisite particularity, or otherwise identify, with specificity, the transaction which they contend amounted to a fraudulent transfer. *Id.* Given the foregoing, the Amended Complaint fails to state a claim upon which the Pier Village or Penn Treaty mortgages may be avoided as fraudulent transfers. Instead of the Debtors enumerating the bases for their alleged claims, they have intentionally made purposefully vague and ambiguous allegations. Were the Debtors' required to allege their fraudulent transfer claims with particularity, as required by Rule 9(b), it would be apparent that those claims could not survive.

### 3. The Exhibits Attached to the Amended Complaint Defeat the Debtors' Fraudulent Transfer Claims With Respect to the Releases

The only other "transfers" identified by the Debtors in the Response are the releases set forth in the Forbearance Agreement and Modification. With respect to these "transfers," however, the Amended Complaint also fails to state any claim. Indeed, the documents attached to the Amended Complaint make clear that the underlying state law claims – even had they not been released – had little to no value. Pursuant to the Forbearance Agreement, Penn Treaty expressly acknowledged, as of the date the release was granted, that "there [were] no existing defenses, claims, counterclaims, or rights of recoupment or set-off against Sharestates, Intercap or any affiliated lenders, holding companies or subsidiaries in connection with the negotiation, preparation, execution, performance or any other matters relating to th[e Forbearance Agreement] or the Loan Documents." *Forbearance Agreement,* § 9. Pursuant to the Modification, Pier Village expressly acknowledged that no event of default had occurred or was continuing under the loan

documents as of the date the release was granted. *Modification,* § 2.2(b). Pier Village and Penn Treaty were represented by counsel in connection with the execution of each of these documents. The same counsel, in fact, that filed the adversary action and now opposes its dismissal.

These acknowledgements, as of August 2020, are consistent with the schedules filed by Pier Village and Penn Treaty which confirm, under penalty of perjury, that Pier Village and Penn Treaty had <u>no</u> claims against any of the Defendants as of the Petition Date. *Penn Treaty Schedule A* (Case No. 21-11471-elf, Dkt No. 44) (listing no affirmative claims or causes of action against any of the above-captioned Defendants); *Pier Village Schedule A* (Dkt No. 44) (same).

The Response states only that "[a]bsent the Releases, Pier and Penn Treaty possessed a clear right to bring the state law claims in the Complaint." *Response,* p. 5. At the same time, the Amended Complaint fails to identify any claim that might have been pursued by the Debtors even were the releases avoidable. *See, Amended Complaint, Count III* (seeking to avoid the Pier Village and Penn Treaty mortgages as fraudulent conveyances, but failing to allege that those mortgages were granted for less than reasonably equivalent value); *Count VI* (asserting a claim for breach of contract and breach of good faith and fair dealing despite the admission by both Penn Treaty and Pier Village in the Modification and Forbearance Agreement that no such claims existed as of August 2020). In this way, the Amended Complaint has failed to allege facts which, taken as true, would support a claim that the "releases" had any value, much less that Pier Village or Penn Treaty did not receive reasonably equivalent value for granting the same.

**C. The Debtors Claims for Fraud and Fraudulent Inducement Also Fail to Satisfy The Requirements of Rule 9(b).**

In addition to the fraudulent conveyance claims, the Debtors also assert claims under theories of fraud and fraudulent inducement. The allegations in support of those claims, however,

also lack the degree of specificity required by Rule 9(b).  The impermissibly lump together the six Debtors and the two separate and distinct Sharestates Entities. They fail to make anything other than cursory and passing references to the Individual Defendants, and fail to identify any alleged false or reckless representation made by those Individual Defendants with any specificity.  They fail to allege that any statement by any Defendant was false when made, or that any Defendant had knowledge of its falsity.  They fail to identify any specific time that the alleged statements were made, which is critical when viewed with the understanding that one or more of the Sharestates Entities had been making loans to various Debtors over the course of several years.  Furthermore, the Response fails to adequately address these deficiencies.

Instead, the Response states the elements for a fraud claim.  *Response,* p. 12 (noting that, under Pennsylvania and New York law, a claim for fraud must be premised on a (i) representation, (ii) which is material to the transaction at hand, (iii) made falsely, with knowledge of its falsity or recklessness, as to whether it is true or false, (iv) with the intent of misleading another into relying on it, (v) justifiable reliance on the misrepresentation, and (vi) a resulting injury that was proximately caused by the reliance).

The Debtors then identify several conclusory allegations set forth in the Amended Complaint that do not support any fraud claim.  In fact, most of the allegations identified as supporting the fraud and fraudulent inducement claims in the Response aren't even "representations."  *See, Response,* p. 13 ("The Complaint further pleads that Sharestates did not have the ability to fund the Loans it was making (Compl. ¶37), that Sharestates intentionally slowed down disbursements is was unable to make (Compl. ¶50-51), that Defendants forced the Debtors to use a specific title company owned by the Davoodis and Shayanfekr (Compl. ¶46-47) and that this company assessed title charges above the legally-permitted rate (Compl. ¶48)….).

To the extent the Response did identify "representations" made by any Defendant, the Debtors fail to identify how those representations were material. *Response,* p. 13 ("The Complaint pleads that the Defendants sometimes represented that investors – who should have no power to prevent Loan disbursements – were vetoing further disbursements unless the Debtors offered more favorable terms than in the Loan contracts). In the absence of the specificity required by Rule 9(b), these claims of the Debtor must also likewise be dismissed.

**D. Contrary to the Debtors' Assertions, the Amended Complaint Fails to Establish that any State Law Claims Can Proceed Notwithstanding the Releases.**

As detailed above, the Modification and Forbearance Agreement attached to the Amended Complaint contain admissions by Penn Treaty and Pier Village that those Debtors had no viable claims under state law breach of contract theories as of August 2020. The Amended Complaint fails, therefore, to allege facts which, taken as true, would support a claim that the Debtors did not receive adequate consideration for those releases. Absent avoidance of the Releases, all state law claims asserted by Penn Treaty and Pier Village in the Amended Complaint must also fail. Further, because the Amended Complaint fails to identify facts in support of a state law claim by any NY Debtor or Frankford, the state law claims must be dismissed with respect to all Debtors.

**E. The New Counts Set Forth in the Amended Complaint Must be Dismissed.**

In the Response, the Debtors assert that, while it may be procedurally unorthodox, the Debtors should be permitted to pursue the objection to proofs of claim, 506(c) surcharge, and bifurcation claims in this adversary action. They do not address, however, the other points raised by Defendants in the Motion – namely, that this Court should not condone the pursuit of those claims by Obermayer Rebmann Maxwell & Hippel LLP (the "**Obermayer Firm**").

Each and every document filed in this adversary action has been filed by the Obermayer

Firm – despite the fact that the Obermayer Firm: (i) has <u>not</u> <u>been</u> <u>retained</u> as counsel for any Debtor in these proceedings, and is not authorized to act on any Debtors' behalf; (ii) represented several of these Debtors in the very transactions that are now the subject of the Amended Complaint; (iii) issued opinion letters attesting to the legitimacy and enforceability of those underlying transactions; and (iv) is the subject of investigation by the Office of the United States Trustee in this case.   As set forth more fully in the Objection of Sharestates Investments LLC to the Application of the Debtors to Employ Obermayer Rebmann Maxwll & Hippel LLP as Special Counsel Nunc Pro Tunc to May 27, 2021 [Case No. 21-11466-elf, Dkt No. 228] (the "**Obermayer Retention Application**"), which is incorporated herein by reference, permitting the Obermayer Firm, under these circumstances, to pursue the relief that constitutes a central aspect of these bankruptcy cases would be both unorthodox and inappropriate.  These counts must be dismissed unless and until a law firm that has been retained by the Debtors and approved by this Court to represent the Debtors has filed an appearance in this adversary action and opts to pursue these claims on the Debtors' behalf.  In the absence of any papers being filed by an attorney authorized to represent these Debtors, the adversary action should be dismissed in its entirety.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Honorable Court grant the Motion and any such other and further relief as may be appropriate under the circumstances.

Respectfully Submitted,

STARK & STARK, P.C.

Date:			By:	_____
				SCOTT I. UNGER, ESQ.
				Attorney I.D. No.
				777 Township Line Road, Ste. 120
				Yardley, PA 19067-5559
				tel. 267.907.9600/fax 267.907.9659
				*Attorneys for Defendant,*